IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PROMMIS HOLDINGS, LLC, et al.,[1] | ) Case No. 13-10551 (BLS) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
AUTHORIZING DEBTORS TO (A) PAY CERTAIN PREPETITION WAGES
AND REIMBURSABLE EMPLOYEE EXPENSES, (B) PAY AND HONOR
EMPLOYEE MEDICAL AND OTHER BENEFITS, AND (C) CONTINUE
EMPLOYEE BENEFITS PROGRAMS**

Prommis Holdings, LLC and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), by and through their proposed undersigned counsel, file this motion (the "Motion") for entry of an interim order, substantially in the form attached hereto as Exhibit A (the "Interim Order"), and a final order, substantially in the form attached hereto as Exhibit B (the "Final Order"), (i) authorizing the Debtors to (a) pay prepetition wages, salaries, commissions, and other compensation, taxes, withholdings, and related costs, and reimbursable employee expenses, (b) pay and honor obligations relating to employee medical, insurance, and other benefits programs, and (c) continue their employee medical,

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Prommis Holdings, LLC (6940); Prommis Fin Co. (2965); Prommis Solutions, LLC (9978); E-Default Services, LLC (0016); Statewide Tax and Title Services LLC (0049); Statewide Publishing Services LLC (0079); Nationwide Trustee Services, Inc. (2436); Statewide Tax and Title Services of Alabama LLC (7733); Nationwide Trustee Services of Virginia, Inc. (6687); Interface Inc. (9903); and Prommis Homeownership Solutions, Inc. (0569). The location of the Debtors' headquarters and the Debtors' service address is 400 Northridge Road, Atlanta, Georgia, 30350.

insurance, and other benefits programs on a postpetition basis, (ii) authorizing financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests related to the foregoing, and (iii) scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order.

## Jurisdiction

1.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b) (2).

2.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are sections 105(a), 362, 363, 507(a)(4)–(5), 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

## Introduction[2]

4.     On the date hereof (the "Petition Date"), each of the Debtors filed a petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are

---

[2]   A description of the Debtors' businesses, the reasons for commencing these chapter 11 cases and the relief sought from this Court to allow for a smooth transition into chapter 11 are set forth in the Declaration of Charlie T. Piper in Support of Debtors' First Day Pleadings (the "First Day Declaration").

operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  Concurrently with the filing of the Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

### Relief Requested

5.    The Debtors' employees perform a variety of critical functions, including, among others, sales, customer service, processing, and a variety of administrative, legal, accounting, finance, and management related tasks.  The skills and experience of the Debtors' employees, as well as their relationships with customers and vendors and knowledge of the Debtors' infrastructure are essential to the Debtors' ongoing operations and ability to effectuate a sale that maximizes value for all stakeholders.  The vast majority of the Debtors' employees rely exclusively on their compensation to pay their daily living expenses.  To minimize the personal hardship the Debtors' employees would suffer if prepetition employment-related obligations were not paid when due or as expected, and to maintain morale and enhance the Debtors' ability to retain employees during this critical restructuring process, the Debtors request the authority to pay and honor certain prepetition claims, honor obligations, and to continue programs in the ordinary course of business and consistent with past practice, relating to, among other things: (a) Unpaid Compensation, Deductions and Payroll Taxes, Severance Payments,

Temporary Employee Compensation, Direct Source Personnel Compensation, and Independent Contractor Compensation; (b) Reimbursable Expenses, and Relocation Expenses; and (c) Employee Benefit Programs (each as defined herein, and collectively the "Employee Obligations").

6.      Additionally, the Debtors request this court schedule a Final Hearing to consider entry of a Final Order granting this Motion, which, in addition to the relief requested above, also would authorize the Debtors to pay and honor prepetition amounts up to $11,725 and postpetition amounts in the ordinary course and consistent with past practice pursuant to the Severance Program (as defined herein).

7.      To the extent payments made hereunder are dishonored by the Debtors' financial institutions, the Debtors also request authority for such financial institutions to receive, process, and honor and pay any and all replacement checks or wire transfer requests in respect of the relief requested herein.

8.      Finally, to the extent any of the Debtors' Employees are asserting claims under the Workers' Compensation Program (as defined herein), the Debtors request that the Court modify the automatic stay under Bankruptcy Code section 362(d) to permit these Employees to proceed with their claims under the Workers' Compensation Program.  This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

**I.      Debtors' Workforce and Wage and Benefit Obligations.**

9.      As of the Petition Date, the Debtors employ approximately 718 employees (the "Employees").  The Debtors pay approximately 570 or 79%, of the

Employees on an hourly basis ("Hourly Employees"), while the remaining 148, or 21%, are paid on a salaried basis ("Salaried Employees"). The Debtors' workforce is not unionized and none of the Debtors is party to any collective bargaining agreement.

10.     In addition to their Employees, the Debtors supplement their workforce by utilizing certain independent contractors (the "Independent Contractors") who vital to the Debtors' businesses. In most cases, the Debtors engage the Independent Contractors through a third-party contracting agency specializing in technological services. On occasion, the Debtors also supplement their workforce with temporary employees (the "Temporary Employees") who are provided to the Debtors through temporary staffing agencies (the "Temporary Staffing Agencies"). As of the Petition Date, the Debtors have approximately thirty-one (31) Temporary Employees.

**II.     Wages, Salaries, and Compensation.**

      **A.     Unpaid Compensation.**

11.     In the ordinary course of business, the Debtors pay the Employees on a bi-weekly basis. The debtors maintain a staggered payroll payment process under which (a) Salaried Employees receive their compensation on a current basis and (b) Hourly Employees receive their compensation one (1) week in arrears.

12.     In addition to regular wages and salaries, the Debtors offered one (1) sales employee the ability to participate in a sales incentive program (the "Commission Program"). The incentives offered under the Commission Program are

an important portion of these Employees' compensation package and are designed to encourage performance. The Debtors estimate they owe one (1) employee $650 on account of prepetition amounts due and owing under the Commission Program.

