IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 )  |
| PROMMIS HOLDINGS, LLC, et al.,[1] | ) Case No. 13-10551 (BLS) )  |
| Debtors. | ) (Joint Administration Requested) ) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS AUTHORIZING THE DEBTORS
TO (A) CONTINUE PREPETITION INSURANCE COVERAGE
AND (B) MAINTAIN FINANCING OF INSURANCE PREMIUMS**

Prommis Holdings, LLC and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), file this motion (this "Motion") for the entry of an interim order, substantially in the form attached hereto as Exhibit A (the "Interim Order") and a final order, substantially in the form attached hereto as Exhibit B (the "Final Order"), authorizing, but not directing, the Debtors to (a) continue to maintain prepetition insurance policies and programs, including payment of any prepetition amounts related to those policies and programs; (b) revise, extend, renew, supplement, change such insurance policies and programs, or enter into new policies, as needed in the ordinary course of business; and (c) maintain the prepetition financing agreement with Flat Iron Capital and revise, extend, renew, supplement, change such financing

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Prommis Holdings, LLC (6940); Prommis Fin Co. (2965); Prommis Solutions, LLC (9978); E-Default Services LLC (0016); Statewide Tax and Title Services LLC (0049); Statewide Publishing Services LLC (0079); Nationwide Trustee Services, Inc. (2436); Statewide Tax and Title Services of Alabama LLC (7733); Nationwide Trustee Services of Virginia, Inc. (6687); Interface Inc. (9903); and Prommis Homeownership Solutions, Inc. (0569). The location of the Debtors' headquarters and the Debtors' service address is 400 Northridge Road, Atlanta, Georgia, 30350.

agreement, or enter into new agreements, as needed in the ordinary course of business. In support of this Motion, the Debtors respectfully state as follows:[2]

### Jurisdiction

1. The Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief requested herein are sections 105(a), 363(b), 364(c), 1107, and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). Relief is also warranted pursuant to Rules 4001(c) and 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

### Introduction[3]

4. On the date hereof (the "Petition Date"), each of the Debtors filed a petition with this Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. Concurrently with the filing of the Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

---

[2] The facts and circumstances supporting this Motion are set forth in the Declaration of Charlie T. Piper in Support of Debtors' Chapter 11 Petitions and First Day Motions (the "First Day Declaration"), filed contemporaneously herewith.

[3] A description of the Debtors' businesses, the reasons for commencing these chapter 11 cases and the relief sought from this Court to allow for a smooth transition into chapter 11 are set forth in the First Day Declaration.

**Relief Requested**

5.     By this Motion, the Debtors seek entry of the Interim Order and the Final Order authorizing the Debtors to (a)(i) continue to maintain prepetition insurance policies and programs, including payment of any prepetition amounts related to those policies and programs, to the extent the Debtors determine that such payments are necessary or appropriate to maintain adequate insurance coverage for the Debtors' estates and assets; (ii) revise, extend, renew, supplement, change such insurance policies and programs, or enter into new policies, as needed in the ordinary course of business; and (iii) maintain the prepetition financing agreement with Flat Iron Capital and revise, extend, renew, supplement, change such financing agreement, or enter into new agreements, as needed in the ordinary course of business, (b) authorizing financial institutions to receive, process, honor, and pay all related checks and electronic payment requests for payment of the related Policies (as defined and discussed below), and (c) scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order to the extent a Final Hearing is necessary.

**Description of the Debtors' Insurance Coverage**

I.     **The Debtors' Insurance Policies.**

6.     As set forth in the First Day Declaration, in the ordinary course of business, the Debtors maintain fourteen active insurance policies that comprise a comprehensive risk management program for their operations and assets. The Debtors believe their risk management program is customary for enterprises of a size, scope, and nature similar to the Debtors' businesses. The Debtors maintain policies with respect to, among other things, potential liability arising from general tort, commercial automobile, property, crime, network, professional,

3

directors and officers, total umbrella liability, and workers' compensation[4] policies (collectively, the "Policies"). A schedule of the Debtors' Policies is attached hereto as Exhibit C, and is incorporated herein by reference (the "Policy Schedule").[5] The Policies are essential to the preservation of the value of the Debtors' businesses, properties, and assets. In many cases, insurance coverage such as that provided by the Policies is required by the diverse regulations, laws, and contracts that govern premiums under the Debtors' commercial activities. As of the Petition Date, the Debtors estimate that they do not owe any premium payments for prepetition periods. The Debtors estimate that approximately $75,000 of premium payments, including any premium financing payments, may become due and payable in the first 21 days of these cases.[6]

