## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| PROMMIS HOLDINGS, LLC, et al.,[1] | Case No. 13-10551 (BLS) |
| Debtors. | (Joint Administration Requested) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO (A) CONTINUE USING THEIR CASH MANAGEMENT SYSTEM, BANK ACCOUNTS, AND BUSINESS FORMS, (B) MAINTAIN EXISTING INVESTMENT PRACTICES; (C) CONTINUE INTERCOMPANY TRANSACTIONS, AND (D) GRANTING INTERCOMPANY CLAIMS ADMINISTRATIVE PRIORITY

Prommis Holdings, LLC and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), by and through their proposed undersigned counsel, file this motion (this "Motion") for the entry of an interim order, substantially in the form attached hereto as Exhibit A (the "Interim Order"), and a final order, substantially in the form attached hereto as Exhibit B (the "Final Order"), authorizing the Debtors to (a) continue using their existing cash management system, bank accounts, and business forms, (b) maintain existing investment practices; (c) maintain existing bank accounts with continue intercompany transactions, and (d) provide postpetition intercompany claims administrative expense priority.  In support of this Motion, the Debtors respectfully state as follows:[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are:  Prommis Holdings, LLC (6940); Prommis Fin Co. (2965); Prommis Solutions, LLC (9978); E-Default Services LLC (0016); Statewide Tax and Title Services LLC (0049); Statewide Publishing Services LLC (0079); Nationwide Trustee Services, Inc. (2436); Statewide Tax and Title Services of Alabama LLC (7733); Nationwide Trustee Services of Virginia, Inc. (6687); Interface Inc. (9903); and Prommis Homeownership Solutions, Inc. (0569).  The location of the Debtors' headquarters and the Debtors' service address is 400 Northridge Road, Atlanta, Georgia, 30350.

[2] The facts and circumstances supporting this Motion are set forth in the Declaration of  Charlie T. Piper in

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 345, 363, 364, 503, 507, 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2015-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

## Introduction[3]

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  Concurrently with the filing of the Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## Relief Requested

5.      By this Motion, the Debtors seek entry of an order authorizing them to: (a) continue to (i) use, with the same account numbers, all of the Bank Accounts (as defined herein) in their Cash Management System (as defined herein), (ii) treat the Bank Accounts for all

---

Support of Debtors' Chapter 11 Petitions and First Day Motions (the "First Day Declaration"), filed contemporaneously herewith.

[3]      A description of the Debtors' businesses, the reasons for commencing these chapter 11 cases and the relief sought from this Court to allow for a smooth transition into chapter 11 are set forth in the First Day Declaration.

purposes as accounts of the Debtors as debtors in possession, (iii) open new debtor-in-possession accounts, if needed; (iv) use, in their present form, all correspondence and business forms (including, without limitation, letterhead and invoices), and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to their status as debtors in possession; (b) continue, in their business judgment and at their sole discretion, performing Intercompany Transactions (as defined herein) in the ordinary course of business, subject to the limitations contained in any cash collateral order; (c) maintain existing investment practices; and (d) provide postpetition administrative expense priority to the Intercompany Claims.

6.      The Debtors further request that the Court authorize the Banks to (a) continue to maintain, service, and administer the Bank Accounts and (b) debit the Bank Accounts in the ordinary course of business on account of (i) checks drawn on the Bank Accounts that are presented for payment at the Banks or exchanged for cashiers' checks prior to the Petition Date; (ii) checks or other items deposited in the Bank Accounts prior to the Petition Date that have been dishonored or returned unpaid for any reason (including associated fees and costs), to the same extent the Debtors were responsible for such items prior to the Petition Date; and (iii) undisputed, outstanding service charges owed to the Banks as of the Petition Date on account of the maintenance of the Debtors' Cash Management System, if any.

**The Cash Management System and Business Forms**

**A.      Description of the Debtors' Cash Management System.**

7.      In the ordinary course of business, the Debtors utilize an integrated, centralized cash management system to collect, transfer, disburse, and invest funds generated by their

operations (the "Cash Management System").  The Debtors maintain current and accurate accounting records of all daily cash transactions.

8.      The Cash Management System is specifically tailored to meet the Debtors' operating needs – enabling the Debtors to centrally control and monitor corporate funds and available cash, invest excess cash, comply with the requirements of their financing agreements, reduce administrative expenses, and obtain accurate account balances and presentment information.  Maintaining the Cash Management System is crucial given the significant volume of cash transactions managed through the Cash Management System every day.

