## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PROMMIS HOLDINGS, LLC, <u>et al.</u>,[1] | ) Case No. 13-10551 (BLS) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

### DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS
### (A) AUTHORIZING THE USE OF CASH COLLATERAL;
### (B) GRANTING ADEQUATE PROTECTION; (C) MODIFYING
### THE AUTOMATIC STAY; AND (D) SCHEDULING A FINAL HEARING

Prommis Holdings, LLC and certain of its affiliates, as debtors and debtors in possession

(collectively, the "Debtors"), by and through their undersigned counsel, hereby file this motion

(the "Motion") for entry of interim and final orders pursuant to sections 105(a), 361, 362, 363,

and 507 of title 11 of the United States Code (the "Bankruptcy Code") (a) authorizing the

Debtors to use Cash Collateral (as defined in section 363(a) of the Bankruptcy Code);[2]

(b) authorizing the Debtors to provide adequate protection to the Agents (as defined herein) and

the Lenders (as defined herein); (c) modifying the automatic stay; and (d) scheduling a final

hearing. In support of the Motion, the Debtors submit the Declaration of Charles T. Piper in

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Prommis Holdings, LLC (6940); Prommis Fin Co. (2965); Prommis Solutions, LLC (9978); E-Default Services LLC (0016); Statewide Tax and Title Services LLC (0049); Statewide Publishing Services LLC (0079); Nationwide Trustee Services, Inc. (2436); Statewide Tax and Title Services of Alabama LLC (7733); Nationwide Trustee Services of Virginia, Inc. (6687); Interface Inc. (9903); and Prommis Homeownership Solutions, Inc. (0569). The location of the Debtors' headquarters and the Debtors' service address is 400 Northridge Road, Atlanta, Georgia, 30350.

[2]    Section 363(a) of the Bankruptcy Code defines "cash collateral" as follows:

Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

Support of Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration"), filed contemporaneously herewith. In further support of the Motion, the Debtors respectfully represent as follows:

## Jurisdiction and Venue

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105(a), 361, 362, 363, and 507(a) of the Bankruptcy Code, Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Introduction[3]

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a petition with this Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. Concurrently with the filing of the Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

---

[3]      A description of the Debtors' businesses, the reasons for commencing these chapter 11 cases and the relief sought from this Court to allow for a smooth transition into chapter 11 are set forth in the First Day Declaration.

**Relief Requested**

5.       By this Motion, and pursuant to sections 105(a), 361, 362, 363, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 9013, and 9014, and Local Rules 4001-2 and 9013-1, the Debtors request entry of the proposed interim order (the "Interim Order"), substantially in the form attached hereto as Exhibit A, (a) authorizing the Debtors to use Cash Collateral; (b) authorizing the Debtors to provide adequate protection to the Agents and the Lenders for any diminution in value of their respective interests in the Prepetition Collateral (as defined herein), including the Cash Collateral; (c) vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order; and (d) scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion on a final basis and the entry of a final order (the "Final Order").

**Concise Statements of Relief Requested
in Accordance with Bankruptcy Rule 4001 and Local Rule 4001-2**

6.       Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the following are the material provisions of the Interim Order.

         a.       Bankruptcy Rule 4001 Concise Statements.

| |
|---|
| **Entities with Interest in Cash Collateral**<br>*Bankruptcy Rule 4001(b)(1)(B)(i)* |
| The Administrative Agent, the First Lien Collateral Agent (for the benefit of the First Lien Lenders), the Second Lien Collateral Agent (for the benefit of the Second Lien Lenders), and the Third Lien Collateral Agent (for the benefit of the Third Lien Lenders). |
| See Interim Order at ¶ H-S. |
| **Use of Cash Collateral**<br>*Bankruptcy Rule 4001(b)(1)(B)(ii)* |
| The Debtors shall be authorized to use the Cash Collateral in accordance with the Budget. |
| See Interim Order at ¶ 4-7. |

## Material Terms, Including Termination Date of Use of Cash Collateral
*Bankruptcy Rule 4001(b)(1)(B)(iii)*

The Debtors shall be authorized to use the Cash Collateral in accordance with the Budget during the period from the Petition Date until the Termination Date.

See Interim Order at ¶ 4-7; ¶ 16.

## Adequate Protection for the Agents for the Benefit of the Lenders
*Bankruptcy Rule 4001(b)(1)(B)(iv)*

### Post-Petition Unencumbered Collateral Liens

The Collateral Agents (for the benefit of their respective Lenders) shall be granted, in their respective priorities pursuant to the Credit Agreement and the Intercreditor Provisions (subject to the Pre-Petition Liens, where applicable, the Permitted Encumbrances, and the Carve-Out), Post-Petition Unencumbered Collateral Liens on the Post-Petition Collateral.

See Interim Order at ¶ 9(a)(i); ¶ 9(b)(i); ¶ 9(c)(i).

### Post-Petition Liens

The Collateral Agents (for the benefit of their respective Lenders) shall be granted, in their respective priorities pursuant to the Credit Agreement and the Intercreditor Provisions, Post-Petition Liens on the Collateral, including, subject to and only effective upon entry of the Final Order, the proceeds of any claims or causes of action arising under sections 541, 542, 544, 545, 547, 548, 550, 551, 552(b) and 553 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code (other than those arising under section 549 of the Bankruptcy Code).

See Interim Order at ¶ 9(a)(ii); ¶ 9(b)(ii); ¶ 9(c)(ii).

### Superpriority Claims

The Collateral Agents (for the benefit of their respective Lenders) shall be granted, in their respective priorities pursuant to the Credit Agreement and the Intercreditor Provisions, Superpriority Claims (subject only to the Carve-Out) in amounts equal to the diminution in value of the Cash Collateral and the Pre-Petition Collateral during these chapter 11 cases or any subsequent chapter 7 cases with priority over all other administrative claims in these chapter 11 cases and any subsequent chapter 7 cases.

See Interim Order at ¶ 9(a)(iii); ¶ 9(b)(iii); ¶ 9(c)(iii).

### Reporting

The Debtors will provide the Administrative Agent with certain reporting on the terms and conditions set forth in the Interim Order.

