## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| PROMMIS HOLDINGS, LLC, et al.,[1] | ) | Case No. 13-10551 (BLS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF CHARLIE T. PIPER
## IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS
## AND FIRST DAY MOTIONS

I, Charlie T. Piper, hereby declare under penalty of perjury:

1.     I am the Chief Executive Officer and President of Prommis Holdings, LLC ("Prommis"), a limited liability company organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). In this capacity, I am familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

2.     On the date hereof (the "Petition Date"), Prommis and ten (10) of its affiliates each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. Concurrently herewith, the Debtors filed a motion seeking joint

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Prommis Holdings, LLC (6940); Prommis Fin Co. (2965); Prommis Solutions, LLC (9978); E-Default Services LLC (0016); Statewide Tax and Title Services LLC (0049); Statewide Publishing Services LLC (0079); Nationwide Trustee Services, Inc. (2436); Statewide Tax and Title Services of Alabama LLC (7733); Nationwide Trustee Services of Virginia, Inc. (6687); Interface Inc. (9903); and Prommis Homeownership Solutions, Inc. (0569). The location of the Debtors' headquarters and the Debtors' service address is 400 Northridge Road, Atlanta, Georgia, 30350.

administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.      I submit this declaration (this "First Day Declaration") to provide an overview of the Debtors and these chapter 11 cases and to support the Debtors' chapter 11 petitions and first day motions (each, a "First Day Motion," and, collectively, the "First Day Motions").[2]  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management team and the Debtors' advisors, or my opinion based on my experience with and knowledge of Debtors' operations and financial condition.  I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## Preliminary Statement

4.      The Debtors, together with their non-debtor subsidiaries (collectively, the "Company"),[3] have earned recognition as an innovative, customer-focused company in their business segment. Despite its historical success, the Company has been affected by the perfect storm of an unsustainable balance sheet combined with unprecedented revenue-decelerating

---

[2]    All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the relevant First Day Motion.

[3]    The Debtors' affiliates Cal-Western Reconveyance Corporation, Cal-Western Reconveyance Corporation of Washington, and Reliable Reconveyance Corporation (collectively, the "CWR Subsidiaries"), which are direct and indirect wholly-owned subsidiaries of Debtor Prommis Solutions, LLC, have not commenced bankruptcy cases and remain in full operation. In many instances, the Debtors describe their business lines to include the business conducted through the CWR Subsidiaries, and consolidated financial data summarized herein includes the CWR Subsidiaries unless otherwise indicated.

regulatory action, as well as complications arising from customer disputes. In addition, the Company believes that one of its largest customers unilaterally breached its service agreement with the Company, cutting off a significant percentage of the Company's business, and thereby triggering an immediate and, in the near term, irremediable crisis.  Faced with the near term prospect of inadequate liquidity, and unable to address adequately their cash needs outside of bankruptcy, the Debtors commenced these chapter 11 cases to implement a dual-track process to maximize value for their stakeholders and seek to preserve over 710 jobs by pursuing (a) a sale of substantially all their assets and the transition of their employees, operations and files and (b) an orderly wind-down of their businesses, to the extent necessary.

5.      The Company is a leading provider of technology-enabled processing services for the default resolution sector of the residential mortgage industry in the United States.  The Company's products and services support the full lifecycle of mortgage loans in default (including pre-default, default, and post-default conditions), and include foreclosure, bankruptcy, eviction, loan settlement processing, and real estate owned ("REO") sale processing support, as well as posting and publication, tax examination, title search, and other related document management and production services.

6.      Since its inception in 2006, the Company quickly emerged as a leader in the residential mortgage default resolution processing market with its growth supported by a series of successful strategic acquisitions as well as a rapid increase in the volume of foreclosure actions and referrals between 2007 and 2010.  By the end of fiscal year 2010, the Company employed approximately 1,550 employees, it referred approximately 131,600 loans for

processing, and reported adjusted EBITDA of $54.6 million.[4]

7.      In the summer of 2010, however, federal regulators and state attorneys general began to focus significant attention on the foreclosure industry, alleging lax foreclosure standards and attacking practices occurring within certain of the national mortgage servicers, such as "robo-signing."   As a result, mortgage servicers voluntarily halted or delayed commencing foreclosure actions to allow for additional document review and to implement further internal controls and procedures.  Consequently, residential mortgage default resolution processors, including the Company, experienced a significant deceleration of revenue recognition and, thus, decline in business.  Indeed, many of the Company's smaller, more thinly-capitalized competitors were forced to curtail their services or shut down their operations entirely.

8.      The Company was further negatively affected by the constriction in cash flow suffered by its largest customer as a result of the industry-wide decline in referral volume. Specifically, certain of the Company's customers stretched out payables to the Company, which ultimately caused the Company's accounts receivable for such customers to balloon to over $50 million.

9.      Faced with these challenges, the Company instituted a turnaround plan centered around improving its operations, increasing productivity, strengthening customer service agreements and relationships, and implementing various cost-cutting measures to bolster liquidity.  The Company's restructuring initiatives included hiring a new, highly-experienced senior management team.  This new executive team had reengineering, turnaround, operating

---

[4]     Charges excluded from adjusted EBITDA include stock based compensation and restructuring costs.

efficiency, and heavy processing experience with emerging and heavily regulated industries and companies. Despite the Company's efforts, in light of weaker than expected performance in the first quarter of 2011, the Company was unable to comply with certain of the financial covenants in its loan documents, causing the Company to breach a financial covenant under its first lien credit agreement and its subordinated purchase agreement for its senior subordinated notes. At around the same time, the Company engaged AlixPartners LLP as its restructuring advisors, to help stabilize the Company's financial operations and develop a comprehensive, five-year strategic business plan, and William Blair & Company, LLC as its investment bankers, to implement one or more strategic alternatives that would de-lever the Company's capital structure and reposition the Company for an anticipated increase in new business opportunities.

10.     Ultimately, the process of seeking strategic alternatives or buyers did not produce a transaction acceptable to the Company or to the Company's key stakeholders. As a result, with no other viable restructuring alternative available, the Company successfully negotiated and consummated a fully consensual debt-for-equity restructuring transaction, which closed in June of 2012 (the "2012 Restructuring"). In the 2012 Restructuring, the Company's existing equity and mezzanine debt were extinguished, and the Company's secured lenders, through newly-formed Prommis Fin Co., acquired the equity (directly or indirectly) of all of the Prommis operating companies comprising the Company's business in a consensual Article 9 sale, in full satisfaction of the senior lenders' debt through a consensual exercise of the senior lenders' remedies under section 9-620 of the Uniform Commercial Code and, in consideration for agreeing to cancel the mezzanine debt, the mezzanine lenders received certain equity interests in newly-formed Prommis Holdings, LLC. As part of the 2012 Restructuring, the Company entered into a $70,000,000 senior secured credit facility comprised of (i) a $10,000,000

revolving credit facility; (ii) a $15,000,000 first lien term loan credit facility, with such facility being _pari_ _passu_ with the revolving credit facility; (iii) a $30,000,000 second lien term loan credit facility; and (iv) a $15,000,000 third lien term loan credit facility.

