**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| PROMMIS HOLDINGS, LLC, *et al.*,[1] | ) ) ) | Case No. 13-10551 (BLS) |
| Debtors. | ) ) ) | Jointly Administered |

**DECLARATION OF JEFFREY M. BEARD IN
SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN
ORDER APPROVING THE DEBTORS' KEY EMPLOYEE INCENTIVE PLAN
AND KEY EMPLOYEE RETENTION PLAN AND GRANTING RELATED RELIEF**

I, Jeffrey M. Beard, declare as follows under penalty of perjury under 28 U.S.C. § 1746:

1. I am a Managing Director with Huron Consulting Services LLC ("Huron").[2] I am intimately familiar with the above-captioned debtors and debtors in possession's (collectively, the "Debtors") day-to-day operations, business affairs, financial performance, and restructuring efforts.

2. I submit this declaration in support the *Debtors' Motion for Entry of an Order Approving the Debtors' Key Employee Incentive Plan and Key Employee Retention Plan and Granting Related Relief* (the "Motion"). Unless otherwise indicated, all facts set forth in this declaration are based upon (a) my personal knowledge of the Debtors' business operations and financial performance, (b) information learned from my review of relevant documents,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Prommis Holdings, LLC (6940); Prommis Fin Co. (2965); Prommis Solutions, LLC (9978); E-Default Services LLC (0016); Statewide Tax and Title Services LLC (0049); Statewide Publishing Services LLC (0079); Nationwide Trustee Services, Inc. (2436); Statewide Tax and Title Services of Alabama LLC (7733); Nationwide Trustee Services of Virginia, Inc. (6687); Interface Inc. (9903); and Prommis Homeownership Solutions, Inc. (0569). The location of the Debtors' headquarters and the Debtors' service address is 400 Northridge Road, Atlanta, Georgia, 30350.

[2] Capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

(c) information learned from my research into market practices for similar companies and for companies in chapter 11, and (d) information I have received from members of the Debtors' management and the Debtors' other advisors. I am authorized to submit this declaration on behalf of the Debtors, and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

### Background and Qualifications

3. Huron is an international management consulting firm that employs approximately 1,417 full-time billable consultants with offices in 16 different cities. Huron offers a wide variety of services to its clients, including representing the interests of debtors, creditors and institutional investors in business restructurings and workouts both in and out of chapter 11. Huron also has extensive experience consulting chapter 11 debtors on executive and management compensation programs.

4. I hold a Bachelor of Arts degree from the University of Michigan. Prior to joining Huron in December 2005, I was an associate in the mergers and acquisitions department of Oxford Investment Group, a private investment firm. I have more than 14 years of experience in restructuring, reorganization, capital raising and interim management. I have experience in analyzing and developing management incentive plans for companies pursuing a chapter 11 restructuring. I am also a Certified Turnaround Professional and a member of the Turnaround Management Association, the Association of Insolvency and Restructuring Advisors and the American Bankruptcy Institute.

### Overview of the Chapter 11 Cases and the Debtors' Restructuring Initiatives

5. Faced with the near term prospect of inadequate liquidity to operate their businesses and unable to adequately address their cash needs outside of bankruptcy, the Debtors, with the support of their prepetition senior secured lenders (the "Lenders"), commenced these

chapter 11 cases to (a) pursue an expedited sale of all or substantially all of their assets, (b) transition employees, operations, and files that are critical to the residential mortgage industry in the United States to potential purchasers or their law firm customers, and (c) proceed with an orderly wind-down of their businesses, to the extent necessary. In furtherance of these objectives, the Debtors will file a motion with this Court in the upcoming days that seeks approval of bidding procedures for potential purchasers to bid for the Debtors' assets on an accelerated timeline. Because of the Debtors' strained liquidity position, the terms on which the Lenders were willing to authorize the use of cash collateral, and the absence of any available debtor-in-possession financing, the bidding procedures contemplate an expedited timeline that will require the Debtors to conduct extensive but accelerated marketing efforts, obtain Court approval of multiple sales transactions, and consummate these transactions on or before July 12, 2013.