13.    The Debtors' payroll obligations generally include wages, salaries, overtime compensation, and payments related to the Commission Program, as applicable. On average, the Debtors' gross payroll is approximately $1,329,500 per bi-weekly pay period. The majority of the Debtors' payroll is made by direct deposit through electronic transfer of funds to the Employee's accounts with the balance of Employees receiving pay cards or checks.[3]

14.    As of the Petition Date, the Debtors estimate they owe Employees approximately $658,040 on account of accrued wages, salaries, and other cash compensation (excluding reimbursable expenses, severance, incentives, and vacation pay) that was earned prior to the Petition Date (the "Unpaid Compensation"). The Debtors do not believe that they owe any Employee Unpaid Compensation in excess of the $11,725 cap imposed by Bankruptcy Code section 507(a)(4).

---

[3]    The Debtors use Automatic Data Processing ("ADP") to provide payroll processing, accounting, tax computation, check preparation, payroll transfer administration, and various administrative services, and to fund their payroll in advance. Specifically, each payroll period, the Debtors fund certain disbursement accounts at ADP with the amounts necessary to satisfy the Debtors' payroll obligations. ADP then processes direct deposit transfers or administers pay cards or payroll checks to Employees. The services of ADP are crucial to the smooth functioning of the Debtors' payroll system because they ensure that (a) Employees are paid on time, (b) source deductions are appropriately determined, (c) payroll reporting is accurate, and (d) appropriate amounts are remitted to taxing authorities and other payees. The Debtors pay ADP approximately $25,000 per bi-weekly period for its payroll services. As of the Petition Date, the Debtors estimate they owe approximately $25,000 to ADP on account of payroll services. By this Motion, the Debtors seek the authority to pay all outstanding prepetition amounts to ADP.

**B.     Gross Pay Deductions, Governmental Withholdings, and Payroll Taxes.**

15.     For each applicable pay period, the Debtors routinely deduct, directly or through ADP, certain amounts from Employee paychecks, including, without limitation, (a) garnishments and (b) other pre- and after-tax deductions payable pursuant to certain of the employee benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions, legally ordered deductions, and miscellaneous deductions (collectively, the "Deductions"). On average, the Debtors deduct a total of approximately $190,000 from Employees' paychecks per bi-weekly pay period, which the Debtors remit (directly or through ADP) to the appropriate third-party recipients. The Debtors, however, may not have forwarded certain of the Deductions to the appropriate third-party recipients prior to the Petition Date. Accordingly, the Debtors seek authority to forward prepetition Deductions (and to continue to forward Deductions on a postpetition basis whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

16.     In addition to the Deductions, federal, state, and local laws require the Debtors to withhold amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withheld Amounts"). The Debtors must then match from their own funds for Social Security and Medicare taxes and pay, based

on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (together with the Withheld Amounts, the "Payroll Taxes"). In the aggregate, the Payroll Taxes, including both the Employee and employer portions, total approximately $298,600 per bi-weekly pay period. As of the Petition Date, the Debtors estimate they owe $165,200 on account of prepetition Payroll Taxes.

17.    To the extent any of the Deductions or Payroll Taxes may not have been forwarded to the appropriate third-party recipients, the Debtors seek authority to forward prepetition Deductions and Payroll Taxes (and to continue to forward Deductions and Payroll Taxes on a postpetition basis whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.[4]

## III.    Supplemental Workforce Obligations.

### A.    Independent Contractor Compensation.

18.    The Debtors engage approximately twelve (12) Independent Contractors to facilitate a number of operational and administrative functions. The Independent Contractors support the Debtors in the following activities: (a) information technology infrastructure and development; (b) title and tax examination; (c) operational support; and (d) administrative support where full or part-time employment/expertise is unavailable. None of the Independent Contractors

---

[4]    ADP is also responsible for administering payment of all Payroll Taxes to applicable third parties on the Debtors' behalf.

falls within the definition of a "professional" under the Bankruptcy Code.  For about half of the Independent Contractors, the Debtors remit compensation through certain third-party agencies specializing in technological services through their accounts payable process with the remaining Independent Contractors being compensated directly from the Debtors (the "Independent Contractor Compensation").    On average, the Debtors pay a total of approximately $108,000 per month to these agencies for the services of the Independent Contractors.  As of the Petition Date, the Debtors believe that they owe approximately $56,000 to nine (9) technology firms for the Independent Contractors' prepetition services, and do not owe any Independent Contractor more than the $11,725 cap imposed by Bankruptcy Code section 507(a)(4).    Because continued performance and contributions by the Independent Contractors are so important to the Debtors' operations and to maintain the Debtors' options during these cases, and because the Debtors believe each agency would remove the Independent Contractors if the Debtors do not satisfy their obligations, the Debtors request authority to pay for all unpaid Independent Contractor Compensation, whether paid through an agency or directly to the Independent Contractor, in the ordinary course of business and consistent with past practice.

      **B.**     **Temporary Employee Compensation.**

      19.    On occasion, the Debtors employ the services of Temporary Employees to handle overflow data processing in connection with the Debtor's foreclosure and bankruptcy services.  The Temporary Employees are placed with the

Debtors through Temporary Staffing Agencies.    The Debtors typically remit compensation for the Temporary Employees to the Temporary Staffing Agencies on a weekly or bi-weekly basis through the Debtors' accounts payable system (the "Temporary Employee Compensation").    The Debtors' average monthly spend on Temporary Employee Compensation is $95,000.    As of the Petition Date, the Debtors estimate that they owe approximately $63,000 in Temporary Employee Compensation to the Temporary Staffing Agencies.    The Debtors believe it is necessary to pay the obligations of the Temporary Staffing Agencies so that these agencies will continue to provide the Debtors with adequate staffing and, therefore, are requesting authority to pay the Temporary Employee Compensation in the ordinary course of business and consistent with past practices.    The Debtors do not seek authority to pay any Temporary Staffing Agency amounts for individual employees in excess of the Bankruptcy Code section 507(a)(4) cap of $11,725.