II.     **The Debtors' Insurance Broker.**

7.      In connection with the Policies, the Debtors employ an insurance broker, Willis Insurance Services of Georgia, Inc. ("Willis"), to assist with the procurement and negotiation of their Policies in the most cost-effective manner possible, enabling the Debtors to obtain policies on advantageous terms and at competitive rates. In connection with these services, Willis is paid

---

[4] The Debtors' workers' compensation insurance policies are discussed in further detail in the Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to (a) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (b) Pay and Honor Employee Medical and Other Benefits, and (c) Continue Employee Benefits Program, filed contemporaneously herewith.

[5] Given the size, complexity, and number of business units that the Debtors operate, it is possible that certain of the Debtors' Insurance Policies may have been inadvertently omitted from the list of Insurance Policies. Accordingly, Exhibit C represents a non-exhaustive list of Insurance Policies and the Debtors reserve the right, pursuant to the terms and conditions of this Motion and without further order from this Court, to amend Exhibit C to add any Insurance Policies that were omitted therefrom and to request that the relief requested herein apply equally to all such Insurance Policies. In the event the Debtors add any Insurance Policies to Exhibit C, the Debtors will serve this Motion, any order approving same, and a revised version of Exhibit C upon the issuer(s) of any such Insurance Policy or Policies, the Office of the United States Trustee for the District of Delaware, counsel to the agent for the Debtors' prepetition secured lenders, and any official committee(s) appointed in these chapter 11 cases.

[6] These amounts reflect only those Policy premiums for which premiums are currently due and payable. The Debtors may, in the future, be invoiced for additional premiums that relate, in whole or in part, to the prepetition period.

a commission fee from the placement of the insurance policies (the "Commission"). As of the Petition Date, the Debtors do not believe they owe any amount with respect to the Commission.

### III. The Financed Policies.

8. The annual premiums for the Debtors' Policies total approximately $1,078,601.12[7] In the ordinary course of businesses, the Debtors finance the premiums on certain of their professional liability and network liability policies (collectively, the "Financed Policies") pursuant to that certain premium financing agreement entered into with Flat Iron Capital (the "Financing Agreement"). The Financing Agreement benefits the Debtors by spreading out the cost of the Financed Policies over the applicable coverage period. While there are no prepetition amounts due and owing to Flat Iron Capital as of the Petition Date, the Debtors' next scheduled monthly payment, in the amount of $42,755.73, is due by March 20, 2013.

9. In summary, the Financing Agreement provides financing subject to, among other things, the following terms:

| Policy Date | Total Premium | Down Payment | Amount Financed | Finance Charges | Monthly Payment | Policy Term |
|---|---|---|---|---|---|---|
| 8/20/2012 | $565,141.44 | $146,936.77 | $418,204.67 | $9,352.63 | $42,755.73 | 12 months |

10. The terms of the Financing Agreement provide that the Debtors pay Flat Iron Capital an initial down payment of $146,936.77, followed by ten monthly installments (bearing an annual percentage rate of 4.85%) commencing on September 20, 2012, in exchange for Flat Iron Capital's agreement to pay the annual insurance premiums of the Financed Policies to the Debtors' insurers.

---

[7] Includes premium and if applicable, surcharge, surplus lines taxes, and fees.

11. In light of the importance to maintain insurance coverage with respect to their business activities and preserving the Debtors' liquidity by financing the premiums for the Financed Policies, the Debtors believe it is in the best interests of their estates to authorize them to honor the obligations under the Financing Agreement.

## Basis for Relief

I. **Payment of the Insurance Obligations is Appropriate under the Bankruptcy Code.**

12. The Court may authorize payment of prepetition claims in appropriate circumstances based on Bankruptcy Code sections 105(a) and 363(b). Bankruptcy Code section 105(a) codifies the inherent equitable powers of the Bankruptcy Court and empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The Court's general equitable powers provided under Bankruptcy Code section 105(a) include authorizing the payment of prepetition debts under the "necessity of payment" rule. Specifically, the Court may use its power under Bankruptcy Code section 105(a) to authorize payment of prepetition obligations when such a payment is necessary to help preserve the debtor's operations and important business relationships. See, e.g., In re Boston and Main Corp., 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing judicial power to authorize a trustee to pay prepetition claims for goods and services that are indispensable to the debtor's continued operation); see also In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (recognizing the necessity of payment rule and stating that courts may authorize payment of prepetition claims when there exists "the possibility that the creditor will employ an immediate economic sanction, failing such payment."); In re Just For Feet, Inc., 242 B.R. 821, 824-25 (Bankr. D. Del. 1999) ("courts have used their equitable powers under section 105(a) . . . to authorize the payment of pre-petition claims when such payment is deemed necessary for the survival of a debtor in a chapter 11