9.      The Cash Management System is managed primarily by the Debtors' personnel in their finance department and is comprised of four (4) bank accounts (collectively, the "Bank Accounts") maintained at various banks throughout the United States (collectively, the "Banks"). A schedule of the Bank Accounts and respective Banks is attached hereto as Exhibit C and incorporated by reference herein.  Many of the Debtors' Bank Accounts are located in banks designated as authorized depositories by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), pursuant to the U.S. Trustee's Operating Guidelines and Financial Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines").

10.     Given the economic scale and geographic reach of the Debtors' business operations, any disruption to the Cash Management System could impede a successful restructuring of the Debtors' businesses.

**B.      The Debtors' Bank Accounts and Flow of Funds.**

11.     The Debtors maintain a number of accounts at various financial institutions primarily to accommodate different business divisions and to collect, organize, and track various

4

forms of customer receipts.  The Cash Management System is designed to manage effectively the inflow of various forms of receipts from the Debtors' customer base, ensure that ongoing trade obligations are settled on a timely basis, and develop and monitor cash flow forecasts and available liquidity.  It is critical that the Cash Management System remains intact to ensure seamless customer experiences and continued collection of revenues.  The Debtors' Bank Accounts and the transfer of funds through the Cash Management System are described below and illustrated in the flow chart attached hereto as Exhibit D and incorporated by reference herein.

### i.    Operating Accounts.

12.     The Debtors maintain two (2) operating accounts (the "Operating Accounts") associated with different business divisions, which allows the Debtors to limit the number of accounts from which payments are made, consolidate cash from the Debtors' operations, and assist in reporting cash receipts and disbursements.  The Operating Accounts function as follows:

a.     Prommis Master Operating Account.  The Debtors maintain this zero-balance master operating account with Wells Fargo Bank, N.A. ("Wells Fargo") to collect a wide range of receipts relating to the administration of the Debtors' east coast operations  (the "Master Operating Account"). Funds also flow into the Master Operating Account from the Debtors' other Operating Accounts on a daily basis to fund certain disbursements for the Debtors' west coast operations, including, without limitation, such Debtors' 401(k) benefits, health insurance, and rent.  The Debtors make disbursements from the Master Operating Account to fund the Debtors' business operations, including all of the Debtors' selling, general, and administrative expenses and payroll, as well as to service their indebtedness.

b.     Interface Inc.'s Operating Account.  The Debtors maintain this operating account with Regents Bank to collect receipts and fund disbursements for debtor Interface Inc.  In addition, the Debtors use this account to fund payments to the Debtors' postage vendors, Pitney Bowes Inc. and Hasler Inc., as an alternative to presenting checks and cash for postage and fees at multiple post offices, and such vendors automatically debit their accounts in the ordinary course for providing postage services.

ii.     **Disbursement Account.**

13.     The Debtors maintain one (1) zero balance stand-alone disbursement account with Wells Fargo to fund advanced costs for a certain law firm customer (the "Advanced Cost Disbursement Account").[4]  The Advanced Cost Disbursement Account is funded manually as necessary by the Prommis Master Operating Account.  At the close of each business day, the net position of the Advanced Cost Disbursement Account is zeroed out through automatic sweeps to the Prommis Master Operating Account.

iii.    **The FSA Account.**

14.     The Debtors maintain one (1) additional account as follows:

    a.     FSA Account.  The Debtors maintain one miscellaneous stand-alone account with SunTrust Bank, Inc. to fund certain of the Debtors' obligations under their employee flexible-spending account benefits program (the "FSA Account").  The FSA Account is funded as needed to make disbursements to the Debtors' employees based on elections made by such employees.  No other funds flow into, or from, the FSA Account.

**C.     The Debtors' Existing Business Forms and Checks.**

15.     In the ordinary course of business, the Debtors use a multitude of check types. Additionally, the Debtors use a variety of correspondence and business forms, including, but not limited to, letterhead and invoices.  To minimize the expense to the Debtors' estates associated with developing and/or purchasing entirely new forms, the delay in conducting business prior to obtaining such forms, and the confusion of employees, customers, and suppliers, the Debtors seek authority to continue to use all correspondence and business forms as such forms existed immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession.  Once existing forms are depleted, the Debtors will commence printing "debtors in

---

[4]    The Debtors' advanced cost program offered to certain of its customers is described in more detail in the Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Maintain and Administer Customer Programs and Honor Related Prepetition Obligations to Customers, filed contemporaneously herewith.

possession" on checks the Debtors print themselves, and the Debtors will replace their existing stock of business forms with new forms identifying their status as debtors in possession.