See Interim Order at ¶ 11-14.

### Fees, Costs, and Expenses of the Agents

The Debtors will pay the Agents, in cash on a current basis, all reasonable and documented out-of-pocket fees, costs, and expenses of the Agents' legal and business advisors, incurred prior to and on and after the Petition Date.

See Interim Order at ¶ 15.

## Carve-Out
*Bankruptcy Rule 4001(b)(1)(B)*

For the purposes hereof, the "Carve-Out" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below) as determined by agreement of the U.S. Trustee or by final order of the Court; (ii) the sum of $15,000 to be allocated for the fees and expenses of a chapter 7 trustee in the event these chapter 11 cases are converted to chapter 7 cases; (iii) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all unpaid fees, disbursements, costs and expenses (collectively, the "Professional Fees") incurred by (x) Debtors' Counsel, (y) Huron Consulting and Donlin Recano & Company, Inc. (together with Debtors' Counsel, collectively, the "Estate Professionals"), and (z) counsel to the Committee,

and, with respect to Huron Consulting, Donlin Recano & Company, Inc. and counsel to the Committee, in an amount not to exceed the respective amounts in the Budget, at any time before or on the first business day following delivery by the Agents (at the direction of the Required Lenders) of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) after the first business day following delivery by the Agents (at the direction of the Required Lenders) of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of Professional Fees of Debtors' Counsel in an aggregate amount not to exceed $100,000 (the "Post Carve-Out Trigger Notice Cap").  "Carve-Out Trigger Notice" means written notice delivered by the Agents (at the direction of the Required Lenders) to the Debtors and their lead counsel, the U.S. Trustee, and, if a Committee is appointed, lead counsel to the Committee appointed in these Chapter 11 Cases, which notice may be delivered following (or concurrently with) the occurrence of a Termination Date, stating that the Post Carve-Out Trigger Notice Cap has been invoked. For the avoidance of doubt and notwithstanding anything to the contrary herein or in the Loan Documents, the Carve-Out shall be senior to all liens and claims securing the Cash Collateral, the First Lien Post-Petition Unencumbered Collateral Lien, the First Lien Post-Petition Liens, the First Lien Superpriority Claim, the Second Lien Post-Petition Unencumbered Collateral Lien, the Second Lien Post-Petition Liens, the Second Lien Superpriority Claim, the Third Lien Post-Petition Unencumbered Collateral Lien, the Third Lien Post-Petition Liens, the Third Lien Superpriority Claim, and the Revolving Loans, the First Lien Term Loans, the Second Lien Term Loans, and the Third Lien Term Loans.  Notwithstanding anything to the contrary herein, neither the Carve-Out nor any other Collateral may be used for the payment of any fees or disbursements incurred in connection with: (i) attempting to modify or otherwise alter any of the terms and conditions set forth in [the Interim Order] or in the Final Order approved by the Agents; (ii) attempting to obtain, without the express prior written consent of the Agents, acting at the direction of the Required Lenders, this Court's authorization to use Cash Collateral; provided, that the Carve-Out may be used in connection with any emergency hearing, during the Remedies Notice Period, to determine if a Termination Event has occurred; or (iii) asserting, alleging, bringing, or supporting any claim or cause of action, of any type or nature whatsoever, against any Agent or any of the Lenders, including, without limitation, challenging the amount, extent, priority, validity, enforceability, perfection or enforcement of Obligations or any of the Agents' security interests and liens or to recover any funds previously paid to the Agents or the Lenders.  This Carve-Out shall be superior to the rights of any succeeding trustee.

See Interim Order at ¶ 27.

b.    Local Rule 4001-2 Concise Statements.

| **Cross-Collateralization Provisions** *Local Rule 4001-2(a)(i)(A)* |
| --- |
| Not Applicable |

| **Binding Findings of Fact, Stipulations, and Waivers** *Local Rule 4001-2(a)(i)(B)* |
| --- |
| Pursuant to the Interim Order, the Debtors stipulate to the following: |

- The Debtors are the owners of the revenues from their businesses and all such revenues are property of their estates, subject to the liens of the Agents.

  See Interim Order at ¶ H.

- Prior to the Petition Date, Prommis Fin Co., a Delaware corporation, as borrower (the "Borrower"), the other Debtors, as guarantors, the Administrative Agent, each Collateral Agent and the Lenders party thereto entered into that certain *Credit and Guaranty Agreement,* dated as of June 12, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").

  See Interim Order at ¶ I.

- Each of (i) Prommis Holdings, LLC, a Delaware limited liability company, (ii) Prommis Solutions, LLC, a Delaware limited liability company, (iii) E-Default Services LLC, a Delaware limited liability company, (iv) Statewide Tax and Title Services LLC, a Delaware limited liability company, (v) Statewide Tax and Title Services of Alabama LLC, an Alabama limited liability company, (vi) Statewide Publishing Services

LLC, a Delaware limited liability company, (vii) Nationwide Trustee Services, Inc., a Tennessee corporation, (viii) Nationwide Trustee Services of Virginia, Inc., a Virginia corporation, (ix) Cal-Western Reconveyance Corporation, a California corporation, (x) Cal-Western Reconveyance Corporation of Washington, a Washington corporation, (xi) Reliable Reconveyance Corporation, a California corporation, (xii) Interface Inc., a California corporation, and (xiii) Prommis Homeownership Solutions, Inc., a California corporation, is a guarantor of the Borrower's obligations under the Credit Agreement pursuant to the terms thereof.

See Interim Order at ¶ J.

- The Credit Agreement and the other agreements, documents, instruments and certificates executed by the Debtors or otherwise delivered in connection with the Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time, collectively, the "Loan Documents") are valid and enforceable in accordance with their terms against each of the Debtors, are not subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever, and are not subject to avoidance, subordination, recharacterization or other challenge pursuant to applicable state or federal law (including, without limitation, the Bankruptcy Code).

See Interim Order at ¶ K.