11.    The macroeconomic, regulatory, and litigation environment in the Company's industry, however, continued to present extraordinary headwinds for the Company following the 2012 Restructuring. The duration of the 2012 Restructuring also negatively affected the Company's revenues based on the marketplace's perception of the Company's financial condition.    As a consequence, the Company's financial performance in 2012 overall, and specifically the second half of 2012, was significantly worse than the Company's projections, as referrals and revenue continued to lag behind the Company's forecasts.    Specifically, the Company's calendar year 2012 revenues of $120 million (on a consolidated basis with all subsidiaries) were approximately $22.7 million less than the Company's projected revenues for that period.    Moreover, the Company suffered from (a) the loss of key employees due to the uncertainty caused by the Company's financial health and long-term prospects; (b) a reduction in the Company's business caused by disputes with key customers; and (c) additional processing requirements imposed by mortgage servicers and investors without the ability to negotiate commensurate increases in revenues in their contracts with their largest customers. Although the Company implemented aggressive cost-reduction measures in the latter part of 2012, the Debtors determined, in consultation with their secured lenders, that they face imminent liquidity issues and must commence these chapter 11 cases in order to pursue a sale of all or substantially all of their assets, effectuate an orderly transition of employees, services, and files to their law firm customers, and conduct an orderly wind-down of the remainder of the Debtors' businesses as necessary.

12.     In connection with the commencement of these cases, and to optimize their chances of successfully implementing their restructuring objectives, the Debtors have negotiated with the Administrative Agent (as defined herein) for their secured lenders (collectively, the "Lenders") to obtain the Lenders' consent to the Debtors' use of the Lenders' cash collateral, with a budget and agreed upon case milestones that are designed to meet the Debtors' objectives in these cases.

13.     To familiarize this Court with the Debtors, their businesses, and the first day relief the Debtors seek to stabilize their operations and facilitate their restructuring efforts, this Declaration is organized into five sections.  Section I provides background information with respect to the Debtors' history and corporate structure; Section II describes the Debtors' businesses and operations; Section III summarizes the Debtors' prepetition capital structure and indebtedness; Section IV sets forth the circumstances leading to the commencement of these chapter 11 cases; and Section V summarizes the relief requested in, and the facts supporting, each of the First Day Pleadings.

**I.**
**Company History and Corporate Structure**

14.     In the mere seven (7) years since Prommis' predecessor ("Old Prommis") first began its operations as a stand-alone business, Prommis, together with its Debtor affiliates and the CWR Subsidiaries, has grown into one of the largest default resolution processors for the residential mortgage industry in the United States.

15.     Old Prommis began its operations as a stand-alone business on February 24, 2006, when it acquired the non-legal mortgage default resolution processing operations of McCalla

Raymer, LLC, a large real estate law firm based in Atlanta, Georgia (the "Acquisition").[5] In 2007, the Company expanded its service offerings and geographic footprint by completing acquisitions of the non-legal processing capabilities of Morris, Schneider & Prior LLC, now known as Johnson & Freedman, LLC, a portion of the REO loan settlement processing operations of Morris, Hardwick & Schneider, LLC, and the bankruptcy processing operations of Pite Duncan, LLP (collectively, the "Law Firm Transactions"). In the same year, Prommis also acquired Cal-Western Reconveyance Corporation, a trustee company (together with the other CWR Subsidiaries, Cal-Western Reconveyance Corporation of Washington and Reliable Reconveyance Corporation as well as the Debtor subsidiary Interface Inc.), which provided key technical expertise for processing foreclosures in certain states and expanded Prommis' geographic footprint to the West Coast (the "Cal-West Transaction" and, together with the Law Firm Transactions, the "2007 Transactions"). Prommis' acquisitions of these businesses were financed largely with debt borrowings and cash on hand.

16.     Following the 2012 Restructuring, the existing operating companies owned by Old Holding became direct and indirect subsidiaries of Prommis Fin Co. and Prommis Holdings, LLC. The following is the Company's organizational chart as of the Petition Date:[6]

---

[5]     For the avoidance of doubt, Old Holding did not own the equity interests in either Prommis Holdings, LLC or Prommis Fin Co., each of which was created in connection with the 2012 Restructuring.

[6]     The CWR Subsidiaries (Cal-Western Reconveyance Corporation, Cal-Western Reconveyance Corporation of Washington and Reliable Reconveyance Corporation), indicated by double-lined borders in the Debtors' organizational chart, are not debtors in these cases.



## II.
## Current Businesses and Operations

17.     The Company is a leading provider of technology-enabled processing services for the default resolution sector of the residential mortgage industry in the United States.   The Company's solution set supports the full lifecycle of mortgage loans in default (including pre-default, default, and post-default conditions), and includes foreclosure, bankruptcy, loan settlement processing, and REO sale processing support, as well as posting and publication, tax examination, title search, and other related document management and production services.   The Company's solutions enhance the competitiveness of their mortgage servicer and law firm customers by lowering their operating costs and allowing their customers to focus on their core services.   In addition, the Company's proprietary technology-enabled solutions are business-

differentiating for its customers as they enable industry-leading quality, flexibility, and data integration with a number of third-party systems.  As of the Petition Date, the Company provides bankruptcy processing and many other services in the following seventeen (17) states: Alabama, Alaska, Arizona, California, Florida, Georgia, Idaho, Mississippi, Nevada, North Carolina, Oregon, South Carolina, Tennessee, Texas, Utah, Virginia, and Washington.

18.     The Company's primary customers include law firms with large mortgage default resolution practices and some of the largest mortgage servicers in the United States.  The Company has entered into long-term service agreements with its major law firm customers under which the Company serves as such law firms' exclusive provider of processing services for their mortgage default transactions.[7]  Through their CWR Subsidiaries, the Debtors also provide services directly to mortgage servicers in certain states.

19.     As further described below, the Company generates revenue by processing non-legal foreclosure and bankruptcy transactions, as well as other transactions, including REO loan settlements.  The Company charges a fee for each service that it provides, and the fees for such services are based on contractual arrangements agreed to by the Company and its customers.  In some states, the Company's law firm customers receive a flat fee per file from their mortgage lender and mortgage servicer clients, and the Company then typically receives the agreed-upon flat fee per file from the applicable law firm customer based on the contractual agreement between the Company and such customer.  In other states, the CWR Subsidiaries are compensated directly by their mortgage servicer customers.