6. On a parallel path, the Debtors' non-debtor affiliates, Cal-Western Reconveyance Corp., Cal-Western Reconveyance Corp. of Washington, and Reliable Conveyance Corp. (collectively, the "CWR Affiliates" and, together with the Debtors, the "Company") did not commence chapter 11 cases, and are instead pursuing a strategic transaction outside of chapter 11. I, along with the CWR Affiliates' boards of directors, Prommis' board of managers, and the other members of the Company's senior management team believe that a sale of the CWR Affiliates as a going-concern outside of chapter 11 will maximize value for all stakeholders.

**Necessity and Development of the KEIP**

7. I believe that the Company will only be able to meet the above-described ambitious milestones, while simultaneously maximizing value for its stakeholders and ensuring an orderly transition of employees and critical files, with the extraordinary efforts of its senior management team. These key employees are simultaneously undertaking the steep challenges of

the Debtors' restructuring initiatives while continuing to perform their normal job functions. Indeed, it cannot be disputed that these employees' tasks have become significantly more challenging since the commencement of these chapter 11 cases, and it is essential that they be appropriately incentivized at this critical juncture.

8. The Company is currently, among other things, negotiating three letters of intent with potential purchasers for certain of their assets, negotiating an asset purchase agreement with a potential purchaser for certain of the Company's assets, and quarterbacking a marketing process to ensure the Company achieves the highest and best value for its assets. Additionally, the Debtors are seeking to transition employees, operations, and files to a purchaser (or series of purchasers) and law firm customers, all while continuing to operate in the ordinary course of business and with the heightened scrutiny of real estate processors in the current regulatory climate. Consistent with the reputation for excellence that made the Company an industry leader in the default resolution sector, the Debtors will expend considerable efforts to seamlessly transition their operations and ensure that all critical files are appropriately handled so as to minimize any potential disruption to the residential mortgage industry.

9. Accordingly, I believe that a successful sale and wind-down process requires the Debtors' five-person senior management team (the "KEIP Participants"), the individuals who are best able to drive value for the Debtors' economic stakeholders, to be actively involved and appropriately incentivized. Each of the KEIP Participants has specialized knowledge of the Debtors' businesses and critical relationships with potential purchasers and key law firm customers that will be indispensible in negotiating a potential transaction or series of transactions. By devoting significant efforts to the Debtors' sale efforts and wind-down process,

however, the KEIP Participants are simultaneously sealing their fate—termination of employment with the Debtors.

10. As a result, Mr. Charlie T. Piper, the Company's Chief Executive Officer, with the assistance of the Debtors' advisors and with extensive input from Prommis' Board of Directors, designed an incentive plan that appropriately incentivizes management to manage the sale and wind-down process and drive value for the Debtors' stakeholders. The benchmarks for the KEIP stemmed from the Debtors' senior management team's good-faith estimate of what potential purchasers would pay for some or all of the Company's assets in a wind-down process and reflect the extraordinary risks presented by the Debtors' chapter 11 cases. The Debtors' senior management's good-faith estimate of what potential purchasers would be willing to pay for the Debtors' assets was based on the Debtors' recent efforts to market its assets and businesses.

11. I understand that prior to the Petition Date, the Company initiated discussions with four potential investors and purchasers to gauge interest in an acquisition of some or all of the Company's assets. As of the Petition Date, no potential purchaser expressed an interest in acquiring the Company's assets absent a significant due diligence period, burdensome financing contingencies, or requiring any potential transaction to contemplate acquiring the Lenders' secured claims at a significant discount to par. The indications of interest received, however, verified the Company's good-faith estimate of what a potential purchaser would pay for some or all of the Company's assets, accounting for the risks associated with any potential sale and wind-down efforts, including, among other things, that (a) mortgage servicers would stop referring volume to the Debtors and the Debtors' customers and (b) certain of the Debtors' law firm customers would immediately cease to perform their contractual obligations under their services

agreement. Since the Petition Date, I have reached out to 20 potential purchasers to gauge their interest in submitting a proposal to purchase some or all of the Company's assets. I believe that this group of consists of the most likely potential purchasers of the Company's assets.