**C.    "Direct Source" Personnel Compensation.**

20.    The Debtors participate in a "direct source" personnel program with certain of their law firm customers, whereby such law firms periodically provide approximately ten (10) of their employees to supplement the Debtors' work force in the administration of certain case files.    The Debtors typically remit compensation for these employees to such law firms on a weekly or bi-weekly basis through the Debtors' accounts payable system (the "Direct Source Personnel Compensation"). The Debtors' average monthly spend on Direct Source Personnel Compensation is $105,000, and such amounts are satisfied under routine setoffs administered by such

customers.[5]    As of the Petition Date, the Debtors estimate that they owe approximately $482,000 in Direct Source Personnel Compensation to the client law firms.

## IV.    Reimbursable Expenses.

21.    In the ordinary course of business, the Debtors reimburse Employees and directors for certain reasonable and customary expenses incurred in the scope of their employment and on behalf of the Debtors (collectively, the "Reimbursable Expenses"), including, without limitation, expenses related to (a) business travel; (b) professional development; (c) business entertainment; (d) communications (*i.e.*, use of cellular telephone, PDA, and internet access for business purposes); and (e) other expenses allowed pursuant to the Debtors' travel and entertainment policy. These Reimbursable Expenses are either paid personally by the Employee or charged to an American Express Corporate Card (as defined herein).

### A.    Travel Expenses and Business Development Expenses.

22.    The Debtors routinely reimburse expenses of Employees for air travel, meals, parking, automobile mileage, communications (i.e., use of cellular telephone and internet access for business purposes), and other business-related expenses incurred in the scope of their employment on behalf of the Debtors. The Debtors also reimburse Employees for certain expenses related to nominal marketing

---

[5]    The ordinary course setoffs administered by the Debtors and certain of their law firm customers are described in further detail in the Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Maintain and Administer Customer Programs and Honor Related Prepetition Obligations, filed contemporaneously herewith.

and business development initiatives.    These expenses are incurred by various classes of the Debtors' Employees in carrying out their employment responsibilities. Without continued reimbursement of these expenses, the Employees would be saddled with additional cost, causing personal financial hardship.

23.    The Employees incur, on average, approximately $75,000 per month in Reimbursable Expenses.    Although the Debtors request that reimbursement requests be submitted promptly, not all of the Employees do so.  Based on historical practice, the Debtors estimate they could owe Employees approximately $38,000 on account of Reimbursable Expenses as of the Petition Date.

24.    To streamline payment of Reimbursable Expenses for certain Employees, the Debtors have policies whereby American Express issues company credit cards to five (5) Employees for travel, commutation, and certain business-related expenses (the "American Express Corporate Cards").  These expenses are ordinary course expenses that such employees incur in performing their job functions.  Although the Debtors pay invoices for the American Express Corporate Cards, the accounts are held in the names of individual employees and, therefore, to the extent the Debtors fail to remit payment to American Express for valid and legitimate charges, the Employees may be personally liable for the same.  Therefore, it is essential to the continued operation of the Debtors' businesses that the Debtors be permitted to continue reimbursing employees for such expenses.    American Express debits the Debtors' account for the amount due, which is typically

approximately $50,000 per month (the "American Express Corporate Card Expenses").

### B.    Relocation Expenses.

25.    In the ordinary course of business, the Debtors also pay or reimburse certain Employees for relocation expenses incurred at the Debtors' request or for the Debtors' benefit, including, but not limited to, costs for transportation and storage of household goods and travel expenses from the old home to the new home (collectively, the "Relocation Expenses").  As of the Petition Date, the Debtors owe approximately $15,000 to certain Employees on account of Relocation Expenses.

26.    All of the above referenced expenses were incurred as business expenses on the Debtors' behalf and with the understanding that the Employees would be reimbursed.  Accordingly, by this Motion, the Debtors seek to continue making such payments in the ordinary course (and regardless of whether the costs are allocable to the prepetition or postpetition period) to avoid harming Employees who incurred Reimbursable Expenses or Relocation Expenses and who may have already paid or may become personally liable for them.

## V.    Severance Obligations.

### A.    Severance Program.

27.    In their normal course of operations, the Debtors maintain a policy of offering severance payments to all Employees who have been involuntarily terminated in connection with a business decision or other restructuring initiative

(the "Severance Program").[6]  Under the Severance Program, Employees accrue one (1) week of severance pay for every year of service.  Typically, payments to the terminated Employee pursuant to the Severance Program begin after execution of a release and meeting other conditions and are made through the Debtors bi-weekly payroll.

28.    The Debtors believe it is critical to maintaining Employee morale and loyalty that they be authorized to continue the Severance Program for non-insider Employees in the ordinary course of business after the Petition Date.  The Debtors cannot afford for such Employees to leave their jobs while the Debtors continue to need their services during this critical process and there is no guarantee that the Debtors could attract new employees of comparable quality and character.  Moreover, even if otherwise available, a new employee would lack the unique knowledge and historical perspective of the Debtors possessed by these Employees.

29.    Accordingly, pursuant to the Final Order, the Debtors seek authority to make postpetition payments to non-insider Employees terminated after the Petition Date, if any, pursuant to the Severance Program in accordance with their past practices.  The Debtors are not seeking interim relief on account of the Severance Program.  Furthermore, the Debtors' insider Employees are explicitly excluded from the relief requested herein.  To the extent the Debtors propose to

---

[6]    In addition to the Severance Program, certain employment contracts entered into by the Debtors contain independent severance provisions.  By this Motion, the Debtors are not seeking authority to honor and pay any such postpetition severance obligations at this time.  The Debtors reserve the right to assume these obligations at a later date upon notice and an opportunity to object.

provide severance payments to any insiders during the chapter 11 cases, the Debtors will seek approval from this Court prior to making any such payments.