reorganization."); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (noting that debtors may pay prepetition claims that are essential to the continued operation of their business).

13. Today, courts generally allow payment of certain prepetition obligations when such payments are necessary to maintain the operations of a chapter 11 debtor and preserve going concern value. See Lehigh, 657 F.2d at 570, 581 (authorizing the payment of certain prepetition obligations that was essential to the continued operation of the debtor); see also In re Penn Cent. Transp. Co., 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); Just for Feet, 242 B.R. at 824-25 (finding that debtors may pay prepetition claims that are essential to continued operation of business); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (same); see further In re UNR Indus., 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992) (permitting the debtor to pay certain prepetition obligations to ensure continued cooperation essential to the debtors' successful reorganization); In re Ionosphere Clubs, Inc., 98 B.R. 174-76 (Bankr. S.D.N.Y. 1989) (granting the debtor the authority to pay certain prepetition obligations); In re Quality Interiors, Inc., 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); In re Eagle-Picher Indus., Inc., 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of certain prepetition obligations as "necessary to avert a serious threat to the Chapter 11 process"); Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1490 (9th Cir. 1987)

(recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation . . ." is appropriate); Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 287 (S.D.N.Y. 1987) (authorizing payment of certain prepetition obligations on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.), 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting the debtor the authority to pay certain prepetition obligations necessary for reorganization).

14. In addition, the Court may authorize the Debtors to pay prepetition amounts related to their Policies pursuant to Bankruptcy Code section 363(b), which provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under this section, a court may authorize a debtor to pay prepetition claims where a sound business purpose exists for doing so. See, e.g., In re Ionosphere Clubs, Inc., 98 B.R. at 175 (finding sound business justification for payment of prepetition wages); In re James A. Phillips, Inc., 29 B.R. at 397 (relying on section 363 of the Bankruptcy Code to allow a debtor to pay prepetition claims of suppliers which were potential lien claimants, to induce general contractor to release funds owed to the debtor).

15. Failure to pay premiums and related expenses (including the Commission) when due may harm the Debtors' estates in several ways. First, the Debtors' insurance companies or its broker, Willis, may refuse to renew (or, with respect to Willis, assist in renewing) the Debtors' Policies going forward, which will require the Debtors to obtain replacement policies

and possibly to reconfigure their risk management program. That, in turn, will require significant resources and may result in less favorable coverage or terms from the Debtors' insurers. Second, the Debtors' insurers may attempt to terminate the Debtors' existing Policies, which may create uncertainty as to the Debtors' ability to continue operating their businesses given the myriad regulatory and contractual requirements imposed on the Debtors to maintain specific amounts and types of insurance coverage. Any purported termination of the Debtors' Policies and any material change in the terms of the Policies may also place additional strain on the Debtors' relationships with key employees crucial to the Debtors' reorganization process, who benefit from the Debtors' insurance coverage.

16. In addition, the Policies are essential to the preservation of the value of the Debtors' businesses, properties, and assets, and their ability to successfully reorganize under chapter 11. The Policies protect the Debtors and other parties in interest from loss in value caused by casualty, tort, fraud, or other unforeseen events. This concern is so paramount that, under Bankruptcy Code section 1112(b)(4)(C), "failure [of a debtor] to maintain appropriate insurance that poses a risk to the estate or to the public," is "cause" for mandatory conversion or dismissal of a chapter 11 case. 11 U.S.C. § 1112(b)(4)(C).

17. As of the Petition Date, the Debtors do not believe they owe any amounts relating to the Policies, Financed Policies, or Commissions. In light of the importance of maintaining consistent and evident insurance coverage with respect to the Debtors' business activities, it is in the best interests of the Debtors' estates and all parties in interest to maintain the Policies pursuant to Bankruptcy Code sections 105(a) and 363(b).