16.     The Debtors have prepared communications materials to distribute to the various parties with whom they conduct business which will, among other things, inform such parties of the commencement of these chapter 11 cases.   The Debtors believe that these direct communications will provide adequate notice to these parties of the Debtors' status as debtors in possession.

### D.     Intercompany Claims and Intercompany Transactions.

17.     In the ordinary course of business, the Debtors maintain business relationships with their Debtor and non-debtor affiliates, which result in intercompany receivables and payables (the "Intercompany Claims") arising from the following types of transactions (the "Intercompany Transactions"):

- Intercompany Sales.  In the ordinary course of business, the Debtors sell and purchase goods and/or services from various Debtor and non-Debtor affiliates. The Debtors' records of Intercompany Transactions reflect the net position of both sales and purchases made between their affiliates.

- Expense Allocations.  In the ordinary course of business, Prommis Holdings, LLC and its Debtor and non-Debtor affiliates incur centrally-billed expenses, including insurance premiums, workers' compensation obligations, and payroll and benefit costs.  In addition, certain of the Debtors make payments on behalf of, and for the benefit of, certain other Debtors and non-Debtors, creating Intercompany Claims between such entities.   Historically, the Debtors have reconciled such Intercompany Claims in the ordinary course of business by remitting checks on a monthly basis.  A more detailed description of intercompany expense allocations follows:

  - A bi-weekly consolidated payroll for all Prommis FinCo subsidiaries is prepared and funded by Prommis Solutions, LLC. An intercompany receivable is recorded for all payments made by Prommis Solutions, LLC on behalf of all other debtor and non-debtor entities. Management seeks authority to continue to have Prommis Solutions LLC fund the bi-weekly payrolls for non-Debtor subsidiaries Cal-Western Reconveyance Corp. ("Cal-Western") and Reliable

Reconveyance Corp. ("Reliable"), and record the resulting intercompany receivables post-petition.

▪ Prommis Solutions, LLC currently processes payments for rent, utilities, and other administrative expenses on behalf of Prommis FinCo's non-debtor subsidiaries. An intercompany receivable is recorded for all such transactions. The Debtors seek authority to continue to have Prommis Solutions LLC process these payments from Prommis Solutions, LLC cash accounts and record the resulting intercompany receivables post-petition.

▪ As needed, Prommis FinCo management directs the transfer of excess cash sitting in Cal-Western and Reliable bank accounts to a Prommis Solutions, LLC bank account. The Debtors seek authority to continue to have Prommis Solutions, LLC process these payments from Prommis Solutions, LLC cash accounts and record the resulting intercompany receivables after the filing for bankruptcy protection.

▪ The budget attached to the Debtors' Motion for Interim and Final Orders (A) Authorizing the Debtor to Use Cash Collateral Pursuant to Bankruptcy Code Section 363; (B) Granting Adequate Protection to the Pre-Petition Secured Parties; and (C) Scheduling a Final Hearing, filed contemporaneously herewith, includes amounts forecasted for the transactions described above.

- Intercompany Loans. The Debtors, from time to time, also provide intercompany loans and capital contributions to facilitate the flow of cash between each of the Debtors.

18. The Debtors track all Intercompany Transactions electronically in their accounting system and can ascertain, trace, and account for them as needed. If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment. The Debtors will continue to maintain records of all transfers during these chapter 11 cases.

**Basis for Relief**

I.      **The Court Should Approve the Debtors'
         Continued Use of the Cash Management System.**

        A.      **The Continued Use of the Cash Management System is
                 Essential to the Debtors' Ongoing Operations and Restructuring Efforts.**

        19.     The Debtors' businesses and financial affairs are complex, requiring the
collection, disbursement, and movement of funds through numerous bank accounts. Pursuant to
28 U.S.C. § 586(a)(3) and the U.S. Trustee Guidelines, debtors in possession may be required to,
among other things, (a) establish one (1) debtor-in-possession account for all estate funds
required for the payment of taxes (including payroll taxes), (b) close all existing Bank Accounts
and open new debtor-in-possession accounts, (c) maintain a separate debtor-in-possession
account for cash collateral, and (d) obtain checks that bear the designation "debtor in possession"
and reference the bankruptcy case number and type of account. These requirements are designed
to provide a clear line of demarcation between prepetition and postpetition claims and payments,
and help protect debtors against the inadvertent payment of prepetition claims by preventing
banks from honoring checks drawn before commencement of chapter 11 cases. Strict
enforcement of the U.S. Trustee Guidelines in these chapter 11 cases, however, would severely
disrupt the ordinary financial operations of the Debtors, reducing efficiencies and causing
unnecessary expense.