- Pursuant to the terms of the Loan Documents, certain of the Lenders (collectively, the "Revolving Lenders") agreed to provide the Borrower with revolving loans up to $10,000,000 (the "Revolving Loans"). In addition: (i) certain of the Lenders (collectively, the "First Lien Term Loan Lenders"; together with the Revolving Lenders, the "First Lien Lenders") agreed to provide the Borrower with a first lien term loan in an original principal amount of $15,000,000 (the "First Lien Term Loans"); (ii) certain of the Lenders (collectively, the "Second Lien Lenders") agreed to provide the Borrower with a second lien term loan in an original principal amount of $30,000,000 (the "Second Lien Term Loans"); and (iii) certain of the Lenders (collectively, the "Third Lien Lenders") agreed to provide the Borrower with a third lien term loan in an original principal amount of $15,000,000 (the "Third Lien Term Loans"). As of the Petition Date, the Debtors were indebted to the Lenders under the Loan Documents in the approximate outstanding principal amount of no less than $73,979,885.12, together with all other liabilities and obligations of the Debtors arising out of or in connection with the Credit Agreement and the other Loan Documents, including, but not limited to, all accrued and unpaid interest, fees, costs and expenses including professional fees (collectively, the "Obligations;" the Obligations owing to the First Lien Lenders are referred to herein as the "First Lien Obligations;" the Obligations owing to the Second Lien Lenders are referred to herein as the "Second Lien Obligations;" and the Obligations owing to the Third Lien Lenders are referred to herein as the "Third Lien Obligations"). As of the Petition Date, the aggregate outstanding amount of the Revolving Loans was no less than $10,000,000, the aggregate outstanding amount of the First Lien Term Loans was no less than $15,964,329.25, the aggregate outstanding amount of the Second Lien Term Loans was no less than $32,010,370.59, and the aggregate outstanding amount of the Third Lien Term Loans was no less than $16,005,185.28.

See Interim Order at ¶ L.

- The Obligations are legal, binding and enforceable obligations of the Debtors and not subject to any offset, defense, claim, counterclaim or any other diminution of any type, kind or nature whatsoever. No portion of the Obligations, or any funds previously paid to the Agents or the Lenders, is subject to avoidance, recharacterization, recovery, disallowance or subordination pursuant to the Bankruptcy Code (including, but not limited to, Section 502(d) of the Bankruptcy Code) or applicable non-bankruptcy law.

See Interim Order at ¶ M.

- Each of the First Lien Obligations, the Second Lien Obligations and the Third Lien Obligations are secured by separate security interests in substantially all of each of the Debtors' assets, including, without limitation, accounts, equipment, inventory, personal property, general intangibles, chattel paper, contracts, deposit accounts, equity interests, fixtures, instruments, intercompany obligations, investment property, patent, trademark and copyright collateral, documents and records, and all proceeds, products, rents and profits of the foregoing, but excluding the Excluded Assets (as defined below) (collectively, the "Pre-Petition Collateral"), and have the respective lien priorities described in paragraphs P, Q and R [of the

Interim Order]. "Excluded Assets" means the Excluded Deposit Accounts and the Excluded Equipment and Inventory.

See Interim Order at ¶ N.

- Each Collateral Agent filed UCC-1 Financing Statements regarding the Pre Petition Collateral against the Debtors in the applicable state filing office.

See Interim Order at ¶ O.

- The liens and security interests of the First Lien Collateral Agent in the Pre-Petition Collateral (the "First Lien Pre-Petition Liens") are: (i) senior in priority to the security interests of all other persons except for the security interests permitted to exist under Section 6.02 of the Credit Agreement ("Permitted Encumbrances"), to the extent the Permitted Encumbrances are valid, enforceable and are perfected and are not subject to avoidance, subordination, recharacterization or other challenge, in each case as of the Petition Date; and (ii) valid, enforceable, binding and properly perfected and are not subject to avoidance, subordination or disallowance pursuant to the Bankruptcy Code or applicable law.

See Interim Order at ¶ P.

- The liens and security interests of the Second Lien Collateral Agent in the Pre-Petition Collateral (the "Second Lien Pre-Petition Liens") are: (i) senior in priority to the security interests of all other persons except for (a) the First Lien Pre-Petition Liens, and (b) Permitted Encumbrances, to the extent the Permitted Encumbrances are valid, enforceable and are perfected and are not subject to avoidance, subordination, recharacterization or other challenge, in each case as of the Petition Date; and (ii) valid, enforceable, binding and properly perfected and are not subject to avoidance, subordination or disallowance pursuant to the Bankruptcy Code or applicable law.

See Interim Order at ¶ Q.

- The liens and security interests of the Third Lien Collateral Agent in the Pre-Petition Collateral (the "Third Lien Pre-Petition Liens"; together with the First Lien Pre-Petition Liens and the Second Lien Pre-Petition Liens, collectively, the "Pre-Petition Liens") are: (i) senior in priority to the security interests of all other persons except for (a) the First Lien Pre-Petition Liens, (b) the Second Lien Pre-Petition Liens and (c) Permitted Encumbrances, to the extent the Permitted Encumbrances are valid, enforceable and are perfected and are not subject to avoidance, subordination, recharacterization or other challenge, in each case as of the Petition Date; and (ii) valid, enforceable, binding and properly perfected and are not subject to avoidance, subordination or disallowance pursuant to the Bankruptcy Code or applicable law

See Interim Order at ¶ R.

- As of the Petition Date, the Collateral Agents and the Lenders are holders of secured claims against the Debtors and, as such, are entitled to adequate protection of their interests in the Cash Collateral and Pre-Petition Collateral pursuant to Section 363(e) of the Bankruptcy Code.

See Interim Order at ¶ S.

| **Section 506(c) Waiver** |
| *Local Rule 4001-2(a)(i)(C)* |

Upon entry of the Final Order.

See Interim Order at ¶ 21.

| **Liens on Chapter 5 Causes of Action** |
| *Local Rule 4001-2(a)(i)(D)* |

Liens on proceeds of chapter 5 causes of action upon entry of the Final Order.