20.     The following chart depicts the Company's fiscal year 2012 revenue by service

---

[7]  Each services agreement with the Company's law firm customers has an initial term of 20 years and may be renewed by mutual agreement of the parties for successive five-year terms.

line, on a consolidated basis:



*Source: Management.*

### A.    Primary Services.

#### 1.    Foreclosure Services.

21.    The Company provides foreclosure processing services to law firm customers in certain states, while certain of the CWR Subsidiaries provide foreclosure processing services to mortgage servicers in other states.  The foreclosure processing services provided to law firm customers are performed primarily through Prommis Solutions, LLC, Nationwide Trustee Services, Inc., and Nationwide Trustee Services of Virginia, Inc., and the foreclosure processing services provided to mortgage servicers are performed primarily through Cal-Western Reconveyance Corporation and Cal-Western Reconveyance Corporation of Washington.  The Company's foreclosure processing services also include deed-in-lieu of foreclosure services, a presale option in which the mortgagor voluntarily relinquishes deed to the secured real property to satisfy the defaulted debt owed to the investor. The Company's foreclosure processing services include, among other things, electronic order intake and file creation, generating required documents, assisting with loan reinstatement and payoff processing, coordinating

foreclosure sales and auctions, and recording deeds.  The Company also provides certain services ancillary to foreclosure processing, including, among other things, ordering title and tax searches, generating publications, and coordinating notices and mailings to parties in interest. These ancillary services are performed primarily by Statewide Tax and Title Services LLC, Statewide Publishing Services LLC, Interface Inc., and the non-debtor Subsidiary Reliable Reconveyance Corporation.

22.    The following chart depicts certain services the Company conducts during a typical foreclosure process:



*Source: Management.*

### 2.    Bankruptcy Services.

23.    The Company provides bankruptcy processing services to its law firm customers primarily through Prommis Solutions, LLC.  The Company's bankruptcy processing services include, among other things, automatically retrieving bankruptcy court and loan documents, generating pleadings and proofs of claim for attorney review, electronically filing pleadings and proofs of claim on behalf of law firms in bankruptcy courts throughout the United States, and

coordinating noticing of parties in interest with pleadings filed on the docket in bankruptcy cases.

24.    The following chart depicts bankruptcy processing services the Company regularly provides to its customers during a typical bankruptcy case:



*Source: Management.*

### 3.    REO Loan Settlement Services.

25.    The Company provides services to assist lenders in the sale of REO properties in an expeditious manner, including ordering title examinations, coordinating communication with all parties to a sale, handling non-legal title curative actions, preparing settlement statements and other necessary documents, reviewing fees with all parties, attending closings and facilitating the disbursement of proceeds, deed recording, and customized milestone reporting to its customers throughout the sale process.  These services are provided primarily through Prommis Solutions, LLC and Statewide Tax and Title Services LLC.

### B.    Additional Services.

26.    The Company also offers a number of additional services to its customers in conjunction with their foreclosure and loan settlement processing services described above.

#### 1.    Title Searches and Tax Record Examinations.

27.    With the oversight of attorneys, the Company, primarily through Statewide Tax and Title Services, LLC, determines the existence and ownership of publicly-recorded liens, tax assessments, encumbrances, or other issues that may impair perfected title in a property.  Among other things, the Company engages independent contractors through its proprietary vendor management website to obtain title records and information, perform federal tax lien searches, and prepare title examination reports to assist its customers.

#### 2.    Posting and Publication Services.

28.    In most instances, the details of a foreclosure sale must be posted in a public space and advertised in a qualified publication to provide parties in interest with reasonable advanced notice of such sale.  The Company's posting and publication services, primarily through Statewide Publishing Services LLC and the non-debtor subsidiary Reliable Reconveyance Corporation, include gathering property specific information through its internet-based tracking platform, submitting electronic information directly to newspapers in order to reduce order and processing time, reducing advertisement size to reduce costs, providing detailed invoicing to its customers of posting and publication expenses, and real-time order tracking to ensure that the details of a foreclosure sale are appropriately disclosed.

#### 3.    Automated Mail Services.

29.    The Company primarily through Interface Inc., also provides comprehensive, secure mail management and mail processing services for certified, first-class, and other mission-

critical mass mailings in the foreclosure and loan servicing process.  The Company's automated

mail services include designing comprehensive customer-specific mail management solutions,

providing encrypted data transfer interfaces to preserve data confidentiality and integrity,

providing real-time online tracking, notifying customers of critical events, cataloging returned

mail, and providing online access to delivery and non-delivery information.

### 4.    Collateral Repossession Processing Services.

30.    The Company, primarily through Prommis Solutions, LLC, offers processing

services in connection with administrative aspects of the repossession of property and such

customers' exercise of remedies under applicable law, including preparing documents and filing

such documents as appropriate in courts on behalf of law firm customers and mortgage servicers.

### 5.    Customer Administrative Services.

31.    The Company, primarily through Prommis Solutions, LLC, also offers law firm

customers with accounting, billing and cash processing, human resource, information

technology, marketing support services, and other consulting services to assist in the non-legal

default resolution and administrative components of their practices.  Importantly, the Company's

technology platform is integrated with mortgage servicers' vendor platforms, facilitating the

Company's billing process and accelerating the cash collection and application process, resulting

in accelerated revenue recognition to the Company's customers.

### III.
### The Company's Prepetition Capitalization and Indebtedness

32.    The Company's prepetition capital structure consists of three tranches of secured

debt, and multiple classes of membership interests.  As of the Petition Date, the Company was

indebted to the Lenders in the approximate outstanding principal amount of approximately

$73,979,885.12, together with all other liabilities and obligations of the Company arising out of

or in connection with the Credit Agreement and the other Loan Documents (defined below), including, but not limited to, all accrued and unpaid interest, fees, costs and expenses including professional fees (collectively, the "Obligations").   In addition, as of the Petition Date, the Company believes its trade creditors hold outstanding prepetition claims of approximately $6.0 million.

> **A.      First Lien Revolving Credit Facility.**

33.      Prior to the Petition Date, Prommis Fin Co., a Delaware corporation, as borrower (the "Borrower"), the other Debtors and the CWR Subsidiaries, as guarantors, Gleacher Products Corp., in its capacities as the administrative agent (in such capacity, the "Administrative Agent"), as first lien collateral agent (in such capacity, the "First Lien Collateral Agent"), as second lien collateral agent (in such capacity, the "Second Lien Collateral Agent"), and as third lien collateral agent (in such capacity, the "Third Lien Collateral Agent" together with the First Lien Collateral Agent and the Second Lien Collateral Agent, the "Collateral Agents;" the Administrative Agent and the Collateral Agents are collectively referred to herein as the "Agents"), on behalf of the Lenders party to that certain Credit and Guaranty Agreement, dated as of June 12, 2012 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement," and, together with all associated agreements, instruments and documents, the "Loan Documents").

34.      Pursuant to the terms of the Loan Documents, certain of the Lenders (collectively, the "Revolving Lenders") agreed to provide the Borrower with revolving loans up to $10,000,000 (the "Revolving Loans") on a first-lien basis (the Revolving Loans, together with the First Lien Term Loan (defined below) are collectively referred to as the "First Lien Obligations").   As of the Petition Date, the aggregate outstanding amount of the Revolving Loans was no less than $10,000,000, plus accrued interest, fees and other specified obligations.