12. Based on a review of, among other things, the Debtors' current operations and financial performance, market practices for similar companies and for companies in chapter 11, and information I received from members of the Debtors' management team and other advisors, I believe that the compensation contemplated by the KEIP is market-based compared to that for similarly situated employees at similar management levels.

13. Additionally, the KEIP was the product of extensive good-faith and arm's-length negotiations between the Debtors and the Lenders. The Lenders thoroughly vetted the Debtors' proposed incentive plan and demanded numerous revisions before offering their support. In my opinion, it is telling that the Lenders, who will ultimately bear the cost of the KEIP if the Debtors are successful in achieving their restructuring goals, believe that the KEIP is reasonable and will incentivize the KEIP Participants to maximize value for the Debtors' stakeholders.

## Overview of the KEIP

14. I believe the KEIP is calibrated to motivate the KEIP Participants to drive value for the Debtors' and the CWR Affiliates' stakeholders.

**I.   Eligible Participants**

15. I believe that the KEIP Participants are limited to those employees in senior management who possess intimate knowledge of the Debtors' businesses and who will be instrumental to implementing a successful sale, marketing, and wind-down process. The KEIP Participants include the following employees:

- The Chief Executive Officer;
- The Chief Operating Officer;

- The Chief Financial Officer;

- The General Counsel; and

- The Chief Technology Officer.

16. Without the diligent efforts of these employees, I believe the Debtors could not hope to expeditiously sell their assets and efficiently and effectively wind-down their business operations. Notably, the KEIP Participants will be most directly responsible for interfacing with potential purchasers of the Debtors' assets, coordinating the transition of employees, operations, and files, and quarterbacking the Debtors' wind-down efforts. In my opinion, the KEIP Participants are also most qualified to manage the Debtors' day-to-day operations and ensure the businesses continue to perform consistent with their past practices. Because the outcome of the Debtors' chapter 11 cases depends so heavily on these five employees, I believe it is essential that they be appropriately incentivized to drive value for all stakeholders and it is appropriate that they participate in the KEIP.

17. In order for a KEIP Participant to be eligible to receive a KEIP award, the KEIP Participant must waive all prepetition unsecured claims, including prepetition unsecured claims for severance, bonus or incentive awards, whether arising under such member's prepetition employment agreement, the Debtors' organizational documents, or other agreements; <u>provided</u>, <u>however</u>, that the KEIP Participants are not waiving any claims for indemnification, contribution, or reimbursement, whether arising under the Debtors' organizational documents or otherwise, or any right to payment the KEIP Participants may have under the Debtors' director and officer insurance policies, or any other insurance policy under which the KEIP Participants are covered.

## II. KEIP Award Payments

18. The KEIP awards are based on the amount of distributable value available to the Company's stakeholders after the Company's wind-down process is completed (the "<u>Distributable Value</u>"). By tying the amount of potential incentive awards to the total Distributable Value available and ultimately distributed to the Lenders, I believe that the KEIP aligns the interests of the KEIP Participants and the Debtors' stakeholders. The Debtors invested a great deal of thought into the best way to structure the KEIP, and I believe that the terms of the KEIP are reasonable and will fully and fairly incentivize the KEIP Participants.

19. The benchmarks and potential payouts under the KEIP are as follows:

- If Distributable Value is less than ▇▇▇▇ in the aggregate, the KEIP Participants will not be entitled to receive any incentive awards.

- If Distributable Value is equal to or greater that ▇▇▇▇ in the aggregate but less than ▇▇▇▇ in the aggregate, each KEIP Participant will be entitled to a lump-sum payment equal to 75% of such employee's (i) unpaid bonus under the Debtors' 2012 bonus program that was approved by Prommis' Board of Directors plus (ii) severance under the KEIP Participant's employment agreement (the "<u>Stretch Award</u>"). The total aggregate amount of payouts to the KEIP Participants if Distributable Value is greater than ▇▇▇▇ and less than ▇▇▇▇ would be $958,781.