### B.    Unpaid Severance Obligations.

30.    As of the Petition Date, the Debtors do not believe they owe any prepetition amounts to non-insider employees who were terminated prior to the Petition Date on account of the Severance Program or other severance arrangements (the "Unpaid Severance").    Out of an abundance of caution, however, by this Motion, the Debtors are seeking authority to pay, pursuant to the Final Order, Unpaid Severance obligations to any non-insider Employee up to the $11,725 cap imposed by Bankruptcy Code section 507(a)(4).    For the avoidance of doubt, the Debtors are not seeking authority to pay any unpaid severance to any insiders, and will seek approval from this Court prior to making any such payments.

## VI.    Employee Benefit Programs.

31.    In the ordinary course of business, the Debtors maintain various employment benefit plans and policies, including, without limitation, health care, dental and prescription drug plans, flexible spending accounts, workers' compensation benefits, a 401(k) retirement plan, basic life insurance coverage, accidental death and dismemberment insurance, voluntary life insurance coverage, short- and long-term disability insurance, tuition reimbursement, paid time off, business travel accident insurance, and an employee assistance plan (collectively, the "Employee Benefit Programs").  By this Motion, the Debtors seek to pay prepetition claims, honor obligations, and to continue programs, in the ordinary course of

business and consistent with past practice, relating to the Employee Benefit
Programs.

### A.    Medical, Dental, Vision, and Prescription Drug Plans.

32.    All Employees who work a minimum of thirty (30) hours per week
and have been employed by the Debtors for at least ninety (90) days are eligible to
receive the following medical, prescription drug, dental, and vision insurance
coverage (collectively, the "Health Care Plan"). The following is a brief summary of
the Health Care Plan:

a.    Medical/RX Plan. - The Debtors offer eligible Employees and
their dependents a choice of medical plans, which all include
prescription drug coverage (the "Medical Plan"). The
Employees' Medical Plan coverage varies based on office
location. The Debtors provide Employees working in San
Diego County the Medical Plan through Sharp HealthCare.
These Employees can choose between a Low Option Plan and
a High Option Plan. For all other Employees not working in
San Diego County, the Debtors provide the Medical Plan
through United HealthCare. These Employees can choose
between a High Option POS, Low Option POS, or a Point of
Service Plan. The Debtors pay approximately $189,790 per
month on account of these Medical Plans, net of Employee
contributions. As of the Petition Date, the Debtors owe
approximately $189,790 in the aggregate to Sharp and United
HealthCare on account of the Medical Plan.

b.    Dental Plan. The Debtors' dental plan (the "Dental Plan") is
administered by United HealthCare. The Dental Plan provides
each Employee and their dependents with an annual maximum
benefit of $1,000 and covers 100% of preventive and
diagnostic care, 80% of basic treatment after the deductible,
and 50% of major treatment after the deductible. The Dental
Plan also covers 50% of child orthodontic services up to a
lifetime maximum amount of $2,000 per employee. The
Debtors pay approximately $18,000 per month on account of
the Dental Plan, net of Employee contributions. As of the

Petition Date, the Debtors owe approximately $18,000 in the aggregate to United HealthCare on account of the Dental Plan.

c.   Vision Plan.  The Debtors' vision plan (the "Vision Plan") is administered by United HealthCare.  The Debtors' average monthly cost on account of the Vision Plan is $1,365, net of Employee contributions.  As of the Petition Date, the Debtors estimate that they owe $1,365 of prepetition obligations to United HealthCare under the Vision Plan.

33.    As of the Petition Date, the Debtors provide medical coverage, including prescription drug coverage, to approximately 560 Employees and their dependents, dental coverage to approximately 567 Employees and their dependents, and vision coverage to approximately 479 Employees and their dependents.

34.    Certain prepetition benefits relating to the Health Care Plan are owed but remain unpaid as of the Petition Date because these obligations have accrued either in whole or in part prior to the Petition Date, but will not become payable in the ordinary course of business until a later date.  The Debtors seek authority to pay all prepetition amounts that, as of the Petition Date, had accrued but remained unpaid.

**B.    Flexible Spending Accounts.**

35.    The Debtors also offer Employees the ability to contribute a portion of their pre-tax compensation to two (2) separate flexible spending accounts to pay for eligible out-of-pocket health care and dependent care expenses (collectively, the "Flexible Spending Accounts").  Continuon Services ("Continuon") administers the Flexible Spending Accounts and Employees receive a "benefit card" that can be used to pay eligible expenses at participating vendors.  For health care spending, which

covers most medical, dental, and vision care expenses, there is a $2,500 annual maximum contribution limit. For dependent care spending, which covers daycare, after-school programs, or elder care programs, there is a $5,000 maximum contribution limit. Currently, approximately 133 Employees participate. The Debtors pay approximately $500 per month to Continuon to administer the Flexible Spending Accounts and the Debtors withhold approximately $161,200 annually on account of Employee contributions to the Flexible Spending Accounts. As of the Petition Date, the Debtors owe prepetition amounts of $500 on account of administrative costs relating to the Flexible Spending Accounts and have $0 in collections on account of Employee contributions to the Flexible Spending Accounts.

### C.    Workers' Compensation.

36.    The Debtors provide workers' compensation insurance for their Employees in each state in which they operate (the "Workers' Compensation Program"), as required by applicable law. The Workers' Compensation Program is administered by Zurich Insurance. The Debtors' annual insurance cost on account of the Workers' Compensation Program is approximately $274,479 and the average monthly claims and administrative costs associated with the Workers' Compensation Program is approximately $3,850.

37.    Furthermore, in accordance with applicable state law, the Debtors make certain payments to provide workers' compensation coverage to their Employees pursuant to certain state administered workers' compensation programs (the "State Administered Workers' Compensation Programs"). The Debtors'

semi-annual payments in connection with these programs are approximately $0.  As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the State Administered Workers' Compensation Programs.

38.     While the Debtors believe that continuing their Workers' Compensation Program is appropriate in the ordinary course of business, out of an abundance of caution, they are seeking authority to maintain the Workers' Compensation Program in accordance with applicable law and to pay all premium installments and any retroactive premium adjustments to the Workers' Compensation Insurers or appropriate state agency under the State Administered Workers' Compensation Programs.   The Debtors also request the authority to assist the Workers' Compensation Insurers with the administration, processing, settlement, and litigation of any workers' compensation claims from their Employees as appropriate under the terms of their workers' compensation insurance and applicable law.