18. Courts in this District regularly authorize debtors to maintain insurance coverage where, as here, it is in the best interest of the debtors' estates. See, e.g., In re School Specialty,

Inc., Case No. 13-10125 (KJC) (Bankr. D. Del. Jan. 30, 2013); In re LCI Holding Co., Inc., Case No. 12-13319 (KG) (Bankr. D. Del. Dec. 13, 2012); In re Monitor Co. Group Ltd. P'ship, Case No. 12-13042 (CSS) (Bankr. D. Del. Dec. 4, 2012); In re Satcon Tech. Corp., Case No. 12-12869 (KG) (Bankr. D. Del. Oct. 18, 2012); In re Pemco World Air Servs., Inc., Case No. 12-10799 (MFW) (Bankr D. Del. Mar. 6, 2012); In re Friendly Ice Cream Corp., Case No. 11-13167 (KG) (Bankr. D. Del. Oct. 5, 2011); In re Appleseed's Intermediate Holdings LLC, Case No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011); In re L.A. Dodgers LLC, Case No. 11-12010 (KG) (Bankr. D. Del. July 26, 2011); In re Ambassadors Int'l, Inc., Case No. 11-11002 (KG) (Bankr. D. Del. Apr. 5, 2011).[8]

## II. Sufficient Cause Exists for the Court to Authorize the Debtors to Maintain the Financing Agreement.

19. Bankruptcy Code section 364 provides, in relevant part, "[i]f the [debtor] is unable to obtain unsecured credit . . . , the court, after notice and a hearing, may authorize the obtaining of [secured] credit or the incurring of [secured] debt . . ." 11 U.S.C. § 364(c). In short, section 364 authorizes a debtor, in the exercise of its business judgment, to incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estates. See, e.g., In re Budget Group, Inc., Case No. 02-12152, 2002 Bankr. LEXIS 1050 (Bankr. D. Del. Aug. 1, 2002) (authorizing the funding of acquisition of property on a secured basis where acquired property was necessary to maintain operations and debtors could not obtain such funding on an unsecured basis); In re Mastercraft Interiors, Ltd., Case Nos. 06-12769, 06-12770, 2006 Bankr. LEXIS 4982, at *10 (Bankr. D. Md. Aug. 10, 2006) (authorizing the debtor's purchase of secured financing because the debtor's financing needs were "immediate

---

[8] Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

and critical" to the success of the proceedings and the debtor was unable to obtain unsecured credit); In re Ames Dept. Stores, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties"); see also 3 COLLIER ON BANKRUPTCY ¶ 364.03, at 364-7 (15th ed. Rev. 1999). Further, Bankruptcy Code section 364(c) does not impose a duty on the debtor to request unsecured credit from every potential lender before seeking secured credit. See In re Snowshoe Co., Inc., 789 F.2d 1085, 1088 (4th Cir. 1986).

20. Generally, lenders are unwilling to finance insurance premiums on an unsecured basis. Hence, bankruptcy courts have routinely deferred to a debtor's business judgment when it is deciding whether to borrow money, unless such decision fails the arbitrary and capricious standard. See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility and asset-based facility "reflect[ed] sound and prudent business judgment . . . [was] reasonable under the circumstances and in the best interests of [the debtor] and its creditors"); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Indeed, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

21. Here, the Debtors were unable to procure viable financing alternatives in the marketplace to finance the premium obligations for their Financed Policies on an unsecured basis within the given time constraints. Additionally, the Financing Agreement provides financing at

an interest rate that is considerably less than the Debtors' other secured financing sources. Thus, the Debtors respectfully submit that the security interest required under the Financing Agreement is justified under Bankruptcy Code section 364(c).

22. Moreover, the ability to maintain the Financed Policies helps the Debtors manage their cash flow. If the Debtors are unable to continue making payments pursuant to the Financing Agreement, under the terms of the Financing Agreement, Flat Iron Capital may be permitted to terminate the Financed Policies. The Debtors then would be required to obtain replacement insurance on an expedited basis. If the Debtors were required to obtain replacement insurance and to pay a lump sum premium for such insurance policies in advance, this payment likely would be greater than what the Debtors currently pay under the Financing Agreement. Even if Flat Iron Capital was not permitted to terminate the insurance policies, any interruption of payment would have severe, adverse effects on the Debtors' ability to finance premiums for future policies. Accordingly, the Debtors respectfully submit that they have articulated a valid business justification for maintaining the Financing Agreement.