        20.     Because the Debtors have a complex corporate and financial structure, it would be
difficult and unduly burdensome to establish an entirely new cash management system for each
of the Debtors' operating entities. To comply with the U.S. Trustee Guidelines, the Debtors also
would need to execute new signatory cards and depository agreements and create a new system

for manually issuing checks and paying postpetition obligations.[5] The delays that would result from opening these accounts, revising cash management procedures, and instructing customers to redirect payments, would disrupt the Debtors' business at this critical time.

21.     In addition, requiring the Debtors to maintain separate accounts would decentralize their Cash Management System, which would create unneeded disruption to the Debtors' operations as they attempt to restructure in chapter 11. Compliance with the U.S. Trustee Guidelines would again require the Debtors to restructure their cash management processes at significant administrative cost. Accordingly, the Debtors respectfully request that the Court waive the requirements imposed by the U.S. Trustee Guidelines.

22.     The Court may authorize the Debtors to continue to use their existing Cash Management System, pursuant to Bankruptcy Code section 105(a). Bankruptcy Code section 105(a) empowers the Court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As set forth herein, the Debtors submit that approval of the continued use of the Cash Management System and Bank Accounts is appropriate and justified.

23.     In similar large and complex chapter 11 cases, this Court has routinely waived the U.S. Trustee Guidelines and allowed large corporate debtors to continue to use their cash management systems and prepetition bank accounts employed in the ordinary course of a debtor's prepetition business. See, e.g., See, e.g., In re School Specialty, Inc., Case No. 13-10125 (KJC) (Bankr. D. Del. Jan. 30, 2013); In re Overseas Shipping Group., Inc., Case No. 12-20000 (PJW) (Bankr. D. Del. Jan. 24, 2012); In re Monitor Group Co. Ltd. P'ship, Case No. 12-

---

5    Notwithstanding anything herein to the contrary, the Debtors reserve the right to close their prepetition Bank Accounts and open new accounts as may be necessary in the Debtors' business judgment. The Debtors, however, will give prompt notice to the U.S. Trustee and any official committees that may be appointed in these chapter 11 cases through the monthly operating reports.

13042 (CSS) (Bankr. D. Del. Dec. 4, 2012); In re Southfield Office Bldg. 14, LP, Case No. 12-

12415 (BLS) (Bankr. D. Del. Nov. 28, 2012); In re Pemco Worldwide Air Servs., Inc., Case No.

12-10799 (MFW) (Bankr D. Del. March 6, 2012); In re Neb. Book Co., Case No. 11-12005

(PJW) (Bankr. D. Del. June 28, 2011); In re L.A. Dodgers LLC, Case No. 11-12010 (KG)

(Bankr. D. Del. June 28, 2011).[6]

**B.** **Maintaining the Existing Cash Management System Will Facilitate a Smooth Transition into Chapter 11 and Will Not Harm Parties in Interest.**

24.     The Debtors' continued use of their Cash Management System will greatly

facilitate their transition into these chapter 11 cases by, among other things, avoiding

administrative inefficiencies and expenses and minimizing delays in payment of postpetition

debts.  The Debtors respectfully submit that parties in interest will not be harmed by the Debtors'

maintenance of the existing Cash Management System (including continued use of all Bank

Accounts) because the Debtors have implemented appropriate mechanisms to ensure that

unauthorized payments will not be made on account of obligations incurred prior to the Petition

Date.  Specifically, with the assistance of their advisors, the Debtors have implemented internal

control protocols that prohibit payments on account of prepetition debts, without the prior

approval of the Debtors' finance department.  In light of such protective measures, the Debtors

submit that maintaining the Cash Management System is in the best interests of their estates and

creditors.

25.     Moreover, the Cash Management System provides the Debtors with the ability to

(a) quickly create status reports on the location and amount of funds, which, in turn, allows

management to track and control such funds, (b) ensure cash availability, and (c) reduce

---

[6]   Because of the voluminous nature of the orders cited herein, such orders are not attached to this Motion.  Copies of these orders are available upon request of the Debtors' proposed counsel.

administrative costs through a centralized method of coordinating the collection and movement of funds.