See Interim Order at ¶ 9(a)(ii), 9(b)(ii), and 9(c)(iii).

| Provisions that Use Postpetition Loans From a Prepetition Secured Creditor to Pay Part or All of that Secured Creditor's Prepetition Debt (Other than as Provided in Section 552(b) of the Bankruptcy Code *Local Rule 4001-2(a)(i)(E)* |
| --- |
| Not Applicable. |

| Provisions that Provide Disparate Treatment for Professionals Retained by a Creditors' Committee and those Professionals Retained by the Debtor in Connection with a Carve-Out *Local Rule 4001-2(a)(i)(F)* |
| --- |
| The fees and expenses of any committee appointed in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code will be subject to the Budget and the fees and expenses of the advisors to any such committee are not included in the Post-Carve-Out Trigger Notice Cap. <br><br> See Interim Order at ¶ 27. |

| Non-Consensual Priming Liens *Local Rule 4001-2(a)(i)(G)* |
| --- |
| Not Applicable. |

## Summary of the Debtors' Prepetition Capital Structure

7.     As more fully set forth in the First Day Declaration, the Debtors' prepetition capital structure consists of three tranches of secured debt, and, as of the Petition Date, the Debtors were indebted to the Lenders under the Loan Documents (as defined herein) in the approximate principal outstanding amount of no less than $73,979,885.12.

## I.      First Lien Revolving Credit Facility

8.     Prior to the Petition Date, Prommis Fin Co., a Delaware corporation, as borrower (the "Borrower"), the other Debtors and non-debtors Cal-Western Reconveyance Corp., Cal-Western Reconveyance Corp. of Washington, and Reliable Reconveyance Corp. (each a direct or indirect subsidiary of Debtor Prommis Solutions, LLC, and collectively, the "CWR Subsidiaries"), as guarantors, Gleacher Products Corp., in its capacities as the administrative agent (in such capacity, the "Administrative Agent"), as first lien collateral agent (in such capacity, the "First Lien Collateral Agent"), as second lien collateral agent (in such capacity, the "Second Lien Collateral Agent"), and as third lien collateral agent (in such capacity, the "Third Lien Collateral Agent," together with the First Lien Collateral Agent and the Second

Lien Collateral Agent, the "Collateral Agents," and with the Administrative Agent and the Collateral Agents, collectively, the "Agents"), on behalf of the Lenders party to that certain Credit and Guaranty Agreement, dated as of June 12, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement," and, together with all associated agreements, instruments and documents, the "Loan Documents"), entered into the Credit Agreement.

9.    Pursuant to the terms of the Loan Documents, certain of the Lenders (collectively, the "Revolving Lenders") agreed to provide the Borrower with revolving loans up to $10,000,000 (the "Revolving Loans") on a first lien basis. As of the Petition Date, the aggregate outstanding amount of the Revolving Loans was no less than $10,000,000 plus all accrued and unpaid interest, fees, costs, and expenses including professionals fees (collectively, the "Revolving Loan Obligations").

**II.    First Lien Term Loan**

10.    Certain of the Lenders (together with the Revolving Lenders, the "First Lien Lenders") agreed to provide the Borrower with a first lien term loan in an original principal amount of $15,000,000 (the "First Lien Term Loans"). As of the Petition Date, the aggregate outstanding amount of the First Lien Term Loans was no less than $15,964,329.25 plus all accrued and unpaid interest, fees, costs, and expenses including professionals fees (and with the Revolving Loan Obligations, collectively, the "First Lien Obligations").

**III.    Second Lien Term Loan**

11.    Certain of the Lenders (collectively, the "Second Lien Lenders") agreed to provide the Borrower with a second lien term loan in an original principal amount of $30,000,000 (the "Second Lien Term Loans"). As of the Petition Date, the aggregate

outstanding amount of the Second Lien Term Loans was no less than $32,010,370.59 plus all accrued and unpaid interest, fees, costs, and expenses including professionals fees (collectively, the "Second Lien Obligations").

## IV.    Third Lien Term Loan

12.    Certain of the Lenders (collectively, the "Third Lien Lenders") agreed to provide the Borrower with a third lien term loan in an original principal amount of $15,000,000 (the "Third Lien Term Loans"). As of the Petition Date, the aggregate outstanding amount of the Third Lien Term Loans was no less than $16,005,185.28 plus all accrued and unpaid interest, fees, costs, and expenses including professionals fees (collectively, the "Third Lien Obligations").

## V.    Collateral for the Credit Facility

13.    Each of the First Lien Obligations, the Second Lien Obligations and the Third Lien Obligations are secured by separate security interests in substantially all of each of the Debtors and the non-debtor CWR Subsidiaries' assets, including, without limitation, accounts, equipment, inventory, personal property, general intangibles, chattel paper, contracts, deposit accounts, equity interests, fixtures, instruments, intercompany obligations, investment property, patent, trademark and copyright collateral, documents and records, and all proceeds, products, rents and profits of the foregoing, but excluding the Excluded Assets (collectively, the "Pre-Petition Collateral").[4]

14.    The liens and security interests of the First Lien Collateral Agent (for the benefit of the First Lien Lenders), the Second Lien Collateral Agent (for the benefit of the Second Lien Lenders), and the Third Lien Collateral Agent (for the benefit of the Third Lien Lenders) in the

---

[4]    "Excluded Assets" means the Excluded Deposit Accounts and the Excluded Equipment and Inventory.

Pre-Petition Collateral (the "Pre-Petition Liens"), each with the respective priorities afforded to such lenders under the Credit Agreement and the relevant intercreditor provisions contained therein (the "Intercreditor Provisions"),[5] are (a) senior in priority to the security interests of all other persons and (b) valid, enforceable, binding and properly perfected.

15.    As of the Petition Date, the Agents and the Lenders are holders of secured claims against the Debtors and, as such, are entitled to adequate protection of their interests in the Cash Collateral and Pre-Petition Collateral pursuant to Section 363(e) of the Bankruptcy Code.