**B.      First Lien Term Loan.**

35.      Certain of the Lenders (collectively, the "<u>First Lien Term Loan Lenders</u>" and together with the Revolving Lenders, the "<u>First Lien Lenders</u>") agreed to provide the Borrower with a first lien term loan in an original principal amount of $15,000,000 (the "<u>First Lien Term Loans</u>").  As of the Petition Date, the aggregate outstanding amount of the First Lien Term Loans was no less than $15,964,329.25, plus accrued interest, fees and other specified obligations (the obligations owing to the First Lien Lenders are referred to herein as the "<u>First Lien Obligations</u>").

**C.      Second Lien Term Loan.**

36.      Certain of the Lenders (collectively, the "<u>Second Lien Lenders</u>") agreed to provide the Borrower with a second lien term loan in an original principal amount of $30,000,000 (the "<u>Second Lien Term Loans</u>"). As of the Petition Date, the aggregate outstanding amount of the Second Lien Term Loans was approximately $32,010,370.59, plus accrued interest, fees and other specified obligations (the Obligations owing to the Second Lien Lenders are referred to herein as the "<u>Second Lien Obligations</u>").

**D.      Third Lien Term Loan.**

37.      Certain of the Lenders (collectively, the "<u>Third Lien Lenders</u>") agreed to provide the Borrower with a third lien term loan in an original principal amount of $15,000,000 (the "<u>Third Lien Term Loans</u>").  As of the Petition Date, the aggregate outstanding amount of the Third Lien Term Loans was approximately $16,005,185.28, plus accrued interest, fees other specified obligations (the obligations owing to the Third Lien Lenders are referred to herein as the "<u>Third Lien Obligations</u>").

**E.      Collateral for the Secured Facilities.**

38.      Each of the First Lien Obligations, the Second Lien Obligations and the Third

Lien Obligations are secured by separate security interests in substantially all of each of the Debtors and the CWR Subsidiaries' assets, including, without limitation, accounts, equipment, inventory, personal property, general intangibles, chattel paper, contracts, deposit accounts, equity interests, fixtures, instruments, intercompany obligations, investment property, patent, trademark and copyright collateral, documents and records, and all proceeds, products, rents and profits of the foregoing (collectively, the "Pre-Petition Collateral"), and have the respective lien priorities described below.   Moreover, each Collateral Agent filed UCC-1 Financing Statements regarding the Pre Petition Collateral against the Debtors and the CWR Subsidiaries in the applicable state filing office.

39.    The liens and security interests of the First Lien Collateral Agent in the Pre-Petition Collateral (the "First Lien Pre-Petition Liens") are:  (i) senior in priority to the security interests of all other persons except for the security interests permitted to exist under Section 6.02 of the Credit Agreement ("Permitted Encumbrances"), to the extent the Permitted Encumbrances are valid, enforceable and are perfected and are not subject to avoidance, subordination, recharacterization or other challenge, in each case as of the Petition Date; and (ii) valid, enforceable, binding and properly perfected and are not subject to avoidance, subordination or disallowance pursuant to the Bankruptcy Code or applicable law.

40.    The liens and security interests of the Second Lien Collateral Agent in the Pre-Petition Collateral (the "Second Lien Pre-Petition Liens") are:  (i) senior in priority to the security interests of all other persons except for (a) the First Lien Pre-Petition Liens, and (b) Permitted Encumbrances, to the extent the Permitted Encumbrances are valid, enforceable and are perfected and are not subject to avoidance, subordination, recharacterization or other challenge, in each case as of the Petition Date; and (ii) valid, enforceable, binding and properly

perfected and are not subject to avoidance, subordination or disallowance pursuant to the Bankruptcy Code or applicable law.

41.     The liens and security interests of the Third Lien Collateral Agent in the Pre-Petition Collateral (the "Third Lien Pre-Petition Liens"; together with the First Lien Pre-Petition Liens and the Second Lien Pre-Petition Liens, collectively, the "Pre-Petition Liens") are:  (i) senior in priority to the security interests of all other persons except for (a) the First Lien Pre-Petition Liens, (b) the Second Lien Pre-Petition Liens and (c) Permitted Encumbrances, to the extent the Permitted Encumbrances are valid, enforceable and are perfected and are not subject to avoidance, subordination, recharacterization or other challenge, in each case as of the Petition Date; and (ii) valid, enforceable, binding and properly perfected and are not subject to avoidance, subordination or disallowance pursuant to the Bankruptcy Code or applicable law

**F.     Intercreditor Agreement.**

42.     Section 11.01 of the Credit Agreement provides that the parties thereto are subject to the intercreditor provisions set forth in Schedule 11.01 to the Credit Agreement. Schedule 11.01 to the Credit Agreement, entitled "Intercreditor Provisions," provides that until the First Lien Obligations are satisfied in full, the First Lien Collateral Agent shall be the "Controlling Collateral Agent," and the First Lien Creditors shall be the "Controlling Creditors." Credit Agreement, Schedule 11.01.  The Controlling Collateral Agent has the exclusive right to receive payment of proceeds, including payment over of any proceeds received by the Second Lien Lenders or Third Lien Lenders, until satisfaction or discharge of the First Lien Obligations.  The Controlling Collateral Agent is entitled, at the direction of the Controlling Creditors, to release liens in a non-bankruptcy disposition of collateral, or to consent to a section 363 sale free and clear in a bankruptcy case, in either event causing a release of any subordinated security interests of other Lenders.  Credit Agreement, Schedule 11.01 ¶ B.5.  In several other respects, exclusive

power is vested in the Controlling Creditors and the Controlling Collateral Agent, including the right to negotiate and otherwise pursue adequate protection provisions as a condition to use of cash collateral of any of the Lenders.

**IV.**
**Events Leading to Chapter 11 Cases and Restructuring Initiatives**

    **A.**    **Regulatory and Governmental Action,**
            **Decline in Operating Performance, and Restructuring Impact.**

    43.    Although the Company's management team was able significantly to improve operations in the 2011- to early-2012 time frame and consummate the 2012 Restructuring, the duration of the restructuring and continuing market and regulatory pressures resulted in material reductions in the Company's revenues.  The combination of these factors left little flexibility for the Company to navigate through a series of unforeseen adverse economic developments and without the liquidity necessary to fund their turnaround efforts.  For the calendar year ending December 31, 2012 (covering the period prior to and following the closing on the 2012 Restructuring), the Company generated approximately $120 million in revenue on a consolidated basis, and approximately negative $890,000 in EBITDAR.  This significant decline in the Company's operating performance severely constrained its availability under the First Lien Revolving Credit Facility, and its liquidity position. Anticipating that the decline in the Debtors and CWR Subsidiaries' operating performance would trigger an event of default under the Credit Agreement, the Debtors, the CWR Subsidiaries, and the Lenders entered into a limited waiver on December 21, 2012, which provided that the Lenders agreed to waive certain specified defaults based on the Debtors and CWR Subsidiaries' failure to comply with the financial covenants in Section 6.08(a) and Section 6.08(b) of the Credit Agreement.