- If Distributable Value is equal to or greater than ▇▇▇▇ in the aggregate, each KEIP Participant will be entitled to a lump-sum payment equal to 100% of such employee's Stretch Award. The total aggregate amount of payouts to the KEIP Participants if Distributable Value is equal to or greater than ▇▇▇▇ would be $1,278,375.

- If Distributable Value is greater than ▇▇▇▇ in the aggregate, in addition to 100% of the Stretch Award, each KEIP Participant will share in a management incentive bonus pool (the "<u>Bonus Pool</u>"). The Bonus Pool will be equal to 7.5% of the total Distributable Value in excess of ▇▇▇▇ (the "<u>Bonus Pool Award</u>"). Each KEIP Participant's Bonus Pool Award will be determined by the Debtors' Board of Directors.

20. The KEIP Participants' award payments, to the extent earned, will be paid on the later of (a) July 12, 2013 and (b) distribution of the first ▓▓▓▓ of Distributable Value (net of KEIP awards) to the Lenders. For the avoidance of doubt, KEIP Participants must be employed on the date of payment unless a KEIP Participant is terminated without cause or resigns for good reason based on a "Change of Circumstances" (as defined in such KEIP Participant's employment agreement).

21. Based on my experience working with chapter 11 debtors, it is my belief that the criteria upon which the KEIP awards are calculated, which represent the aggregate amounts to be paid if earned at the Stretch Award under the KEIP are (a) fair and reasonable and (b) comparable to incentive plans offered to key employees by debtors of similar size in similarly situated chapter 11 cases.

22. Furthermore, it is my belief that the KEIP is primarily incentivizing and will serve to motivate the KEIP Participants. As discussed above, there is no guaranty of success in these chapter 11 cases. Pursuant to the *Stipulation and Agreed Interim Order Authorizing the Debtors' Use of Cash Collateral* [Docket No. 30], the Debtors must operate within a specified and agreed upon budget and meet certain milestones with respect to consummating a sale of the Debtors' assets as well as the CWR Affiliates' businesses. If the Debtors should fail to meet any of these milestones, it is quite likely the Debtors will be forced to convert these chapter 11 cases to a liquidation proceeding under chapter 7 of the Bankruptcy Code. Additionally, certain of the Debtors' law firm customers have ceased to perform their contractual obligations under their services agreement with the Debtors further constraining the Debtors' liquidity position.

23. While the Debtors have made significant progress in pursuing potential sales of assets since the Petition Date, they have not achieved any binding agreements, let alone

consummated any sale. Based on the Debtors' recent marketing efforts and my marketing efforts to date, I believe that the targets set forth in the KEIP are challenging, appropriate, and a stretch. The KEIP Participants awards grow in-step and proportionately with the recoveries the KEIP Participants work to bring into the Debtors' estates, and therefore clearly provide the intended incentive effect contemplated by the KEIP.

24. The KEIP Participants are aware that at the conclusion of these chapter 11 cases, their employment with the Debtors will be terminated. It is my belief, however, that the KEIP and its incentive structure transforms this pivotal moment for the Debtors from a time when the KEIP Participants could bide their time and "punch the clock" waiting for the end into an opportunity to motivate the KEIP Participants to maximize value for all stakeholders and step up to the challenge. As the KEIP Participants strive to increase value and implement a smooth transition of employees, services, and files on an accelerated timeline that will inure for the benefit of all stakeholders, they will be afforded the opportunity to be rewarded accordingly and appropriately.

25. For all of these reasons, I believe that the KEIP and the benchmarks and payments contemplated thereunder, is an appropriate exercise of the Debtors' business judgment, and is appropriate under the facts and circumstances of these chapter 11 cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  April 9, 2013                                  */s/  Jeffrey M. Beard*
                                                                        Jeffrey M. Beard
                                                                        Managing Director
                                                                        Huron Consulting Services LLC
                                                                        900 Wilshire Dr.
                                                                        Troy, MI 48084