**D.      Paid Time Off.**

**i.       Paid Time Off.**

39.     The Debtors provide a set amount of paid time off to Employees (the "Paid Time Off").  When an Employee elects to take Paid Time Off, whether for vacation or health-related reasons, that Employee is paid his or her regular hourly or salaried rate based on the following:

| Number of Months Employed by Debtor | Hours of Paid Time Off Per Bi-Weekly Period | Maximum Accrual (California Only) |
|---|---|---|
| 0-59 | 4.92 | 128 |
| 60-119 | 6.46 | 168 |
| 120 or More | 7.69 | 200 |

40.    Employees working in the State of California ("California Employees") who were hired before December 31, 2007 are paid their regular hourly or salaried rate for Paid Time Off based on the following:

| Number of Months Employed by Debtor | Hours of Paid Time Off Per Bi-Weekly Period | Maximum Accrual |
|---|---|---|
| 0-59 | 5.23 | 136 |
| 60-119 | 6.76 | 176 |
| 120 or More | 8.30 | 216 |

41.    Vacation benefits are prorated based on full calendar months worked and must be taken within the Debtors' fiscal year.  Employees may elect to carry over up to a maximum of forty (40) hours of Paid Time Off each calendar year.  All balances of forty (40) hours or under automatically roll over to the next fiscal year. The Debtors estimate that approximately $242,282 of earned but unused Paid Time Off has accrued as of the Petition Date.  This amount, however, is not a current cash payment obligation, as Employees only are entitled to be paid for accrued and unused Vacation Time as required by state law in the event the Employees leave the Debtors' employ.  By this Motion, the Debtors are requesting authority to pay and honor accrued and unused Vacation Time in the ordinary course and consistent with

past practice, <u>provided</u>, <u>however</u>, that the Debtors will not pay any Employee in excess of $11,725 on account of such accrued but unused Vacation Time.[7]

### ii.    Bereavement Pay.

42.    The Debtors also offer bereavement pay (the "<u>Bereavement Pay</u>"), whereby Employees are granted up to three (3) days of regular pay for time off for death of an immediate family member or a spouse's immediate family member. The Debtors estimate that the amount of earned but unused Bereavement Pay that has accrued as of the Petition Date is <u>de</u> <u>minimis</u>.

### iii.    Leaves of Absence.

43.    The Debtors allow Employees to take certain other leaves of absence for personal reasons, many of which are required by law (collectively, the "<u>Leaves of Absence</u>"). Leaves of Absence include family medical leaves, maternity leaves, military leaves, jury duty, voting leave, personal leaves, sick leaves, and disability leaves. Leaves of Absence benefits differ depending on whether an Employee works in the State of California.

      a.    <u>Non-California Employees</u>. Employees working outside the State of California ("<u>Non-California Employees</u>") who take a leave of absence are neither permitted to carry over unused days from one year to the next nor cash out their unused personal days upon termination or resignation.

      b.    <u>California Employees</u>. California Employees are entitled to the following supplemental Leaves of Absence benefits:

---

[7]    The Debtors believe that one (1) Employee is owed in excess of the $11,725 cap provided under Bankruptcy Code section 507(a)(4).

(i)     <u>Pregnancy Disability Leave</u>.  Employees may take to up to four months leave if such Employee is disabled due to pregnancy, childbirth, or a related medical condition ("<u>Pregnancy Disability Leave</u>").[8]  Although Employees on Pregnancy Disability Leave are without pay, such Employees may utilize accrued paid time off during the leave.

(ii)    <u>Temporary Disability Leave</u>.  California Employees are entitled to temporary disability leave if such Employee is not eligible for leave under the federal or state family and medical leave laws after three (3) years of employment ("<u>Temporary Disability Leave</u>").  Employees on Temporary Disability may be granted up to one (1) month of unpaid leave if such Employees are unable to perform duties as a result of a disability not related to the employment.

(iii)   <u>Family Disability Insurance Benefits</u>.  California has two (2) programs administered by the California Employment Development Department designed to provide benefits to employees when they are unable to work either because of a personal illness, injury that is not work-related, the need to care for a qualified family member who is ill or injured, or bond with a new child.

(a)    <u>State Disability Insurance</u>.  State Disability Insurance ("<u>SDI</u>") benefits are available to eligible employees who are personally ill or injured.  Unlike the workers' compensation program that covers work-related injuries, SDI benefits are available from the state if the illness or injury is not work related.

---

[8]    Under the Family and Medical Leave Act (the "<u>FMLA</u>"), Non-California Employees may take a leave for pregnancy-related causes only if such Employee has worked for the Debtors for at least twelve (12) months.  The FMLA allows eligible Employees to take a leave and receive benefits for a period of up to twelve (12) weeks. Eligible Employees are also required to use their Paid Time Off during the unpaid FNMLA leave.

     (b)     <u>Family Temporary Disability Insurance</u>. Family Temporary Disability Insurance ("<u>FTDI</u>") benefits are available to eligible California Employees who are unable to work as a result of a need to care for qualified family members or bond with a new child. Employees must use their accrued Paid Time Off (up to a maximum of two (2) weeks of benefits) before such Employee will be eligible to receive FTDI benefits. If Employees have less than two (2) weeks of accrued Paid Time Off benefits available, they must use all their accrued benefits before they will be eligible for FTDI benefits. Employees who have more than two (2) weeks of accrued Paid Time Off benefits may voluntarily elect to use any additional benefits in order to receive their full pay after two (2) weeks of accrued benefits have been used.

     (iv)     In addition to the list provided in paragraph 42, California Employees are also entitled to Leaves of Absence for civil air patrol, bone marrow and organ donations, domestic violence and sexual assault, school activities, and voluntary civil service.