23. In view of the importance of maintaining insurance coverage throughout the entire duration of the chapter 11 cases with respect to their business activities and preserving their liquidity by financing certain insurance premiums, the Debtors believe honoring their monthly obligations under the Financing Agreement is in the best interests of their estates.

24. Courts in this District regularly grants similar relief to chapter 11 debtors, authorizing, among other things, such debtors to maintain insurance coverage and premium financing of insurance policies, where, as here, it is in the best interest of the estates. See, e.g., In re LCI Holding Co., Inc., Case No. 12-13319 (KG) (Bankr. D. Del. Dec. 13, 2012); In re Monitor Co. Group Ltd. P'ship, Case No. 12-13042 (CSS) (Bankr. D. Del. Dec. 4, 2012); In re

Satcon Tech. Corp., Case No. 12-12869 (KG) (Bankr. D. Del. Oct. 18, 2012); In re Pemco World Air Servs., Inc., Case No. 12-10799 (MFW) (Bankr D. Del. Mar. 6, 2012); In re Friendly Ice Cream Corp., Case No. 11-13167 (KG) (Bankr. D. Del. Oct. 5, 2011); In re Appleseed's Intermediate Holdings LLC, Case No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011); In re L.A. Dodgers LLC, Case No. 11-12010 (KG) (Bankr. D. Del. July 26, 2011); In re Ambassadors Int'l, Inc., Case No. 11-11002 (KG) (Bankr. D. Del. Apr. 5, 2011).

III.  **Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.**

25.  The Debtors represent that they have sufficient funds to remit the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations. Also, under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Policies. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and the Court should authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested herein.

### The Requirements of Bankruptcy Rule 6003 Have Been Satisfied

26.  Pursuant to Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. See In re Ames Dep't Stores, 115 B.R. 34, 36 n.2 (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

27. As described above, the Policies are integral to the Debtors' continued operations because they are necessary to maintain the smooth operations of the Debtors' businesses in chapter 11. Not only are some of the Policies required by the various regulations, laws, and contracts that govern the Debtors' commercial activities but Bankruptcy Code section 1112(b)(4)(C) provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public," is "cause" for mandatory conversion of a dismissal of a chapter 11 case. 11 U.S.C. § 1112(b)(4)(C). Moreover, the Guidelines of the United States Trustee for the District of Delaware also require debtors to maintain insurance coverage throughout their chapter 11 cases. Accordingly, the Debtors submit they have satisfied Bankruptcy Rule 6003 to continue their prepetition Policies and support immediate payment of their obligations under the Financing Agreement.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

28. To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

29. The Debtors have provided notice of the Motion to: (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the Largest 30 Unsecured Claims; (c) counsel to the agent for the Debtors' prepetition secured lenders; (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; (f) the Delaware Secretary of State; (g) the Delaware Secretary of Treasury; and (h) Willis and the insurance carriers for the Policies. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## No Prior Request

30.  No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, the Debtors respectfully request that the Court (a) enter the Interim Order, substantially in the form attached hereto as <u>Exhibit A</u>, and the Final Order, substantially in the form attached hereto as <u>Exhibit B</u>, granting the relief requested herein and (b) grant such other and further relief as is just and proper.

Dated: March 18, 2013

    **WOMBLE CARLYLE SANDRIDGE & RICE, LLP**

    <u>/s/ Steven K. Kortanek</u>
    Steven K. Kortanek (DE Bar No. 3106)
    Thomas M. Horan (DE Bar No. 4641)
    Ericka F. Johnson (DE Bar No. 5024)
    222 Delaware Avenue, Suite 1501
    Wilmington, DE 19801
    Telephone: (302) 252-4320
    Facsimile: (302) 252-4330
    E-mail: skortanek@wcsr.com
    E-mail: thoran@wcsr.com
    E-mail: erjohnson@wcsr.com

    -and-

    **KIRKLAND & ELLIS LLP**
    Christopher Marcus, P.C. (*pro hac vice* pending)
    David S. Meyer (*pro hac vice* pending)
    601 Lexington Avenue
    New York, New York 10022
    Telephone: (212) 446-4800
    Facsimile: (212) 446-4900
    E-mail: christopher.marcus@kirkland.com
    E-mail: david.meyer@kirkland.com

    *Proposed Counsel to the Debtors and Debtors-in-Possession*