**C.      The Court Should Authorize the Banks to Continue to Maintain, Service, and Administer the Debtors' Bank Accounts in the Ordinary Course of Business.**

26.      The Debtors submit that parties in interest will not be prejudiced or injured by the Debtors' maintenance of their Bank Accounts in the ordinary course of business.  The Debtors strongly believe that replacing their existing Bank Accounts with new accounts as of the Petition Date pursuant to the U.S. Trustee Guidelines would needlessly interrupt their operations and impair their efforts to preserve the value of their estates and reorganize in an efficient manner.

27.      Thus, the Debtors respectfully request that the Court authorize the Banks to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business.  In this regard, the Banks should be authorized to receive, process, honor, and pay any and all checks, ACH Payments, and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto; provided that any check, advice, draft, or other notification that the Debtors advised the Banks to have been drawn, issued, or otherwise presented prior to the Petition Date may be honored only to the extent authorized by order of the Court.

28.      The Debtors further request that the Court authorize the Banks to accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH Payments should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH Payments are dated prior to or subsequent to the Petition Date.

29.    Moreover, in the ordinary course, the Banks charge, and the Debtors will pay, honor, or allow the deduction from the appropriate account, certain service charges and other fees, costs, and expenses (collectively, the "Bank Fees"). The Debtors respectfully request that the Court authorize the Banks to (a) continue to charge the Debtors the Bank Fees and (b) charge-back returned items to the Bank Accounts, whether such items are dated prior to, on, or subsequent to the Petition Date, in the ordinary course of business. The Debtors further request that the Court order that liens on any of the Bank Accounts granted to creditors will not have priority over the Bank Fees, as applicable, at which the applicable Bank Account is located.

30.    In similar large chapter 11 cases, the Courts regularly has waived the U.S. Trustee Guidelines and allowed large corporate debtors to maintain ordinary course banking activities, including deduction of ordinary course banking fees, on the grounds that the U.S. Trustee Guidelines are impractical and potentially detrimental to a debtor's postpetition business operations and restructuring efforts. See, e.g., In re School Specialty, Inc., Case No. 13-10125 (KJC) (Bankr. D. Del. Jan. 30, 2013); In re Overseas Shipping Group., Inc., Case No. 12-20000 (PJW) (Bankr. D. Del. Jan. 24, 2012); In re Monitor Group Co. Ltd. P'ship, Case No. 12-13042 (CSS) (Bankr. D. Del. Dec. 4, 2012); In re Southfield Office Bldg. 14, LP, Case No. 12-12415 (BLS) (Bankr. D. Del. Nov. 28, 2012); In re Pemco Worldwide Air Servs., Inc., Case No. 12-10799 (MFW) (Bankr D. Del. March 6, 2012); In re Neb. Book Co., Case No. 11-12005 (PJW) (Bankr. D. Del. June 28, 2011); In re L.A. Dodgers LLC, Case No. 11-12010 (KG) (Bankr. D. Del. June 28, 2011).

## II.    The Debtors Should Be Granted Authority to Use Existing Business Forms and Checks Until They Are Depleted.

31.    To minimize expenses to their chapter 11 estates, the Debtors request authority to continue to use all correspondence and business forms including, without limitation, letterhead,

purchase orders, and invoices, as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession. Upon depletion of the Debtors' check stock and/or business forms stock, the Debtors will obtain new check stock and/or business forms stock reflecting their status as debtors in possession.

32.     By virtue of the nature and scope of the Debtors' business operations and the large number of vendors and customers with whom the Debtors transact on a regular basis, it is important that the Debtors be permitted to continue to use their existing checks and other business forms without alteration or change, except as requested herein. Indeed, because parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the publicized nature of these chapter 11 cases and the communications and notice of commencement the Debtors' are distributing to such parties, changing business forms is unnecessary and unduly burdensome.