### The Proposed Use of Cash Collateral

16.    The Debtors do not have available sources of working capital and financing to continue to operate their businesses without the use of Cash Collateral.  Specifically, the Debtors require access to Cash Collateral to, among other things, (a) make payments to vendors, suppliers and employees, (b) satisfy the ordinary costs of the Debtors' operations, and (c) fund the administrative costs of these chapter 11 cases, including implementing the proposed sale of all or substantially all of their assets and commencing an orderly wind-down of their businesses, as may be necessary.  In the absence of the authority to use Cash Collateral, the Debtors will not be able to operate their businesses and the Debtors' enterprise would suffer severe and irreparable harm through an immediate destruction of value.  Accordingly, the authority to use Cash Collateral is imperative to the Debtors' ability to preserve value and maximize recoveries to their stakeholders.

17.    Recognizing the importance of obtaining authority to continue to use Cash Collateral, the Debtors approached the Agents before the commencement of these chapter 11

---

[5]    Schedule 11.01 of the Credit Agreement, among other things, outlines the Intercreditor Provisions, which in part provide:  (a) the relative rights of the First Lien Lenders, the Second Lien Lenders, and the Third Lien Lenders and their respective Collateral Agents; and (b) the relative priorities of the First Lien Obligations, the Second Lien Obligations, and the Third Lien Obligations.

cases to discuss the terms on which the Lenders would agree to allow the Debtors to use Cash Collateral. After extensive good-faith, arms'-length negotiations between the Agents (on behalf of the Lenders) and the Debtors, the Agents and the Debtors agreed on the terms set forth in the proposed Interim Order, approval of which will allow the Debtors to transition smoothly into these chapter 11 cases, continue operating their businesses, and undertake the aforementioned dual-track approach to maximize value for all stakeholders. Specifically, the Debtors are authorized to use Cash Collateral up to the amounts, and only for the purposes set forth in the budget (the "Budget"), which is attached hereto as Exhibit 1 to Exhibit A. The Interim Order authorizes the Debtors to use Cash Collateral commencing on the Petition Date through the Expiration Date[6] or the occurrence of a Termination Event.[7]

---

[6] As more fully described in the Interim Order, the "Expiration Date" shall mean July 12, 2013; provided, however, that the Expiration Date may be extended with the express prior written consent of the Administrative Agent, acting at the direction of the Required Lenders, without further order of this Court following the Debtors providing written notice of the extension of the Expiration Date to the U.S. Trustee and any committee appointed in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code.

[7] As more fully described in the Interim Order, "Termination Event" shall mean:  (a) the Expiration Date; (b) reversal, vacatur, or modification, in whole or in part, of the Interim Order or any other order of this Court in any of these chapter 11 cases or any subsequent chapter 7 cases without the express prior written consent of the Administrative Agent, acting at the direction of the Required Lenders; (c) (i) dismissal of any of these chapter 11 cases or conversion of any of these chapter 11 cases to chapter 7 cases, or appointment of a chapter 11 trustee or examiner with expanded powers or other responsible person in any of these chapter 11 cases without the express prior written consent of the Administrative Agent, acting at the direction of the Required Lenders, (ii) termination of the exclusive period for the Debtors to file a chapter 11 plan in these chapter 11 cases or any subsequent chapter 7 cases, or (iii) the Debtors seek or request the entry of any order to effect any of the events described in subclause (i) of this clause (c) without the express prior written consent of the Administrative Agent, acting at the direction of the Required Lenders; (d) the entry by this Court of an order granting relief from the automatic stay imposed by Section 362 of the Bankruptcy Code sought by any party that materially affects the Debtors' property, without the express prior written consent of the Administrative Agent, acting at the direction of the Required Lenders; (e) five (5) business days after written notice to the Debtors of the failure by the Debtors to make any payment required pursuant to the Interim Order when due (during which time the Debtors may cure subject to any extensions of the due date); (f) five (5) business days after written notice to the Debtors of (i) the failure by the Debtors to deliver to the Agents any of the documents or other information required to be delivered pursuant to the Interim Order when due (during which time the Debtors may cure) or (ii) the fact that any such documents or other information contains a misrepresentation of a material fact (g) two (2) business days after the Debtors' failure to adhere to the Budget, subject to Permitted Variances, as provided for in the Interim Order; (h) except as set forth in the Interim Order, five (5) business days after written notice from either (i) the Administrative Agent to the Debtors, or (ii) the Debtors to the Administrative Agent, in each case, of the failure by the Debtors to observe or perform any of the terms or provisions contained in the Interim Order or any other order of this Court in any of these chapter 11 cases or any subsequent chapter 7 cases; (i) the entry of an order of this Court approving the terms of any debtor-in-possession financing for any of the Debtors,

18.    Of note, the CWR Subsidiaries, in consultation with the Lenders, elected not to commence chapter 11 cases and to instead pursue a strategic transaction outside of chapter 11. The CWR Subsidiaries' boards of directors, Prommis, and Prommis' senior management team believe that a sale of the CWR Subsidiaries as a going-concern outside of chapter 11 will maximize value for all stakeholders.    In furtherance of their goal to maximize value for all stakeholders, the Debtors assigned their services agreement with McCall Raymer, LLC, one of their leading law firm customers, to the CWR Subsidiaries (the "MR Assignment").    As further described in the Interim Order, any proceeds generated by a going-concern sale of the CWR Subsidiaries attributable to the MR Assignment will be allocated and paid to Debtor Prommis