**B.      The Debtors' Need for Use of Cash Collateral and the Proposed Sale of the
Debtors' Assets.**

44.      The Debtors' default under the Credit Agreement and their operational challenges
are generally known by many participants in the Debtors' industry. As a result, the Debtors are
receiving increased pressure from service providers to reduce credit terms, thereby further
constraining the Debtors' liquidity.   Additionally, certain of the Debtors' key employees,
concerned about the long-term viability of the Debtors' operations as a going concern, recently
resigned.  The most recent departures include a software engineer who served as the Debtors'
key technology expert.

45.      Having explored a range of out-of-court restructuring alternatives and concluding
that the Debtors cannot continue to operate as a going concern in their current model, the
Debtors, in consultation with their advisors and with the support of the Lenders, determined to
commence the chapter 11 cases to (a) pursue a sale of all or substantially all of their assets and
an orderly transition of their employees in an effort to preserve as many jobs as possible, and (b)
conduct an orderly wind-down of their businesses through a chapter 11 plan of liquidation.

46.      In addition, the CWR Subsidiaries, in consultation with the Lenders, elected not
to commence chapter 11 cases and to instead pursue a strategic transaction outside of chapter 11.
The CWR Subsidiaries' boards of directors, Prommis' board of directors, and Prommis' senior
management team believe that a sale of the CWR Subsidiaries as a going-concern outside of
chapter 11 will maximize value for all stakeholders.   As of the Petition Date, the Debtors'
management team is in discussions with four potential  acquirers  about  purchasing  the  CWR
Subsidiaries' businesses as a going-concern, and each of these potential purchasers are
continuing to conduct diligence and have expressed interest in consummating a transaction on an
expedited  timeline.   The  CWR  Subsidiaries,  the  Debtors,  and  the  Lenders  are  cautiously

optimistic that a value-maximizing transaction may be implemented outside of chapter 11 for the benefit of the CWR Subsidiaries' stakeholders.  Recognizing that a sale of the CWR Subsidiaries outside of chapter 11 will provide the highest and best value, on March 18, 2013, the Debtors, the CWR Subsidiaries, and the Lenders entered into a forbearance agreement (the "Forbearance Agreement") and the Lenders agreed not to exercise remedies against the CWR Subsidiaries or their assets during the Forbearance Period (as defined in the Forbearance Agreement) with the hope that a transaction can be consummated.

## V.
## Evidentiary Support for First Day Motions[8]

47.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of First Day Motions seeking relief that the Debtors believe is necessary to enable them to operate with minimal disruption and loss of productivity.  The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring a smooth transition into, and stabilizing and facilitating the Debtors' operations during the pendency of, these chapter 11 cases.

48.     I believe, with respect to the First Day Motions requesting authority to pay discrete prepetition claims, the relief requested is essential to the Debtors' efforts to preserve and maximize value in these chapter 11 cases and avoid immediate and irreparable harm to the Debtors, their estates, and creditors. I have reviewed each of the First Day Motions discussed below and the facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.

---

[8]   Capitalized terms used in this section and not otherwise defined shall have the meanings ascribed to them in the applicable motion.

A.   **Motion Of The Debtors And Debtors-In-Possession For Interim And Final Orders (A) Authorizing The Debtor To Use Cash Collateral Pursuant To Bankruptcy Code Section 363; (B) Granting Adequate Protection To The Pre-Petition Secured Parties; And (C) Scheduling A Final Hearing (the "Cash Collateral Motion")**

49.     In the ordinary course of business, the Debtors use cash on hand and cash flow from operations to fund their business operations.  As described above, the Agents and the Lenders hold liens on substantially all of the Debtors' assets pursuant to that Credit Agreement, and absent access to the Cash Collateral, the Debtors do not and will not have available sources of working capital and financing to continue to operate their businesses.  Specifically, the Debtors require access to Cash Collateral to, among other things, (a) make payments to vendors, suppliers and employees, (b) satisfy the ordinary costs of the Debtors' operations, and (c) fund the administrative costs of these chapter 11 cases, including implementing the proposed sale of all or substantially all of their assets and commencing an orderly wind-down of their businesses, as may be necessary.  In the absence of the authority to use Cash Collateral, the Debtors will not be able to operate their businesses and the Debtors' enterprise would suffer severe and irreparable harm through an immediate destruction of value.  Accordingly, the authority to use Cash Collateral is critical to the success of these chapter 11 cases and imperative to the Debtors' ability to preserve value and maximize recoveries to their stakeholders.

50.     Recognizing the importance of obtaining authority to continue to use Cash Collateral, the Debtors approached the Agents before the commencement of these chapter 11 cases to discuss the terms on which the Lenders would agree to allow the Debtors to use Cash Collateral.  After extensive good-faith, arms'-length negotiations between the Agents (on behalf of the Lenders) and the Debtors, the Agents and the Debtors agreed on the terms set forth in the proposed Interim Order, approval of which will allow the Debtors to transition smoothly into these chapter 11 cases, continue operating their businesses, and undertake the aforementioned

dual-track approach to maximize value for all stakeholders.    Specifically, the Debtors are authorized to use Cash Collateral up to the amounts, and only for the purposes set forth in the budget (the "Budget"), which is attached as Exhibit 1 to the Interim Order.    The Interim Order authorizes the Debtors to use Cash Collateral commencing on the Petition Date through the Expiration Date or the occurrence of a Termination Event.

51.    Of note, the CWR Subsidiaries, in consultation with the Lenders, elected not to commence chapter 11 cases and to instead pursue a strategic transaction outside of chapter 11. The CWR Subsidiaries' boards of directors, Prommis, and Prommis' senior management team believe that a sale of the CWR Subsidiaries as a going-concern outside of chapter 11 will maximize value for all stakeholders.    In furtherance of their goal to maximize value for all stakeholders, the Debtors assigned their services agreement with McCall Raymer, LLC, one of their leading law firm customers, to the CWR Subsidiaries (the "MR Assignment").    As further described in the Interim Order, any proceeds generated by a going-concern sale of the CWR Subsidiaries attributable to the MR Assignment will be allocated and paid to Debtor Prommis Solutions, LLC and then distributed to the Agents and the Lenders, within one business day after the Debtors' receipt of such proceeds, and will then be applied to the First Lien Obligations, the Second Lien Obligations, and the Third Lien Obligations in accordance with the Loan Documents.

### B.    Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motion")

52.    Many of the motions, applications, hearings, and orders that will arise in these chapter 11 cases will jointly affect each and every Debtor.    Thus, the Debtors believe the interests of the various Debtors, their estates, their creditors, and other parties in interest would be best served by the joint administration of these chapter 11 cases for procedural purposes.    In

particular, joint administration will ease the administrative burdens of these chapter 11 cases on the Debtors, the Court, and all parties in interest.  For these reasons, I believe that it is in the best interests of the estates and all parties in interest for the Court to approve the joint administration of the chapter11 cases for procedural purposes only.