44. The Debtors estimate that the amount of Pay related to Leaves of Absence that has accrued as of the Petition Date is <u>de minimis</u>.

**E.    401(k) Retirement Plan.**

45. The Debtors maintain a qualified defined contribution savings plan for the benefit of Employees who have been employed for at least ninety (90) days and meet the requirements of section 401(a) and 401(k) of the Internal Revenue Code (the "<u>401(k) Plan</u>"). Approximately 535 Employees participate in the 401(k)

Plan. The Debtors estimate that they withhold on average approximately $46,850 each bi-weekly period from such Employees' paychecks for 401(k) contributions. The Debtors match 50% of an Employee's first 3% contribution under the 401(k) Plan. The Debtors estimate that they spend approximately $16,710 each bi-weekly period in matching contributions. The Retirement Advantage administers the 401(k) Plan and Goodwin, Wright (Northwestern Mutual) serves as the broker. As of the Petition Date, the Debtors believe they owe approximately $11,000 on account of matching contributions under the 401(k) plan.

**F.      Life, Accident, and Disability Insurance.**

46.      The Debtors provide all Employees with life, disability, and accident insurance coverage through UNUM, as described below (collectively, the "Life, Disability, and Accident Insurance").

**i.      Life, Business Travel, and Accidental Death and Dismemberment Insurance.**

47.      The Debtors provide Employees with Basic Life Insurance (the "Basic Life Insurance Coverage"). This coverage provides payment of up to $50,000 for Salaried Employees and $20,000 for Hourly Employees. On average, this coverage costs the Debtors $1,795 per month.[9] As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of Basic Life Insurance coverage. Out of an abundance of caution, the Debtors request authority to pay any prepetition amounts that may be outstanding.

---

[9]    The Debtors' monthly Basic Life Insurance payments also include the AD&D Insurance Coverage (as defined below).

48.     In addition to the coverage described above, all Employees are also eligible to purchase voluntary life insurance through UNUM.  Group universal life insurance coverage is available for Employees and eligible dependants, but is paid exclusively by the electing Employee.  Premiums for this coverage are paid through regular payroll deductions from the participating Employees' paychecks.   The Debtors estimate that approximately 298 Employees have elected to purchase Voluntary Life Insurance Coverage.

49.     The Debtors also provide all Employees with accidental death and dismemberment insurance (the "AD&D Insurance Coverage").  This coverage provides payment of up to $50,000 for Salaried Employees and $20,000 for Hourly Employees.  The premiums associated with this insurance are fully paid by the Debtors and Employees are eligible for coverage on their first day of service.

50.     Lastly, the Debtors provide business travel accident insurance (the, "Business Travel Accident Insurance") through Chubb to all Employees who travel to conduct business on the Debtors' behalf.  The premiums associated with this insurance are fully paid by the Debtors and Employees are eligible for business travel insurance on their first day of service.   On average, this coverage costs the Debtors $2,500 per year. As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of business travel insurance.  Out of an abundance of caution, however, the Debtors request authority to pay any prepetition amounts that may be outstanding.

25

ii.        **Disability Benefits.**

51.    The Debtors offer Employees voluntary short-term disability benefits ("Voluntary Short-Term Disability Coverage"). Premiums for the Voluntary Short-Term Disability Coverage are paid entirely by the electing Employee. Voluntary Short-Term Disability Coverage pays 60% of the Employee's monthly base salary, upon sickness or other disability that prevents the Employee from performing the duties of his or her occupation. The benefit begins after ninety (90) days of disability and the monthly maximum benefit available to the Employee is $10,000. As of the Petition Date, the Voluntary Short-Term Disability Coverage covers approximately 147 Employees.

52.    Further, the Debtors offer employees voluntary long-term disability benefits (the "Voluntary Long-Term Disability Coverage"). Employees have the option to choose from 40% or 60% of their weekly earnings up to a maximum of $2,000 per week. The Long-Term Disability Coverage covers approximately 190 Employees.

G.        **Other Employee Benefit Programs.**

i.        **Tuition Expenses.**

53.    In the ordinary course of business, the Debtors reimburse certain Employees who have completed three (3) months of service for tuition expenses (the "Tuition Expenses.)" The tuition reimbursement allows eligible Employees to prepare themselves to make greater contributions to the future of the Debtors' businesses. Eligible Employees receive full reimbursement up to a maximum

amount of $1,500 per calendar year as long as the courses are related to their positions with the debtors.  In 2012, thirty-two (32) Employees participated in program and, as of the Petition Date, the Debtors estimate that they owe approximately $3,000 in Tuition Expenses under the program, none of which is due and owing as of the Petition Date.

ii.        **Employee Assistance Program.**

54.     The Debtors offer an employee assistance program (the "Employee Assistance Program") at no cost to Employees.  The Employee Assistance Program offers free and confidential access to licensed psychiatrists and social workers to Employees and their immediate family members.  As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the Employee Assistance Program.[10]  Out of an abundance of caution, the Debtors request authority to pay any prepetition amounts that may be outstanding.

iii.       **Automobile Expenses.**

55.     In the ordinary course of business, the Debtors provide automobile benefits to one (1) executive (the "Company Car Benefit").  The Debtors, at their sole discretion, will evaluate and determine if any vehicle is warranted for any current or future positions.  For those employees with the Company Car Benefit, the Debtors reimburse Employees for the costs of repairs, gas, and insurance (the Debtors provide insurance for such vehicle under the Debtors' automobile insurance

---

[10]  The Employee Assistance Program is provided through UNUM as part of the Basic Life and ADD &D Insurance Coverage at no additional charge to the Debtors.

policy).  As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the Company Car Benefits.  Out of an abundance of caution, the Debtors request authority to pay any prepetition amounts that may be outstanding.

iv.        <strong>Expense Allowance.</strong>

56.     In the ordinary course of business, the Debtors provide an expense allowance to one executive (the "<u>Expense Allowance</u>").  The Debtors, at their sole discretion, will evaluate and determine if the expense allowance is warranted for any current or future positions.  For those employees with the Expense Allowance, the Debtors reimburse Employees for the costs of temporary housing in Atlanta, GA and the costs and expenses of travel between Colorado and Georgia.  As of the Petition Date, the Debtors do not believe they owe any prepetition amounts on account of the Expense Allowance.  Out of an abundance of caution, the Debtors request authority to pay any prepetition amounts that may be outstanding.