33.     This Court has allowed debtors to use their prepetition check forms without the "debtor in possession" label in other large, complex, or well-publicized cases until the debtors' existing check stock was depleted. See, e.g., In re School Specialty, Inc., Case No. 13-10125 (KJC) (Bankr. D. Del. Jan. 30, 2013); In re Overseas Shipping Group., Inc., Case No. 12-20000 (PJW) (Bankr. D. Del. Jan. 24, 2012); In re Monitor Group Co. Ltd. P'ship, Case No. 12-13042 (CSS) (Bankr. D. Del. Dec. 4, 2012); In re Southfield Office Bldg. 14, LP, Case No. 12-12415 (BLS) (Bankr. D. Del. Nov. 28, 2012); In re Pemco Worldwide Air Servs., Inc., Case No. 12-10799 (MFW) (Bankr D. Del. March 6, 2012); In re Neb. Book Co., Case No. 11-12005 (PJW) (Bankr. D. Del. June 28, 2011); In re L.A. Dodgers LLC, Case No. 11-12010 (KG) (Bankr. D. Del. June 28, 2011).

III.    **The Debtors Should Be Authorized to**
        **Continue Using Debit, Wire, and ACH Payments.**

34.    The Debtors request further relief from the U.S. Trustee Guidelines to the extent they require all of the Debtors' receipts and disbursements be made by check with a notation representing the reason for the disbursement.    Considering the complexity of the Debtors' operations, it is necessary for the Debtors to conduct transactions by debit, wire, ACH payments, or other similar methods in the ordinary course of business.    In addition, a certain percentage of the Debtors' customer receipts are received through ACH and wire transfer payments.    To deny the Debtors the opportunity to conduct transactions by debit, wire, or ACH Payments or other similar methods would likely interfere with the Debtors' performance of their contracts and unnecessarily disrupt the Debtors' business operations, as well as create additional costs to be borne by the Debtors and their creditors.

IV.    **Cause Exists for Waiving the Deposit Guidelines**
        **of Bankruptcy Code Section 345.**

35.    Prior to the Petition Date, the Debtors maintained all cash in accounts that may not be designated as authorized depositories under the U.S. Trustee Guidelines.    The Debtors request authority to continue to utilize their accounts that are non-authorized depositories.    In accordance with their prepetition practices, funds are maintained in accounts that may not be with banks that are listed as approved depositories pursuant to the U.S. Trustee Guidelines, or may exceed the level for FDIC insurance.

36.    Bankruptcy Code section 345(a) authorizes deposit or investment of money of estates, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a).    While Bankruptcy Code section 345(b) generally requires that, with respect to investments other than investments "insured or guaranteed by the United States or by a department, agency or instrumentality of the

15

United States or backed by the full faith and credit of the United States," the estate must require a bond in favor of the United States secured by the undertaking of a U.S. Trustee-approved corporate surety, it allows the court to dispense with this limitation "for cause." 11 U.S.C. § 345(b).

37.    The Debtors submit that cause exists in these chapter 11 cases for the Court to allow the Debtors to continue their practice of maintaining deposits in accounts that are not authorized depositories.  The Debtors further request that the applicable Banks be authorized to accept and hold or invest such funds in accordance with the Debtors' pre-petition practice, without the need for any additional agreements not otherwise utilized prior to the Petition Date.

38.    The Debtors respectfully submit that their other deposit accounts provide sufficient protection for their cash and that it would be in the best interest of their estates and creditors for the Debtors to continue to follow this practice for investment of cash.  Moreover, a bond secured by undertaking a corporate surety would likely be unduly expensive, assuming such a bond were available, and could offset much of the financial gain derived from investing in the bank accounts.

39.    The Court's ability to excuse strict performance of the deposit and investment requirements of Bankruptcy Code section 345(b) "for cause" arises from the 1994 amendments to the Bankruptcy Code.  The legislative history of that amendment provides:

> Section 345 of the Code governs investments of funds of bankruptcy estates.  The purpose is to make sure that funds of a bankrupt that are obliged to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankruptcy estate.  Under current law, all investments are required to be FDIC insured, collateralized or bonded.  While this requirement is wise in the case of smaller debtors with limited funds that cannot afford a risky investment to be lost, it can work to needlessly handcuff larger, more sophisticated debtors.  This section would amend the Code to allow the courts to approve

> investments other than those permitted by section 345(b) for just
> cause, thereby overruling In re Columbia Gas Systems, Inc., 33
> F.3d 294 (3d Cir. 1994).

In re Serv. Merch. Co., Inc., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (quoting H.R. Rep.

103-834, 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994); 140 Cong. Rec. H10767 (Oct. 4, 1994)).