---

or the Debtors shall seek or request the entry of any such order, in each case, without the express prior written consent of the Administrative Agent, acting at the direction of the Required Lenders; (j) except as provided in the Interim Order, the entry of an order of this Court granting any lien on or security interest in any of the Collateral that is pari passu with or senior to the Agents' respective liens on or security interests in the Collateral, or the Debtors shall seek or request the entry of any such order; (k) except as provided in the Interim Order, the Debtors' creating or permitting to exist any super-priority claim which is pari passu with or senior to the claims of the Agents or the Lenders, except for the Carve-Out; (l) the date any of the Debtors shall file, or materially support another party in interest's filing of a pleading, seeking to modify or otherwise alter any of the terms and conditions set forth in the Interim Order or any other order of this Court in any of these chapter 11 cases without the prior express prior written consent of the Administrative Agent, acting at the direction of the Required Lenders; m) two (2) business days after any of the Debtors uses Cash Collateral for any item other than those set forth in the Budget, except as agreed in writing in advance by the Administrative Agent, acting at the direction of the Required Lenders; (n) the date any of the Debtors (or any party with the support of any of the Debtors) shall file a chapter 11 plan in any of these chapter 11 cases if such plan is not in form and substance acceptable to the Administrative Agent, acting at the direction of the Required Lenders; (o) (2) business days after any Permitted Variances under the Budget are exceeded for any period of time (other than as approved in writing by the Administrative Agent, acting at the direction of the Required Lenders); (p) any judgments are entered with respect to any post-petition liabilities against any of the Debtors or any of their respective properties that materially affects the Debtors and/or such properties; (q) the failure of the Debtors to obtain entry of the Final Order in form and substance satisfactory to the Administrative Agent in its sole discretion on or before the twenty fifth (25th) day after the Petition Date; (r) the allowance of any claim under section 506(c) of the Bankruptcy Code or otherwise against any or all of the Agents, any Lender or the Collateral; (s) the failure of the Debtors to provide prompt notice to the Administrative Agent of any of the foregoing; (t) any Weekly Counsel Report (as defined herein provides that fees and expenses incurred by (or expected to be incurred by) Debtors' Counsel have exceeded (or are expected to exceed) the sum of $1,550,000 in the aggregate; and (u) the date that a default, event of default or breach occurs under that certain forbearance agreement, dated on or around the Petition Date (the "CWR Forbearance Agreement"), among the CWR Subsidiaries, the Administrative Agent, the First Lien Collateral Agent and the Required Lenders; provided, that such default, event of default or breach only shall constitute a Termination Event hereunder in the event that the CWR Subsidiaries fail to file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court within the time period provided in the CWR Forbearance Agreement.  The date at which the Agents (acting at the direction of the Required Lenders) elect to terminate the Debtors' use of Cash Collateral based on the occurrence of any Termination Event is the "Termination Date."

Solutions, LLC and then distributed to the Agents and the Lenders, within one business day after

the Debtors' receipt of such proceeds, and will then be applied to the First Lien Obligations, the

Second Lien Obligations, and the Third Lien Obligations in accordance with the Loan

Documents.

**Proposed Adequate Protection**

19.    Pursuant to Sections 361 and 363 of the Bankruptcy Code, as adequate protection

against any diminution in value of the interests of the Lenders in the Pre-Petition Collateral,

resulting from (a) the Debtors' use of the Pre-Petition Collateral and the Cash Collateral and

(b) the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code, the

First Lien Collateral Agent (for the benefit of the First Lien Lenders), the Second Lien Collateral

Agent (for the benefit of the Second Lien Lenders), and the Third Lien Collateral Agent (for the

benefit of the Third Lenders), shall be granted, all as more fully described in the Interim Order,

in their respective priorities pursuant to the Credit Agreement and the Intercreditor Provisions:

    a.    priority (subject to the Pre-Petition Liens, where applicable, the Permitted Encumbrances and the Carve-Out) liens (the "Post-Petition Unencumbered Collateral Liens") on all of the Debtors' assets and property that are not otherwise encumbered by valid, binding, enforceable and nonavoidable liens and security interests, including, but not limited to, any and all real, personal, tangible, or intangible property of the Debtors' estates, wherever located and of whatever kind or nature and any and all proceeds, products, cash, distributions, checks, negotiable instruments, securities, debt or equity, and other cash equivalents now or hereafter received by the Debtors in respect of any of the foregoing items, but excluding intent-to-use trademark or service mark applications (collectively, the "Post-Petition Collateral"), whether arising from Section 552(b) of the Bankruptcy Code or otherwise;

    b.    valid, enforceable and non-avoidable replacement liens (together with the Post-Petition Unencumbered Collateral Liens, the "Post-Petition Liens") on all assets and property of each of the Debtors other than Excluded Assets that are already encumbered as of the Petition Date (collectively, the "Existing Lien Collateral" and, together with Post-Petition Collateral, the "Collateral"), including, subject to and only effective upon entry of the Final Order, the proceeds of any claims or causes of action under sections

541, 542, 544, 545, 547, 548, 550, 551, 552(b) and 553 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code (other than those arising under section 549 of the Bankruptcy Code); and

c.    allowed superpriority administrative expense claims pursuant to section 507(b) of the Bankruptcy Code (the "Superpriority Claims") (subject only to the Carve-Out) in amounts equal to the diminution in value of the Cash Collateral and the Pre-Petition Collateral during these chapter 11 cases or any subsequent chapter 7 cases with priority over all other administrative claims in these chapter 11 cases and any subsequent chapter 7 cases.

20.    Additionally, the Debtors will provide the Administrative Agent with certain reporting (the "Reporting") on the terms and conditions set forth in the Interim Order. Specifically, the Debtors will:

a.    provide the Administrative Agent's counsel of record, via e-mail upon their filing, with copies of the monthly operating reports required to be filed by the U.S. Trustee;

b.    provide the Administrative Agent with weekly financial reports, which include (a) a 13-week cash flow projection and an accompanying variance report, and (b) such other information as agreed to by Debtors and the Administrative Agent;

c.    provide the Agents with such other information as may be reasonably requested by the Agents;

d.    authorize and cause their accountants, consultants, and financial advisors to cooperate with the Agents and provide the Agents with all information pertinent to the Debtors' businesses, which is reasonably requested by the Agents, but for such information, which the Debtors believe, based on the advice of counsel, is subject to attorney-client privilege; and

e.    provide the Agents with a written report on the Tuesday of each week during the Budget Period (as defined in the Interim Order) (each a "Weekly Counsel Report") that sets forth:

i.    the aggregate amount of fees and expenses incurred by each of Kirkland & Ellis LLP and Womble Carlyle Sandridge and Rice, LLP, co-counsel to the Debtors (collectively "Debtors' Counsel"), during the pendency of these chapter 11 cases;

ii.    the amount of fees and expenses incurred by each such counsel during the immediately preceding week (*i.e.*, Monday through and including Sunday);

      iii.      the amount of any retainer held by each such counsel, as of the date of such Weekly Counsel Report; and

      iv.      each Debtors' Counsel's goof-faith estimate of the amount of fees and expenses expected to be incurred by such counsel during the following two week period (*i.e.*, that first Monday of such period through and including the second Sunday of such period).