**C.**     **Application for an Order Appointing Donlin Recano & Company, Inc. as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and Local Rule 2002-1(f)  (the "<u>Donlin Application</u>")**

53.     The Debtors seek to retain Donlin Recano & Company, Inc. ("<u>DRC</u>") as claims and noticing agent in these chapter 11 cases (the "<u>Claims Agent</u>").  Upon information and belief, DRC is an experienced Claims Agent and frequently is used by debtors in large chapter 11 cases, and I believe DRC is well qualified to serve as the Claims Agent in these chapter 11 cases.  I also understand that because there are more than 200 creditors of the Debtors, the Debtors are required to seek authorization to retain a Claims Agent, in accordance with Rule 2002-1(f) of the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware.  The retention and employment of DRC will provide the Clerk of the Court and the Debtors with efficient management of the claims and noticing process in these chapter 11 cases, which will allow the Debtors' management and professionals to focus their attention more closely on the Debtors' overall chapter 11 efforts.

**D.**     **Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Using Their Cash Management System, Bank Accounts, and Business Forms, (B) Maintain Existing Investment Practices, (C) Continue Intercompany Transactions, and (D) Granting Intercompany Claims Administrative Priority (the "<u>Cash Management Motion</u>")**

54.     By the Cash Management Motion, the Debtors seek entry of an order to (a) continue to (i) use, with the same account numbers, all of the four (4) bank accounts (collectively, the "<u>Bank Accounts</u>") in their integrated, centralized cash management system (the "<u>Cash Management System</u>"), (ii) treat the Bank Accounts for all purposes as accounts of the

Debtors as debtors in possession, (iii) open new debtor-in-possession accounts, if needed; (iv) use, in their present form, all correspondence and business forms (including, without limitation, letterhead and invoices), and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to their status as debtors in possession; (b) maintain their existing prudent investment practices; (c) continue, in their business judgment and at their sole discretion, performing intercompany sales, expense allocations, and intercompany loans (collectively, the "Intercompany Transactions") in the ordinary course of business, subject to the limitations contained in any cash collateral order; and (d) provide postpetition administrative expense priority to the intercompany receivables and payables.  In connection with this relief, the Debtors respectfully request a waiver of certain of the operating guidelines established by the Office of the United States Trustee for the District of Delaware that would require the Debtors to close all prepetition bank accounts, open new accounts designated as debtor in possession accounts, and obtain new checks bearing a "debtor in possession" legend.

55.    As described in detail in the Cash Management Motion, the Debtors utilize an integrated, centralized cash management system to collect, transfer, disburse, and invest funds generated by their operations.  Through this system, the Debtors can coordinate the transfer of funds efficiently and effectively and maintain current and accurate accounting records of daily cash transactions that are essential to the proper functioning of the Debtors' complex business operations.  The Cash Management System is specifically tailored to meet the Debtors' operating needs – enabling the Debtors to centrally control and monitor corporate funds and available cash, invest excess cash, comply with the requirements of their financing agreements, reduce administrative expenses, and obtain accurate account balances and presentment information.  Maintaining the Cash Management System is crucial given the significant volume of cash

transactions managed through the Cash Management System every day.

56.     The Debtors' longstanding Cash Management System is integrated on a consolidated basis, and includes the three CWR Subsidiaries.  At my direction, the Debtors' senior financial and accounting staff have reviewed the nature and extent of the ordinary course cash flows from Debtor entities to the CWR Subsidiaries, and compared such cash flows over various sample periods with the cash flows from the CWR Subsidiaries to the Debtors.  Those studies reflect that on balance, the CWR Subsidiaries provide a net positive cash flow to the Debtors. The Debtors provide various services to the CWR Subsidiaries, and, in turn, the CWR Subsidiaries pay or cause to be paid monies to Debtor entities in exchange for such services.  In view of the amount of secured debt owed to the Lenders by the Debtors and the CWR Subsidiaries, the only parties with an interest in the cash transferred between the CWR Subsidiaries and the Debtors, or any associated intercompany accounts, are the Lenders.  The Lenders' interests in their Collateral are adequately protected by the provisions of the Cash Collateral Order with respect to the Debtors, and pursuant to their applicable non-bankruptcy rights with respect to the CWR Subsidiaries.

57.     To lessen the effect of the chapter 11 filings on the Debtors' business and that of the CWR Subsidiaries, and thereby maximize value of the Debtors' estates, it is vital that the Debtors keep the Cash Management System in place and be authorized to pay outstanding fees owed in relation to the Bank Accounts, such as payments to third party vendors whose services are critical for the uninterrupted operation of the Cash Management System.  I believe that any disruption of the Debtors' current cash management procedures would impair their operations and ability to optimize business performance to the detriment of parties in interest.  Accordingly, the Debtors request approval of the relief sought in the Cash Management Motion.

E.    **Motion for Entry of Interim and Final Orders Authorizing Debtors to (A) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Other Benefits, and (C) Continue Employee Benefits Programs (the "<u>Employee Wage Motion</u>")**

58.    In the Employee Wage Motion, the Debtors request an order (i) authorizing the Debtors to (a) pay prepetition wages, salaries, commissions, and other compensation, taxes, withholdings, and related costs, and reimbursable employee expenses, (b) pay and honor obligations relating to employee medical, insurance, and other benefits programs, and (c) continue their employee medical, insurance, and other benefits programs on a postpetition basis, (ii) authorizing financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests related to the foregoing.  Further, to the extent any of the Debtors' employees are asserting claims under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under Bankruptcy Code section 362(d) to permit these employees to proceed with their claims under the Workers' Compensation Program.  The Debtors also seek an order directing their banks to honor, process, and pay, to the extent funds are available in their accounts, any checks or wire transfer requests issued by the Debtors with respect to their employee obligations.

59.    As of the Petition Date, the Debtors employ approximately 718 employees (the "<u>Employees</u>").   The Debtors pay approximately 570 or 79%, of the Employees on an hourly basis ("<u>Hourly Employees</u>"), while the remaining 148, or 21%, are paid on a salaried basis ("<u>Salaried Employees</u>").  The Debtors' workforce is not unionized and none of the Debtors is party to any collective bargaining agreement.

60.    In addition to their Employees, the Debtors supplement their workforce by utilizing certain independent contractors (the "<u>Independent Contractors</u>") who are vital to the Debtors' businesses.  The Independent Contractors support the Debtors in the following

activities: (a) information technology infrastructure and development; (b) title and tax examination; (c) operational support; and (d) administrative support where full or part-time employment/expertise is unavailable.  For about half of the Independent Contractors, the Debtors remit compensation through certain third-party agencies specializing in technological services through their accounts payable process with the remaining Independent Contractors being compensated directly from the Debtors.  On occasion, the Debtors also supplement their workforce with temporary employees (the "Temporary Employees") who are provided to the Debtors through temporary staffing agencies (the "Temporary Staffing Agencies"). As of the Petition Date, the Debtors have approximately thirty-one (31) Temporary Employees.