<strong><u>Basis for Relief</u></strong>

**I.**    **Sufficient Cause Exists to Authorize**
       **the Debtors to Honor Employee Wage and Benefit Obligations.**

    **A.**    **Certain of the Employee Obligations are Entitled to Priority**
         **Treatment.**

57.     Bankruptcy Code sections 507(a)(4) and 507(a)(5) entitle the majority of Unpaid Compensation and other Employee related obligations to priority treatment.  To confirm a chapter 11 plan, the Debtors must pay priority claims in full.  <u>See</u> 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured

claims for (a) wages, salaries, or commissions, including vacation, severance, and sick pay earned by an individual, and (b) contributions to an employee benefit plan). Thus, granting the relief sought herein affects only the timing of payments to Employees, and does not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of Employee claims at this time enhances value for the benefit of all interested parties.

**B.      Payment of Certain of the Employee Obligations is Required by Law.**

58.      The Debtors also seek authority to pay Deductions and Payroll Taxes to the appropriate entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' paychecks. Indeed, certain Deductions, including contributions to the Employee Benefits Programs, are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' paychecks on another party's behalf. See 11 U.S.C. § 541(b). Further, federal and state laws require the Debtors to withhold certain tax payments from Employees' paychecks and to pay such amounts to the appropriate taxing authority. See 26 U.S.C. §§ 6672 and 7501(a); see also City of Farrell v. Sharon Steel Corp., 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); In re DuCharmes & Co., 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally

liable for failure to pay trust fund taxes).  Because the Deductions and Payroll Taxes are not property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Deductions and Payroll Taxes to the proper parties in the ordinary course of business.

59.    Similarly, state laws require the Debtors to maintain the Workers Compensation Program.  If the Debtors fail to maintain the Workers Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all workers compensation amounts, therefore, is crucial to the Debtors' continued operations.

## II.    Payment of the Employee Wages and Benefits is Warranted Under Section 363(b)(1) of the Bankruptcy Code and the Doctrine of Necessity.

60.    Courts generally acknowledge that it is appropriate to authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances.  See, e.g., In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages); see also Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.), 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers who were potential lien claimants).  In authorizing payments of certain prepetition obligations, courts have relied on several legal theories, rooted in Bankruptcy Code sections 363(b) and 507.

61.    Pursuant to Bankruptcy Code sections 1107(a) and 1108, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the

business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." Id. Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id. The CoServ court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate . . . ." Id.

62.    Consistent with a debtor's fiduciary duties, courts also have authorized payment of prepetition obligations under Bankruptcy Code section 363(b) where a sound business purpose exists for doing so. See, e.g., In re Ionosphere Clubs, 98 B.R at 175 (discussing prior order authorizing payment of prepetition wage claims pursuant to section 363(b); relief appropriate where payment was needed to "preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale."); see also Armstrong, 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors). Specifically, the business judgment standard requires that a debtor "articulate some business justification, other than the mere appeasement of major creditors." In re Ionosphere Clubs, 98 B.R. at 175.

63.     In addition, the Court may authorize payment of prepetition claims in appropriate circumstances based on Bankruptcy Code section 105(a).  Bankruptcy Code section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Under Bankruptcy Code section 105(a), courts may permit pre-plan payments of prepetition obligations when essential to the continued operation of the debtor's business.  Specifically, the Court may use its power under Bankruptcy Code section 105(a) to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity").  In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992).

64.     The United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981).  The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor.  Id. (stating a court may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); see also In re Motor Coach Indus. Int'l, Inc., No. 09-078, 2009 WL 330993, at *3 (D. Del. Feb. 10, 2009) (denying a stay pending appeal on the grounds that there is not a serious basis to challenge the doctrine of necessity in the Third Circuit); In re Penn Cent. Transp. Co., 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits

"immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); In re Just for Feet, Inc., 242 B.R. 821, 824–845 (Bankr. D. Del. 1999) (noting that the Third Circuit permits debtors to pay prepetition claims that are essential to continued operation of business);   In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).

65.    The necessity of payment doctrine is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." Id.; see also In re Just for Feet, 242 B.R. at 826 (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); In re Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of prepetition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain prepetition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a serious threat to the Chapter 11 process"); Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of prepetition debts when necessary for rehabilitation . . ." is appropriate); Mich. Bureau of Workers'

Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 287
(S.D.N.Y. 1987) (authorizing payment of prepetition worker's compensation claims
on grounds that the fundamental purpose of reorganization and equity powers of
bankruptcy courts "is to create a flexible mechanism that will permit the greatest
likelihood of survival of the debtor and payment of creditors in full or at least
proportionately"); 3 COLLIER ON BANKRUPTCY, 105.04[5][a] (15th ed. rev. 2004)
(discussing cases in which courts have relied on the "doctrine of necessity" or the
"necessity of payment" rule to pay prepetition claims immediately).

66.    Courts also have permitted postpetition payment of prepetition claims
pursuant to Bankruptcy Code section 105(a) in other situations, such as if
nonpayment of a prepetition obligation would trigger a withholding of goods or
services essential to the debtors' business reorganization plan. See In re Ionosphere
Clubs, 98 B.R. at 177 (finding that Bankruptcy Code section 105 empowers
bankruptcy courts to authorize payment of prepetition debt when such payment is
needed to facilitate the rehabilitation of the debtor).

67.    This flexible approach is particularly critical where prepetition
creditors – here, the Employees and related third parties – provide services to a
debtor that would be unavailable if the debtor did not satisfy its prepetition
obligations.  For example, in In re Structurlite Plastics Corp., 86 B.R. 922, 931
(Bankr. S.D. Ohio 1988), the bankruptcy court stated that "a bankruptcy court may
exercise its equity powers under § 105(a) [of the Bankruptcy Code] to authorize
payment of prepetition claims where such payment is necessary 'to permit the

34

greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately.'" Id. (citation omitted). The court explained that "a per se rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code." Id. at 932.