40.     In determining whether the "for cause" standard has been met, the Court should

consider a "totality of the circumstances," utilizing the following factors:

a)     the sophistication of the debtor's business;

b)     the size of the debtor's business operations;

c)     the amount of the investments involved;

d)     the bank ratings (Moody's and Standard & Poor) of the financial
       institutions where the debtor in possession funds are held;

e)     the complexity of the case;

f)     the safeguards in place within the debtor's own business of insuring the
       safety of the funds;

g)     the debtor's ability to reorganize in the face of a failure of one or more of
       the financial institutions;

h)     the benefit to the debtor;

i)     the harm, if any, to the estate; and

j)     the reasonableness of the debtor's request for relief from section 345(b)
       requirements in light of the overall circumstances of the case.

Serv. Merch., 240 B.R. at 896.

41.     Here, the Debtors submit that any risk to the funds does not require strict

adherence to the requirements of Bankruptcy Code section 345(b).  Moreover, if granted a

waiver, the Debtors will not be burdened with the significant administrative difficulties and

expenses relating to opening new accounts in a manner that ensures all of their funds are fully

insured or invested strictly in accordance with the restrictions established by Bankruptcy Code section 345.

42.    In other large, complex, or well-publicized chapter 11 cases, this Court has liberally construed the requirement of Bankruptcy Code section 345(b) that the debtor-in-possession obtain a bond from any entity with which their money is deposited or invested.  In those instances, this Court has waived the requirements of Bankruptcy Code section 345(b) and replaced them with alternative procedures.  See, e.g., In re School Specialty, Inc., Case No. 13-10125 (KJC) (Bankr. D. Del. Jan. 30, 2013); In re Overseas Shipping Group., Inc., Case No. 12-20000 (PJW) (Bankr. D. Del. Jan. 24, 2012); In re Monitor Group Co. Ltd. P'ship, Case No. 12-13042 (CSS) (Bankr. D. Del. Dec. 4, 2012); In re Southfield Office Bldg. 14, LP, Case No. 12-12415 (BLS) (Bankr. D. Del. Nov. 28, 2012); In re Pemco Worldwide Air Servs., Inc., Case No. 12-10799 (MFW) (Bankr D. Del. March 6, 2012); In re Neb. Book Co., Case No. 11-12005 (PJW) (Bankr. D. Del. June 28, 2011); In re L.A. Dodgers LLC, Case No. 11-12010 (KG) (Bankr. D. Del. June 28, 2011).  Cause exists for a similar waiver in these cases.

## V.    The Debtors Should Be Authorized to Continue Performing Under the Intercompany Transactions.

43.    To permit the ordinary course operations of the Debtors' businesses to continue without disruption, the Intercompany Transactions must be preserved to the degree requested herein.  If the Intercompany Transactions were discontinued, a number of services currently provided by and among the Debtor and non-Debtor entities, such as the centralized payment of rent, payroll, and certain other costs, would be disrupted, and may even be so counterproductive as to risk causing serious operational and business disruptions for the Debtors.  Accordingly, the Debtors respectfully submit that the continuation of the Intercompany Transactions is in the best

interest of the Debtors' estates and their creditors and, therefore, the Debtors should be permitted to continue such Intercompany Transactions.

44.    At any given time, there may be balances due and owing between and among Debtor and non-Debtor affiliates.  These balances represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System.  Thus, while the Debtors are not seeking to assume any Intercompany Transactions as executory contracts at this time, the Debtors respectfully request the authority, in their sole discretion, to continue performing under the Intercompany Transactions, as described herein, in the ordinary course of business without need for further Court order.

45.    This Court has routinely granted such authority in other complex multi-debtor chapter 11 cases to continue in place ordinary course intercompany transactions.  See, e.g., In re School Specialty, Inc., Case No. 13-10125 (KJC) (Bankr. D. Del. Jan. 30, 2013); In re Overseas Shipping Group., Inc., Case No. 12-20000 (PJW) (Bankr. D. Del. Jan. 24, 2012); In re Monitor Group Co. Ltd. P'ship, Case No. 12-13042 (CSS) (Bankr. D. Del. Dec. 4, 2012); In re Southfield Office Bldg. 14, LP, Case No. 12-12415 (BLS) (Bankr. D. Del. Nov. 28, 2012); In re Pemco Worldwide Air Servs., Inc., Case No. 12-10799 (MFW) (Bankr D. Del. March 6, 2012); In re Neb. Book Co., Case No. 11-12005 (PJW) (Bankr. D. Del. June 28, 2011); In re L.A. Dodgers LLC, Case No. 11-12010 (KG) (Bankr. D. Del. June 28, 2011).  For the reasons discussed herein, the Debtors submit that this Court should authorize the Debtors to continue to perform under the Intercompany Transactions.