Furthermore, as more fully described in the Interim Order, in the event that any Weekly Counsel Report provides that the amount of fees and expenses incurred by Debtors' Counsel has reached $1,300,000, the Agents (acting at the direction of the Required Lenders) and the Debtors will meet and confer to discuss a potential modification of the Budget regarding the fees and expenses of Debtors' Counsel.

21.      Finally, the Debtors will provide the Agents with payment of all reasonable and documented out-of-pocket fees, costs, and expenses of the Agents' legal and business advisors in cash (the "Fee Payments" and with the Post-Petition Liens, the Superpriority Claims, and the Reporting, collectively, the "Proposed Adequate Protection").

**Consent by the Agents and Lenders**<br>**to the Use of Cash Collateral and the Proposed Adequate Protection**

22.      As noted above, pursuant to the Credit Agreement and Intercreditor Provisions, the Agents and the Lenders maintain the Pre-Petition Liens as security interests in the Pre-Petition Collateral, including the Cash Collateral. The Agents and the Lenders have agreed and consented to the Debtors' use of Cash Collateral and the proposed adequate protection as set forth in the Interim Order.

**Basis for Relief Requested**

I.      **The Use of Cash Collateral is Warranted and Should be Approved.**

23.      The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code, which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section ... 1108 ... of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

24.     Absent the use of Cash Collateral, the Debtors will not have sufficient working capital to (a) make payments to vendors, suppliers and employees, (b) satisfy ordinary operating costs, and (c) fund the administrative costs of these chapter 11 cases, including implementing the proposed sale of all or substantially all of their assets and commencing an orderly wind-down of their businesses, if necessary.  Furthermore, as discussed above, and in accordance with section 362(c)(2) of the Bankruptcy Code, the Agents (acting on behalf of the Lenders) have consented to the Debtors' use of Cash Collateral pursuant to the terms of the Interim Order, including the Budget.  Accordingly, the Debtors submit that the use of Cash Collateral is in the best interests of the Debtors' estates and should be approved.

## II.     The Proposed Adequate Protection Should be Approved.

25.     Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor in possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."

26.     What constitutes sufficient adequate protection is decided on a case-by-case basis. See In re Columbia Gas Sys., Inc., 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); see

also In re Martin, 761 F.2d 472 (8th Cir. 1985); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Sw. Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992). By adequate protection, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in its collateral during the period of a debtor's use. See In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); In re Hubbard Power & Light, 202 B.R. 680 (Bankr. E.D.N.Y. 1996). Adequate protection can come in various forms, including payment of adequate protection fees, payment of interest, granting of replacement liens, and administrative claims.

27.    Here, as more fully set forth in the Interim Order and as summarized above, the Debtors agreed to provide the Agents and the Lenders with, among other things, five primary forms of adequate protection to protect the Lenders from any diminution in the value of the Pre-Petition Collateral and the Cash Collateral.

28.    First, subject to the Pre-Petition Liens, where applicable, the Permitted Encumbrances, and the Carve-Out, the Debtors will provide the First Lien Collateral Agent (for the benefit of the First Lien Lenders), the Second Lien Collateral Agent (for the benefit of the Second Lien Lenders), and the Third Lien Collateral Agent (for the benefit of the Third Lien Lenders) with Post-Petition Unencumbered Collateral Liens on the Post-Petition Collateral, with such liens subject to the respective priorities afforded to such lenders under the Credit Agreement and the Intercreditor Provisions.

29.    Second, subject to the Carve-Out, the Debtors will provide the First Lien Collateral Agent (for the benefit of the First Lien Lenders), the Second Lien Collateral Agent (for the benefit of the Second Lien Lenders), and the Third Lien Collateral Agent (for the benefit of the Third Lien Lenders) with Post-Petition Liens on the Collateral, with such liens subject to

the respective priorities afforded to such lenders under the Credit Agreement and the Intercreditor Provisions, provided that the Post-Petition Liens on the proceeds of any claims or causes of action commenced by the Debtors pursuant to sections 541, 542, 544, 545, 547, 548, 550, 551, 552(b), and 553 of the Bankruptcy Code or any other section of the Bankruptcy Code (other than section 549 of the Bankruptcy Code) shall be subject to and effective only upon entry of the Final Order.

30.    Third, subject to the Carve-Out, the Debtors will provide the First Lien Collateral Agent (for the benefit of the First Lien Lenders), the Second Lien Collateral Agent (for the benefit of the Second Lien Lenders), and the Third Lien Collateral Agent (for the benefit of the Third Lien Lenders) with Superpriority Claims in amounts equal to the diminution in value of the Pre-Petition Collateral and the Cash Collateral during these chapter 11 cases or any subsequent chapter 7 cases with priority over all other administrative claims in these chapter 11 cases and any subsequent chapter 7 cases, with such Superpriority Claims subject to the respective priorities afforded to such lenders under the Credit Agreement and the Intercreditor Provisions.

31.    Fourth, the Debtors will provide the Reporting to the Administrative Agent on the terms set forth in the Interim Order, specifically monthly and weekly financial reports to ensure the Debtors' compliance with the Budget.  Furthermore, the Debtors will cause their accountants, consultants, and financial advisors to cooperate with the Agents and provide the Agents with all information pertinent to the Debtors' businesses which is reasonably requested by the Agents; provided that the Debtors will not provide such information that they believe, based on the advice of counsel, is subject to attorney-client privilege.

32.   Fifth, the Debtors will provide the Agents with the Fee Payments, paying all reasonable and documented out-of-pocket fees, costs, and expenses of the Agents' legal and business advisors in cash.