61.     The Debtors' employees perform a variety of critical functions, including, among others, sales, customer service, processing, and a variety of administrative, legal, accounting, finance, and management related tasks.  The skills and experience of the Debtors' employees, as well as their relationships with customers and vendors and knowledge of the Debtors' infrastructure are essential to the Debtors' ongoing operations and ability to effectuate a sale that maximizes value for all stakeholders.  The vast majority of the Debtors' employees rely exclusively on their compensation to pay their daily living expenses.  To minimize the personal hardship the Debtors' employees would suffer if prepetition employment-related obligations were not paid when due or as expected, and to maintain morale and enhance the Debtors' ability to retain employees during this critical restructuring process.

62.     A stable work force will play a critical role in the uninterrupted continuation of the Debtors' business and the preservation and maximization of the value of the Debtors' estates during these chapter 11 cases.  Any significant number of departures or deterioration in morale among the Debtors' Employees or Independent Contractors at this time will immediately and

substantially adversely impact the Debtors' efforts in chapter 11 and result in immediate and irreparable harm to the Debtors' estates and creditors. There is a real and immediate risk that if the Debtors are not authorized to continue to honor their prepetition obligations to these parties in the ordinary course, the Employees and Independent Contractors would no longer support and maintain the operations of the Debtors, thereby crippling the Debtors' business operations. Accordingly, the Debtors strongly believe it is critical that they be permitted to pay their Employees and Independent Contractors prepetition wages and continue with in the ordinary course to honor the Employee Benefit Programs, including, without limitation, the: (a) Health Care Plan; (b) Flexible Spending Accounts; (c) Workers' Compensation Program; (e) Paid Time Off; (f) 401(K) Retirement Plan; (g) Life, Disability, and Accident Insurance Coverage; (h) short- and long-term disability benefits; (i) Employee Assistance Program; (j) Tuition Expenses; and (f) Automobile Expenses that were in effect prior to the Petition Date.

###   F.    Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment For Future Utility Services (the "Utility Motion")

63.    By the Utility Motion, the Debtors request entry of Interim and Final Orders: (a) determining that the Debtors' utility providers (as such term is used in Bankruptcy Code section 366 and, as described herein, each a "Utility Provider" and collectively the "Utility Providers") have been provided with adequate assurance of payment within the meaning of Bankruptcy Code section 366; (b) approving the Debtors' proposed adequate assurance; (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of the Final Order; (d) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this Motion, pending entry of the Final Order; and (e) scheduling a final hearing to consider entry of

a Final Order.

64.    In the ordinary course of business, the Debtors incur expenses for gas, electric, telecommunications, and other similar utility services provided by approximately six (6) Utility Providers, a list of which is attached as Exhibit C to the Utilities Motion (the "Utility Service List").   On average, the Debtors spend approximately $104,387 each month on utility costs.  As of the Petition Date, the Debtors estimate that approximately $176,350.00 in utility costs are outstanding in the aggregate to the Utility Providers.

65.    Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of their restructuring.  Indeed, any interruption of utility services, even for a brief period of time, would negatively affect the Debtors' operations, customer relationships, revenues, and profits, seriously jeopardizing the Debtors' restructuring efforts and, ultimately, recoveries to the Debtors' stakeholders.  Therefore, I believe it is critical that utility services continue uninterrupted during these chapter 11 cases.

66.    To that end, and to provide additional assurance of payment for future services to the Utility Providers, the Debtors propose to deposit $48,179 (the "Adequate Assurance Deposit"), into a segregated, interest-bearing account (the "Adequate Assurance Deposit Account") within seven (7) business days following entry of the Interim Order.  The amount of the Adequate Assurance Deposit equals the estimated aggregate cost for two (2) weeks of utility service, calculated as a historical average over the past twelve (12) months.  The Adequate Assurance Deposit will be held for the benefit of Utility Providers during the pendency of these chapter 11 cases.

67.    I believe that that the Adequate Assurance Deposit, in conjunction with the Debtors' demonstrated ability to pay for future utility services in the ordinary course of business

(together, the "<u>Proposed Adequate Assurance</u>"), constitutes sufficient adequate assurance to the Utility Providers.

68.    To the extent that the Debtors subsequently identify additional providers of utility services, the Debtors seek authority to amend the Utility Service List to add or remove any Utility Provider.  The Debtors further request that the Court make the Interim and Final Orders apply to any such subsequently identified Utility Provider, regardless of when each Utility Provider was added to the Utility Service List.  The Debtors request that they be permitted the period specified in the proposed Adequate Assurance Procedures to seek to resolve any subsequently added Utility Provider's Additional Assurance Request by mutual agreement with the Utility Provider without further order of the Court or to schedule a Determination Hearing with the Court to determine the adequacy of assurance of payment with respect to such Utility Provider in accordance with such Adequate Assurance Procedures.

69.    The Debtors request that all Utility Providers, including subsequently added Utility Providers, be prohibited from altering, refusing, or discontinuing utility services to the Debtors absent further order of the Court.

70.    Based on the foregoing, I believe that the proposed adequate protection is appropriate under the circumstances and support the entry of an Order granting the Utility Motion.

G.    **Motion of the Debtors for an Order (I) Authorizing the Debtors to Prepare a Consolidated List of the Debtors' Top Thirty Unsecured Creditors; (II) Approving the Form and Manner of the Notice of Commencement; and (III) Granting Extension to File Creditor Lists (the "<u>Creditors List Motion</u>")**

71.    By the Creditors List Motion, the Debtors seek entry of an order (i) authorizing the Debtors to prepare (i) authorizing the Debtors to prepare a (a) consolidated list of the Debtors' thirty largest unsecured creditors; (ii) approving the form and manner of notice of the

commencement of these Chapter 11 Cases and of the meeting of creditors to be held pursuant to Bankruptcy Code section 341 (the "Section 341 Meeting"); and (iii) granting extension to file Creditor Lists.

72.     I believe that a single consolidated list of their combined thirty (30) largest unsecured creditors in these cases would better reflect the body of unsecured creditors with the greatest stake in these cases than separate Top 20 Lists for each of the Debtors. I believe that such relief is not only appropriate under the circumstances, but necessary for the efficient and orderly administration of these cases.

73.     The Debtors request that the Claims Agent, and not the Clerk, be directed to serve the Commencement Notice attached as Exhibit B to the Creditors List Motion in accordance with Bankruptcy Rule 2002(a).  The Debtors further propose that the Commencement Notice be served by regular mail, postage prepaid, on those entities entitled to receive such notice pursuant to Bankruptcy Rule 2002(a). I believe that this procedure will provide sufficient notice of the commencement of these Chapter 11 Cases and the Section 341 Meeting.

74.     The Debtors also request a brief extension of time to file for each Debtor the list of creditors (the "Creditor Lists").  Prior to the Petition Date, the Debtors began gathering the information necessary to generate complete Creditor Lists for filing with the Court.  However, the creditor information is stored in multiple systems, and the Debtors were unable to gather information about certain categories of creditors without risking disclosure of the bankruptcy filings.