68.     The Debtors submit that the relief requested represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under Bankruptcy Code section 363(b), as well as under Bankruptcy Code section 105(a) and Bankruptcy Rule 6003. Paying prepetition wages, employee benefits, and similar items will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Indeed, the Debtors believe the without the relief requested herein being granted, their Employees may leave. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to meet their customer obligations and, likely, diminishing stakeholder confidence in the Debtors' ability to conduct these cases in a manner that maximizes value for the Debtors' stakeholders. The loss of valuable Employees and resulting recruiting of new personnel that would be necessary to find replacements (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations and attending to the urgent business of these cases. Accordingly, there can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all

wage, benefit and related obligations, including the wages and benefits that accrued prepetition.

69.     In addition, the majority of the Debtors' Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses.   Consequently, these Employees will be exposed to significant financial difficulties if the Court does not permit the Debtors to honor their Employee Wages and Benefits.   Moreover, failure to satisfy such obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' businesses.   Furthermore, if the Court does not authorize the Debtors to honor their various obligations under the insurance programs, the Employees will not receive health coverage and, thus, may become obligated to pay certain health care claims in cases where the Debtors have not paid the respective insurance providers.   The loss of health care coverage will result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency.   Similarly, if the Debtors are unable to pay the outstanding reimbursable expenses, Employees will be forced to shoulder a significant financial burden and will be reluctant to undertake essential business activities that require them to incur out-of-pocket expenses.   Additionally, as set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at a critical juncture.

70.     For all of the foregoing reasons, the relief requested herein will benefit the Debtors' estates and creditors by allowing the Debtors' business operations to continue without interruption.  The importance of a debtor's employees to its operations has been recognized by courts in this district in granting relief similar to the relief requested herein.  See, e.g., In re Barnes Bay Dev., Ltd., No. 11-10792 (PJW) (Bankr. D. Del. Mar. 21, 2011); In re Appleseed's Intermediate Holdings LLC, No. 11-10160 (KG) (Bankr. D. Del. Feb. 18, 2011); In re OTC Holdings Corp., No. 10-12636 (BLS) (Bankr. D. Del. Aug. 27, 2010); In re Visteon Corp., No. 09-11786 (CSS) (Bankr. D. Del. May 29, 2009).[11]

## III.    Waiver of Automatic Stay as it Applies to Workers' Compensation Claims.

71.     Bankruptcy Code section 362(a) operates to stay:

> the commencement or continuation, including the issuance or employment of process of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to receive a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. § 362(a)(1).  Bankruptcy Code section 362, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause."  Id. at § 362(d)(1).

---

[11]  Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion.  Copies of these orders are available upon request to the Debtors' counsel.

72.     The Debtors seek authorization, under Bankruptcy Code section 362(d), to permit the Employees to proceed with their workers' compensation claims in the appropriate judicial or administrative forum.  The Debtors believe that cause exists to modify the automatic stay because staying the workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to the departure of certain Employees who are critical at this juncture.  Such departures could cause a severe disruption in the Debtors' businesses to the detriment of all parties in interest.

## IV.    Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.

73.     The Debtors have sufficient funds to remit the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to debtor-in-possession financing.  Also, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the relief requested herein.  Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and the Court should authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested herein.

**The Requirements of Bankruptcy Rule 6003 are Satisfied**

74.     Under Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within twenty-one (21) days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. See In re Ames Dep't Stores, Inc., 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001(c)(2)); see also Fed. R. Bankr. P. 6003, Committee Notes (noting that cases applying Bankruptcy Rule 4001(b)(2) and (c)(2) may "provide guidance" for relief under Bankruptcy Rule 6003).

75.     As described above, the Debtors' Employees, Temporary Employees, and Independent Contractors are vital to the Debtors' operations.  Failure to satisfy obligations with respect to these persons in the ordinary course of business during the first twenty-one (21) days of these chapter 11 cases will jeopardize their loyalty and trust, causing Employees, Temporary Employees, and Independent Contractors to leave the Debtors' employ, severely disrupting the Debtors' operations at a critical juncture.

76.     Moreover, the Debtors' Employees, Temporary Employees, and Independent Contractors rely on their compensation, benefits, and reimbursement of expenses to pay their living expenses and the effect could be financially ruinous if the Debtors cannot pay them in the ordinary course of business.  Accordingly, the

Debtors submit they have satisfied the requirements of Bankruptcy Rule 6003 to support immediate payment of the Employee Obligations.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

77.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen (14) day stay period under Bankruptcy Rule 6004(h).

### Notice

78.    The Debtors have provided notice of the Motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the Largest Thirty (30) Unsecured Claims; (c) counsel to the agent for the Debtors' prepetition secured lenders; (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; (f) the Delaware Secretary of State; and (g) the Delaware Secretary of Treasury.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

### No Prior Request

79.    No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, the Debtors respectfully request that the Court (a) enter interim and final orders, substantially in the form attached hereto as Exhibit A and Exhibit B, respectively, granting the relief requested herein and (b) grant such other and further relief as is just and proper.

Dated:  March 18, 2013

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**

*/s/ Steven K. Kortanek*
Steven K. Kortanek (DE Bar No. 3106)
Thomas M. Horan (DE Bar No. 4641)
Ericka F. Johnson (DE Bar No. 5024)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
E-mail: skortanek@wcsr.com
E-mail: thoran@wcsr.com
E-mail: erjohnson@wcsr.com

-and-

**KIRKLAND & ELLIS LLP**
Christopher Marcus, P.C. (*pro hac vice* pending)
David S. Meyer (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
E-mail: christopher.marcus@kirkland.com
E-mail: david.meyer@kirkland.com

*Proposed Counsel to the Debtors and Debtors-in-Possession*