## VI.    Granting Administrative Priority Status to Postpetition Intercompany Claims Is Necessary to Protect the Debtors' Claims.

46.    The Debtors' funds are commingled in the Cash Management System, and the individual Debtor's rights with respect to funds input into that system are documented by

intercompany book entries reflecting Intercompany Claims, attributed expenses, and investments among the participants in the Cash Management System in the ordinary course. The Debtors track all fund transfers electronically in their accounting system and can ascertain, trace, and account for all Intercompany Transactions. If the Intercompany Transactions that permit use of the Cash Management System were to be discontinued, that system and related administrative controls would be disrupted to the Debtors' detriment. Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption in the Debtors' Cash Management System will facilitate the Debtors' reorganization efforts.

47.     The Debtors respectfully request that, pursuant to Bankruptcy Code sections 503(b)(1) and 364(b), all Intercompany Claims against a Debtor by another Debtor or a non-Debtor affiliate arising after the Petition Date, as a result of ordinary course Intercompany Transactions through the Cash Management System, be accorded administrative priority expense status. If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

48.     Administrative expense treatment for intercompany transactions, as requested here, has been granted in other comparable chapter 11 cases in this district. See, e.g., In re School Specialty, Inc., Case No. 13-10125 (KJC) (Bankr. D. Del. Jan. 30, 2013); In re Ambassadors Int'l, Inc., Case No. 11-11002 (Bankr. D. Del. Apr. 5, 2011); In re OTC Holdings Corp., Case No. 10-12636 (Bankr. D. Del. Aug. 27, 2010); In re NEC Holdings Corp., Case No. 10-11890 (Bankr. D. Del. July 13, 2010); In re Atrium Corp., Case No. 10-10150 (Bankr. D. Del. Jan. 21, 2010); In re Int'l Aluminum Corp., Case No. 10-10003 (Bankr. D. Del. Jan. 6, 2010).

### The Requirements of Bankruptcy Rule 6003 Have Been Satisfied

49.     Under Bankruptcy Rule 6003, this Court may authorize the Debtors to continue using the Cash Management System because such relief is necessary to avoid immediate and irreparable harm.   Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001(c)(2)); see also Fed. R. Bankr. P. 6003, Committee Notes (noting that cases applying Bankruptcy Rule 4001(b)(2) and (c)(2) may "provide guidance" for relief under Bankruptcy Rule 6003).

50.     The Cash Management System is crucial to the Debtors' continued operations. Without the Cash Management System, payments might not be made in a timely manner and the Debtors would be unable to track incoming receipts efficiently.   Late payments may cause the Debtors to face vendors unwilling to provide necessary goods and services.   Moreover, the lack of an integrated Cash Management System would make the tracking of cash movements and balances much more difficult, potentially causing the Debtors to lack critical information on current liquidity.  Such situations could cause a diminution in the value of the Debtors' estates to the detriment of all parties in interest.  As a result, it is clear that immediate and irreparable harm would result without the relief requested herein being granted.

### Waiver Of Bankruptcy Rule 6004(a) and 6004(h)

51.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

52.     The Debtors have provided notice of the Motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the Largest Thirty (30) Unsecured Claims; (c) counsel to the agent for the Debtors' prepetition secured lenders; (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; (f) the Delaware Secretary of State; (g) the Delaware Secretary of Treasury; and (h) the Banks.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## No Prior Request

53.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, the Debtors respectfully request that the Court (a) enter the Interim Order, substantially in the form attached hereto as Exhibit A, and the Final Order, substantially in the form attached hereto as Exhibit B, granting the relief requested herein and (b) grant such other and further relief as is just and proper.

Dated: March 18, 2013

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**

*/s/ Steven K. Kortanek*
Steven K. Kortanek (DE Bar No. 3106)
Thomas M. Horan (DE Bar No. 4641)
Ericka F. Johnson (DE Bar No. 5024)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
E-mail: skortanek@wcsr.com
E-mail: thoran@wcsr.com
E-mail: erjohnson@wcsr.com

-and-

**KIRKLAND & ELLIS LLP**

Christopher Marcus, P.C. (*pro hac vice* pending)
David S. Meyer (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
E-mail: christopher.marcus@kirkland.com
E-mail: david.meyer@kirkland.com

*Proposed Counsel to the Debtors and Debtors-in-Possession*