33.   In light of the foregoing, the Debtors submit, and the Agents (on behalf of the Lenders) agree, that the Proposed Adequate Protection is both necessary and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors can continue to have access to and the ability to use Cash Collateral. Accordingly, the Debtors submit that the Proposed Adequate Protection is (a) fair and reasonable, (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and (c) in the best interests of the Debtors and their estates. Moreover, Courts in this district have granted similar relief in other recent chapter 11 cases. See e.g., In re Masonite Corp., Case No. 09-10844 (PJW) (Bankr. D. Del. March 17, 2009) (interim order); In re Monaco Coach Com., Case No. 09-10750 (KJC) (Bankr. D. Del. Mar. 10, 2009) (interim order); In re Spansion Inc., Case No. 09-10690 (KJC) (Bankr. D. Del. Mar. 4, 2009) (interim order); In re Muzak Holdings LLC, Case No. 09-10422 (KJC) (Bankr. D. Del. Feb. 12, 2009) (interim order); In re Hawaiian Telcom Commun's, Inc., Case No. 08-13086 (PJW) (Bankr. D. Del. Dec. 3, 2008); In re DBSI, Inc., Case No. 08-12687 (PJW) (Bankr. D. Del. Dec. 8, 2008); In re Intermet Corp., Case No. 08-11859 (KG) (Bankr. D. Del. Sept. 19, 2008) (amended Nov. 14, 2008); In re Tropicana Entm't, LLC, Case No. 08-10856 (KJC) (Bankr. D. Del. May 30, 2008).

**Request For Immediate Relief Pending Final Hearing**

34.   Pursuant to Bankruptcy Rule 4001(b)(2), a final hearing on a motion for use of cash collateral, may be held no earlier than fifteen days after service of such motion. Bankruptcy Rule 4001(b)(2), however, empowers a court to conduct a preliminary expedited hearing on the

motion and to authorize of the use of cash collateral on an interim basis, to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

35.     Pursuant to Bankruptcy Rule 4001(b), the Debtors request that (a) the Court authorize the Debtors to use Cash Collateral pursuant to the terms of the Interim Order which will (i) allow the Debtors to operate their businesses in the ordinary course in order to preserve value so they can implement the proposed sale of all or substantially all of their assets and commence an orderly wind-down of their businesses, as may be necessary, and (ii) prevent immediate and irreparable harm and prejudice to the Debtors' estates, and (b) schedule the Final Hearing.

36.     Absent the Court's authorization to use Cash Collateral on an interim basis, pending a Final Hearing, the Debtors will suffer immediate and irreparable harm.  As set forth herein, the Debtors' ability to use Cash Collateral pursuant to the Budget is necessary for the continued operation of the Debtors' businesses.  Furthermore, absent the working capital provided by the Cash Collateral, the Debtors will be unable to pay employees, vendors, and suppliers, or fund the costs of their day-to-day operations, causing the Debtors' enterprise to suffer immediate and irreparable harm.  Therefore, the Debtors respectfully request entry of the Interim Order.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

37.     Under Bankruptcy Rule 6003, the Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm.  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 36 n.2 (Bankr.

S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001(c)(2)); see also Fed. R. Bankr. P. 6003, Committee Notes (noting that cases applying Bankruptcy Rule 4001(b)(2) and (c)(2) may "provide guidance" for relief under Bankruptcy Rule 6003).

38.     As described herein and in the First Day Declaration, the Debtors' ability to use Cash Collateral is critical to their ability operate their businesses, transition smoothly into these chapter 11 cases and, implement their dual-track approach for the benefit of their estates and all their stakeholders.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm, and, therefore, the requirements of Bankruptcy Rule 6003(b) are satisfied.

### Waiver of Bankruptcy Rule 4001(a)(3)

39.     The Debtors request a waiver of the stay of the effectiveness of the order approving the Motion under Bankruptcy Rule 4001(a)(3).  Bankruptcy Rule 4001(a)(3) provides "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 4001(a)(3).  As set forth herein, the use of Cash Collateral is necessary to allow the Debtors to operate their businesses and transition smoothly into these chapter 11 cases and, thereafter, undertake their dual-track approach for the benefit of their estates and all interested stakeholders.  Furthermore, allowing the Debtors' use of Cash Collateral will prevent irreparable harm to the Debtors' estates.  Accordingly, the Debtors submit that ample cause exists to justify the waiver of the fourteen day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such stay applies.

## Notice

40.     The Debtors have provided notice of the Motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the entities listed on the Consolidated List of Creditors Holding the Largest 30 Unsecured Claims; (c) counsel to the agent for the Debtors' prepetition secured lenders; (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; (f) the Delaware Secretary of State; and (g) the Delaware Secretary of Treasury.  In light of the nature of the relief requested, the Debtors submit that no other or further notice of the Interim Order need be provided.

41.     The Debtors further request that, at the Interim Hearing, the Court schedule the Final Hearing.  Following the Interim Hearing, the Debtors propose to serve notice of the Final Hearing (the "Final Hearing Notice") on (i) the Office of the United States Trustee for the District of Delaware; (ii) the creditors holding the thirty (30) largest unsecured claims against the Debtors' estates; (iii) all parties requesting notice pursuant to Bankruptcy Rule 2002; and (iv) all parties known to hold security interests or liens in the Cash Collateral.

## No Prior Request

42.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully requests (i) entry of the Interim Order; (ii) the scheduling of a Final Hearing; (iii) final approval of the use of Cash Collateral following such Final Hearing; and (iv) such other and further relief as is just and proper under the circumstances.

Dated:  March 22, 2013

WOMBLE CARLYLE SANDRIDGE
& RICE. LLP

/s/ Steven K. Kortanek
Steven K. Kortanek (DE Bar No. 3106)
Thomas M. Horan (DE Bar No. 4641)
Ericka F. Johnson (DE Bar No. 5024)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
E-mail: skortanek@wcsr.com
E-mail: thoran@wcsr.com
E-mail: erjohnson@wcsr.com

-and-

KIRKLAND & ELLIS LLP
Christopher Marcus, P.C. (*pro hac vice* pending)
David S. Meyer (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
E-mail: christopher.marcus@kirkland.com
E-mail: david.meyer@kirkland.com

*Proposed Counsel to the Debtors and Debtors-in-Possession*