75.     I believe that these procedures, which I understand commonly to be approved in bankruptcy cases of similar size and complexity, will improve the administrative efficiency of these cases, conserve resources, and better serve the interests of the Debtors and their creditors.

**H.**      **Motion for Entry of an Order Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees (the "Taxes Motion")**

76.      In the ordinary course of business, the Debtors:  (a) incur and/or collect taxes, including franchise, unemployment, and other miscellaneous taxes in the operation of their businesses (collectively, the "Taxes"); (b) incur business license fees and other similar fees and assessments (collectively, the "Fees") in connection with obtaining the licenses and permits necessary to operate their businesses; and (c) remit such Taxes and Fees to various taxing, licensing, and other governmental authorities (each, an "Authority" and, collectively, the "Authorities").  The Debtors also seek an order directing their banks to honor, process, and pay, to the extent funds are available in their accounts, any checks or wire transfer requests issued by the Debtors with respect to their tax obligations.  The Debtors pay the Taxes and Fees monthly, quarterly, or annually, in each case as required by applicable laws and regulations.

77.      The Taxes and Fees that the Debtors incur and pay fall into five categories.  First, the Debtors pay franchise taxes to certain state Authorities (collectively, the "Franchise Taxes") to operate their businesses in the applicable taxing jurisdictions.  States assess Franchise taxes in one of the following manners: (a) a minimum tax on all businesses; (b) a tax based on gross receipts, gross margin, or net operating income; or (c) a tax on an entity's total capital/equity or pro forma calculation thereof.  Second, federal and state Authorities impose unemployment taxes for employer funded unemployment compensation programs (the "Unemployment Taxes").  The Authorities calculate the Unemployment Taxes based upon various tax rates assessed against the amount of wages paid in those jurisdictions in which the Debtors operate.  Often, state tax liability with respect to any one employee is capped at a certain amount.  Third, the federal and state Authorities impose income tax obligations on the Debtors (the "Income Taxes").  Fourth, certain Authorities impose business, partnership, environmental, or other taxes on the Debtors

(collectively, the "Miscellaneous Taxes").  The Debtors believe the Miscellaneous Taxes to be a de minimis expense and that the continued payment of Miscellaneous Taxes, including any such taxes due and owing on account pre-petition Miscellaneous Taxes, are a necessary cost of continuing to operate their businesses.  Finally, many states and certain local taxing Authorities require the payment of Fees for the Authority to conduct business within their jurisdictions.  The Fees are typically for licenses, annual reports, permits and business licenses, and other similar charges and assessments.  In the ordinary course of business, the Debtors pay these Fees, which authorize them to conduct business in certain states.

78.    It is essential that the Debtors be authorized to pay the Taxes and Fees because, in accordance with Bankruptcy Code section 541(d), certain of the Taxes and Fees are "trust fund" taxes and are not property of the debtors' estates.  In addition, the Debtors' directors and officers may be held personally liable for the non-payment of certain taxes.  Certain Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes, which would distract the Debtors from their efforts to complete a successful reorganization.

79.    Moreover, any regulatory dispute or delinquency that affects the Debtors' ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtors' operations as a whole.  Specifically, the Debtors' failure to pay the Taxes and Fees could adversely affect their business operations because, among other things:  (a) the Authorities could audit the Debtors or prevent the Debtors from continuing their businesses, which, even if unsuccessful, would unnecessarily divert the Debtors' attention away from the reorganization process; (b) the Authorities could attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates; and (c) certain directors and officers might be subject to personal liability – even if such a failure to pay such

Taxes and Fees was not a result of malfeasance on their parts –which would undoubtedly distract those key individuals from their duties related to the Debtors' restructuring.   Accordingly, the Debtors must continue to pay the Taxes and Fees as they become due to ensure that their officers and directors remain focused during these chapter 11 cases on operating the businesses and implementing a successful restructuring.

80.    In addition, claims for some of the Taxes and Fees are or may be priority claims entitled to payment prior to general unsecured creditors, and to the extent that the Taxes and Fees are entitled to priority treatment, the governmental units also may attempt to assess interest and penalties.   Therefore, Payment of certain of the Taxes and Fees likely will give the Authorities no more than that to which they otherwise would be entitled under a chapter 11 plan and will save the Debtors the potential interest expense, legal expense, and penalties that otherwise might accrue on the Taxes and Fees during these chapter 11 cases.

81.    I believe that the relief requested in the Taxes Motion is necessary to ensure the effective administration of these cases, and is in the best interests of the Debtors and their creditors.

**I.    Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Prepetition Insurance Coverage and (B) Maintain Financing of Insurance Premiums (the "<u>Insurance Motion</u>")**

82.    The Debtors are requesting authority (a) continue to maintain prepetition insurance policies and programs, including payment of any prepetition amounts related to those policies and programs; (b) revise, extend, renew, supplement, change such insurance policies and programs, or enter into new policies, as needed in the ordinary course of business; and (c) maintain the prepetition financing agreement with Flat Iron Capital and revise, extend, renew, supplement, change such financing agreement, or enter into new agreements, as needed in the ordinary course of business.   The Debtors also seek an order directing their banks to honor,

36

process, and pay, to the extent funds are available in their accounts, any checks or wire transfer requests issued by the Debtors with respect to their insurance obligations.

83.    The Debtors maintain policies with respect to, among other things, potential liability arising from general tort, commercial automobile, property, crime, network, professional, directors and officers, total umbrella liability, and workers' compensation policies (collectively, the "Policies").  A schedule of the Debtors' Policies is attached to the Insurance Motion as Exhibit C, and is incorporated herein by reference (the "Policy Schedule").

84.    The annual premiums for the Debtors' Policies total approximately $1,078,601.12.  In the ordinary course of businesses, the Debtors finance the premiums on certain of their professional liability and network liability policies (collectively, the "Financed Policies") pursuant to that certain premium financing agreement entered into with Flat Iron Capital (the "Financing Agreement").  The Financing Agreement benefits the Debtors by spreading out the cost of the Financed Policies over the applicable coverage period.

85.    The Policies are important to the preservation of the Debtors' businesses, properties, and assets.  In many cases, insurance coverage such as that provided by the Policies is required by the diverse regulations, laws, and contracts that govern premiums under the Debtors' commercial activities.   If the Debtors are unable to make payments that may be required under or in connection with their Policies, insurance coverage may be terminated.  The Debtors would then be required to obtain replacement Policies on an expedited basis and at significant cost to the estates.  Moreover, even if the Policies are not ultimately terminated, any disruption in the Policies would prevent the Debtors from being able to operate in the ordinary course of their businesses.  Given the importance of maintaining the Policies with respect to their business activities, the Debtors believe it is in the best interests of the estates for the Court to authorize the

Debtors to honor their insurance obligations under the Policies.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated:  March 18, 2013                    /s/ Charlie T. Piper
                                          Charlie T. Piper
                                          Chief Executive Officer